Exhibit C

IN THE SUPREME COURT OF DELAWARE

DEVEARL L. BACON )
Appellant/Defendant )
Below )
)
)
V. )
State of Delaware )
Appellee/Plaintiff )
Below )
)

You might have to file this as is.

Court of The State of Delaware and for New Castle County

ON APPEAL FROM THE SUPERIOR COURT OF THE STATE OF DELAWARE IN AND FOR NEW CASTLE COUNTY

Appellant's Opening Brief

Loren C. Meyers, Esq.
Dept. Of Justice
820 N. French St.
Wilmington, Del 19801

January 20, 2006

Devearl L. Bacon
#291242
D.C.C.
1181 Paddock Rd.
Smyrna, Del. 19977

TABLE OF CONTENTS

| | PAGES |
|---|---|
| Table of Authorities | iii – VI |
| Nature and Stages | i – 3 |
| Opening Arguments | i – ii |

Arguments:

I. Prejudicial Joinder Of PDWFF (Prior Crime Evidence) Offenses Violated Due Process, And Caused Irreparable Damage Prejudicing Defendant's Right to a Fair Trial _____ 6-1

II. Prejudicial Joinder of Charges Committed At Four Separate And Distinct Time And Locations Severely Prejudiced Defendant's Right to a Fair Trial _____ 11-21

III. Ineffective Counsel for Failure to Object to Introduction of Prior Bad Acts, or Request A Hearing (404) under DeShields v. State Del. Supr. 706 A.2d 502 _____ 21-27

IV. IN-COURT IDENTIFICATION OF DEFENDANT BY STATE WITNESS DAWN SMITH VIOLATED DEFENDANT'S Right To A FAIR TRIAL, WHEN THERE WAS NO "INDEPENDENT ORIGIN" FOR-

this "IN-Court" Identification.

Defense Counsel was Ineffective for his

failure to raise this issue on Direct Appeal_____ 28-33

V.   Ineffective Assistance of Counsel for.
      failure to raise The Amendment to
      Defendant's Indictment Counsel Argued
      prior to Trial. Defendant is prejudiced
      because he would have had more favorable
      Review on Direct Appeal._____ 33-37

VI.  Prosecutorial Misconduct; Ineffective
      Assistance of Counsel for Failure To
      Identify and Raise this Super. Ct. Crim.
      Rule 16.(A)(d) Discovery Violation Concerning
      a videotape made of Defendant's Statements
      At police station, either during trial or on
      Direct Appeal._____ 37-44

Conclusion _____ 44-45

*✱  Note: All End Notes and Exhibits Are in Accord.

TABLE OF AUTHORITIES

PAGES

Sexton v. State, 397 A.2d 540 (Del. 1977) _____ 7

State v. McKay, 382 A.2d 260 (Del. Super. 1978) _____ 7, 25

State v. Wais, 591 A.2d 591 (Del. Super. 1987) _____ 7

Flonnery v. State, 778 A.2d 1044 (Del. 2001) _____ 8, 26

Bullock v. State, 775 A.2d 1043 N.4 (Del. 2001) _____ 9, 28

Howard v. State, 549 A.2d 692 (Del. 1988) _____ 9, 26

Wooters v. State, 625 A.2d 280 [5] (Del. 1993) _____ 9

Major v. State, 1995 WL 236658 (Del. Supreme) _____ 9, 26, 33

State v. Dorsey, 2001 WL 1079013 (Del. Super) _____ 9, 26

Sawyer v. State, 634 A.2d 377 N.4 (Del. 1993) _____ 9

Zimmerman v. State, 565 A.2d 887 _____ 9

Getz v. State, 538 A.2d 726 (Del. 1988) _____ 9, 14, 23, 27

DeShields v. State, 706 A.2d 502 (Del. 1985) _____ 9, 13, 14, 26, 27, 42

Allen v. State, 644 A.2d 982 (Del. 1984) _____ 9, 13, 27

Milligan v. State, 761 A.2d 6 N. 6, 7 (2000) _____ 9, 26

Cobb v. State, 765 A.2d 1252 (2001) _____ 9, 26

Wiest v. State, 542 A.2d 1193 (1988) _____ 10, 14

Berryman v. Morton, 100 F.3d 1089 (3rd Cir. 1996) _____ 10, 14

PAGES

Strickland v. Washington, 466 US 668 (1987) _____ 10, 21

Wiggins v. Smith, 539 US 510 (2003) _____ 10

Williams v. Taylor, 529 US 391 (2000) _____ 10, 21

Woodford v. Visciotti, 537 US 19 (2002) _____ 11, 10, 21

Drew v. US, 331 F 2d 85 N. 12 _____ 11, 14, 15, 16, 17

Pointer v. US, 151 US 396 (1894) _____ 11

McElroy v. US, 164 US 76 (1896) _____ 11, 15

O'Conner v. State, 577 A. 2d 754 (1990) _____ 11, 12, 15

Pope v. State, 632 A.2d 73 N. 6, 7, 8 (1993) _____ 12

Coffield v. State, 794 A. 2d 588 (Del. 2002) _____ 12, 17, 18

Younger v. State, 496 A. 2d 546 (1985) _____ 12

McDonald v. State, 307 A. 2d 796 (1973) _____ 12

Bantum v. State, 85 A. 2d 74 (Del. 1952) _____ 12

Gates v. State, 386 A. 2d 1139 (Del. 1978) _____ 12, 18

Farmer v. State, 698 A. 2d 949 (1997) _____ 13, 14

Huey v. State, 689 A. 2d 1177 (1997) _____ 14

Jenkins v. State, 230 A. 2d 262 (1967) _____ 18

US v. Gray, 878 F. 2d 702 (5th Cir. 1989) _____ 19

Deluca v. Lord, 77 F. 3d 578 (2nd Cir. 1996) _____ 19

US. v. Myers, 892 F. 2d 642 (1st Cir. 1990) _____ 19

US. v. Yizar, 956 F. 2d 230 (11th Cir. 1992) _____ 19

Williams v. Washington, 59 F.3d 673 (7th Cir. 1995) _____ 19

Lyons v. Cotter, 770 F. 2d 529 (5th Cir. 1985) _____ 19

US. v. Valenzuela-Bernal, 458 US. 858 (1982) _____ 21

Vela v. Estelle, 708 F. 2d 954 (5th Cir. 1983) _____ 21

Holtzman, 718 A. 2d 528 _____ 24, 26

Johnson v. State, 550 A. 2d 903 _____ 24, 40, 41, 42

Scott v. State, 642 A. 2d 767 (Del. 1994) _____ 27

Manson v. Brathwaite, 432 US. 96 At 122 (1977) _____ 28

Nails v. State, 560 A. 2d 1038 (Del. 1989) _____ 28

Niel v. Biggers, 409 US. 188 _____ 28

US. v. Willis, 759 F. 2d 1486 (11th Cir. 1985) _____ 31

Gilbert v. US, 388 US 263 (1967) _____ 31

Johnson v. State, 711 A. 2d 18 (1998) _____ 34, 36

Bacon v. State, No. 369, 2001 (Del.) _____ 34

Williamson v. State, 669 A. 2d 95 (Del. 1995) _____ 34

Mallory v. State, 462 A. 2d 1088 (1983) _____ 34

State v. Minnick, 168 A. 2d 93 (1960) _____ 34, 36

Pages

Roberts v. State, 1992 WL 231269 (Del.) _____ 34, 35

O'Neal v. State, 691 A.2d 50 (Del.) _____ 35

State v. Deedon, 189 A.2d 660 (1943) _____ 35

State v. Green, 376 A.2d 424 (1977) _____ 35

Johnson v. US, 613 A.2d 1381 (D.L. App. 1986) _____ 35

Harley v. State, 534 A.2d 255 (Del. 1987) _____ 36

Robinson v. State, 600 A.2d 356 (1991) _____ 36

CONSTITUTION AUTHORITIES

Article 1, Section 8 (Del.) _____ 34

STATUTES AND RULES

Super. Ct. Crim. Rule 7(=) _____ 34

Superior Court Crim. Rule 16(A)(d) _____ 40, 41, 42

DRE

401; 403; 613 (b)(2) _____ 23

402, 404 _____ 3

404 (A)(1) and (B); 608 (A) _____ 22, 23, 27

803 (6)(8) _____ 40

Defendant (Appellant) was originally indicted on 24 separate, and distinct criminal offenses that alleged He violated Sections of the Del. Criminal Code between June 21 and 22, 2000. There were four sets of charges that alleged violations at three different locations in New Castle County. Of these four sets of charges, two sets alleged the same location, but on two separate dates.

Specifically, NONE of these indictments contain any written language alleging, "A pattern of criminal behavior.", and also Noteworthy, Absolutely NO language in any of the 24 indictments that state, or is meant to infer, "that the offenses comprising of a common scheme or plan, occurring over a two-day period, Nothing what so ever.".

The first five indictments where dropped against the Defendant by The State because the evidence was deemed much too weak against Defendant to proceed to trial. In fact this Gulf Station (Dupont Highway #13) evidence Alleged to have been part of the Video Tape evidence, the Video Tape that stays on the entire time a suspect is held in Wilmington Police Station process and interview area, was allegedly taped over by the detective in charge of this investigation. This video tape that contained Miranda's warnings allegedly read to Defendant at 2:30 (exhibit B) and any of the detective's comments or Defendant's Answers from 2:13 am At time of arrival until Defendant was

Defendant was unaware that his trial counsel entered into a "stipulated agreement," for him,[87] with the State[88] regarding defendants prior criminal "status" to be brought in front of his jury. This stipulation undermined defendant's case. Defense counsel acted without defendant's "knowledge" in waiving defendant's rights to a separate trial on the PDWPP counts. It should be noted that as of the time of this writing, Counsel Hillis nor the State has provided defendant with a copy of Mr. Hillis affidavit in his response to this claim. We are left "without a clue" as to Mr. Hillis response to ground one as to whether his affidavit properly states: the date, time and location of Hillis "consultation" with the defendant, or the nature and extent of counsels "explanation" as to what counsel actually "told" defendant or "explained to defendant so defendant could make a "knowingly, voluntarily and intelligently" made choice in this matter.

The introduction of the stipulation was an unreasonable decision made by counsel. It was deficient performance that introduced evidence that had absolutely no strategic or tactical value unless defendant is taking the stand. But, it was already agreed before trial that defendant would not be taking the stand. Refer to: June 21, 2001 T.T. pgs. 53-54.

> Mr Hillis: "I speak with all my clients as I did with mr. Bacon some times in advance of the beginning of the trial about the decision to testify . . . I did give him my advice. And it's my understanding that based on our decision and his understanding of his rights, he's elected not to testify. That's consistent with the advice I gave him." Id.

> The important issue here is not "whether" defendant made this stipulation but "why," on earth was it made?

Defendant asserts this stipulation but "why," on earth was it made? Defendant assets this stipulation is a "mistaken waiver" of his rights. It was not done "knowingly," and it was not done "intelligently" because defendant did not know about it, and it was not "explained" to him in order to make a "voluntary" choice in the matter. Counsel never explained the harmful effects of such a stipulation when defendant does not take the stand. The prejudice asserted is in the record and in the State's Response, which highlights this: "In asserting this claim, the defendant fails to recognize that defense counsel secured a stipulation from the State . . . . You [the jury] must accept these facts as true for the

---

[87] See Affidavit Exhibit A. Before this one research defendant did not even know "what" a stipulation was. Counsel never explained it to him.

[88] This stipulation was revealed in the States Response to this issue.

Removed and placed in lock-up. Defendant (Blackmon, however) discuss before trial; that State Attorney is flatly cheating Defendant's Reprieve from the (Department of Corrections) Howard Center, Mr. Lugg tactically and purposely cites this harmful evidence English. Defendant swears his counsel, Mr. Hillis, DID NOT EVER EXPLAIN ANYTHING regarding the so plea or agreement that was made between his Counsel and the State Attorney. (Mr. Edward M. Hillis Public Defender)

## RULE 61 PROCEDURAL STANDARDS

There are no procedural bars to Defendant's Six Grounds. This is His first Post Conviction Motion filed under Rule 61. This Motion was filed within three years of the finalized Order of D's Direct Appeal concerning the Amendment to Indictment Count XX. (Recently supplied to Defendant via State's Response exhibit.) Since all Six of Defendant's claims ASSERT Ineffective Assistance of Counsel they are not subject to the procedural default rule, See Rule 61(i)(3)(A) in part, because the Delaware Supreme Court will not generally hear such claims for the first time on direct Appeal unless the claim is Adequately raised in the lower Court. This Satisfies the "external impediment", as the United States Supreme Court Explained in Murray V. Carrier, 477 U.S. 478 (1986).

In add to the above Rule 61(i)'s (A) and Rule 61(i)(4) (For The Amendment Issue) Grounds one through four and six, assert "A Mistaken Waiver" of fundamental Rights that fall into the Narrow Miscarriage of justice that undermined the fundamental legality, reliability, integrity or fairness of proceedings, Rule 61(i)(5) except as (Webster V.

State, 604 A.2d 1329 Del. 1992. The Defendant has claimed that Counsel's "failure to identify" issues in Ground One "Pre-Trial, During Trial and [Failure to] Raise on Direct Appeal, effective', States "A mistaken waiver, three of them, on those issues. Ground Two consists of the same three mistaken waivers, on the Set of issues. Ground Three explains "A MISTAKEN WAIVER" caused by Counsel's failure to object to introduction of Prior Bad Acts and His failure to request a hearing to determine "even if" they were permitted "a limiting instruction" regarding the relevance of those Bad acts be given to the jury. Ground Four explains "A mistaken waiver" caused by Defendant counsel in His failure to raise this issue on Direct Appeal, concerning confrontation. Ground Six concerns a Due Process issue, "A mistaken waiver caused by Counsel's failure to develop facts at trial, and raise this issue on Direct Appeal, as Brady Material, among others. Rule 61(i)(5) provides for post-conviction issues which have not been previously litigated, where the procedural default was not caused by ineffective assistance of Counsel. Finally, because defendant has raised the issue that "the factual basis" at argument in His Post-Conviction Ground Five is "An important change in the circumstances" then the issue previously poised this opens the gate to this procedural bar, notwithstanding the equitable concern of preventing injustice may trump this procedural bar. At Rule 61(i)(4) as well.

Defendant requests that This Court note this distinction concerning the review of His Claims that His Counsel may have been the cause of these mistaken waivers, because it certainly was not defendant's fault, "as He has clean Hands" and should not have endured or bear the formably stricter of review under Strickland's prejudice prong. This distinction of the different review standard is rarely noted and it is Defendant's belief that The Courts of The State tend to gravitate toward. Apparently the Strictest standard here is Rule 61(i)(3) the prejudice prong, formulated toward full, bright(s)(a)'s claims of Ineffective Assistance of

Cannot, go beyond, just to meet, but defendant does not have to meet + have to go beyond, just meet the two prong test set forth in Strickland.

## FACTS

On June 20, 2000, at 9:30 pm. An unidentifiable person walked into busy Star Liquors Store, Route 9, New Castle Ave. According to eye witness this person had a gun, wearing a blue bandana, blue or dark hooded jacket, 18 to 25 years old, was either 5 feet tall or 5 feet 11 inches tall, was either thin or medium build, weighted either 115 or 175 pounds, had dark skin, dark brown or dark black skin or dark-complected, and was wearing gloves.

At 11:00 pm., June 22, 2000, a person walked into Star Liquors, with green raincoat with hood around face, facial hair, and was about 5 feet 6 inches or 5 foot 8 inches tall and 165 to 175 pounds. This person was unable to get anything because the Clerk Gina Harris Refused his demands.

At 11:15 pm. June 22, 2000 a person walked into the Route 13, 7-11 Store, Dupont Hwy, wearing either All black or a black bandana, or a green scarf, a windbreaker with hood. This persons described by these four witnesses being either REALLY black, dark skinned, or not real light skinned, but light brown complected. This person height was between 5 feet tall to 5 feet 8 inches tall, weighed about 100 to 175 pounds.

* Appellant will show all of these Above suspects are different.

* There was no identification until Trial started when Leon Smith was called.

Legally, you can not use one one crime evidence to prove another Crime. And, particulary, an inference must be based on a proven fact. There are no proven facts proving Defendant was at either Star Liquors or 7-11. There is no direct or circumstantial evidence that proves Defendant possessed the gun Legally.

Defendant will now present Arguments supporting the Prejudicial effects he suffered as a result of the deficiencies in his Trial.

ARGUMENT'S I AND II

Argument I. (Pages 6-11)

Prejudicial Joinder of PDWIP (Prior Crime Evidence) Offenses Violated Due Process, and Caused Irreparable Damage Prejudicing Defendant's Right To A Fair Trial.

STANDARD AND SCOPE OF REVIEW

Whether Superior Court Abused It's Descretion In It's Denial of Appellant's Argument I, The Court Stated " Defense Counsel Asserts In His " Affidavit that the stipulation protected " Defendant by preventing the jury from learning " the details of His prior criminal convictions. " This assertion is correct ". (See Decision pg. 6)

Argument II. (Pages 11-21)

Prejudicial Joinder of Charges Committed At Four Separate and Distinct Time and Locations Severly Prejudiced Defendant's Right to A Fair Trial.

STANDARD AND SCOPE OF REVIEW

Whether Superior Court Abused It's Discretion In It's Denial of Appellant's Argument II, The Court Stated "Thus even if Defense Counsel " have move to sever, the Motion would no doubt " have been Denied. (See Decision pg. 7)

Appellant will now present Arguments I and II ;

purposes of this trial . . . . Defendant, by virtue of his "prior convictions," achieved the "status" of a person prohibited from possessing a firearm.

While a stipulation of this type may have been desirable for a defendant who takes the stand and testified, where an exposure of his prior bad acts and convictions are permitted to be raised in front of the jury, "a choice" to be made by defendant as to whether to testify on his behalf or not, is the distinguishing factor here in this instant case as it was a distinguishing key fact in Sexton v. State.[89] Sexton is not on point on this issue. State v. McKay[90] points out

> [t]he presence of two charges in the indictment which create issues of particular prejudice [ ] Escape
> After Conviction and [ ] Possession of a Deadly Weapon by a Person Prohibited Evidence presented to
> support these charges conveys to the jury the defendants prior criminal record and status as a
> prisoner. Neither of these charges has a "direct relationship" to the other offenses and can be proven
> without reference to the remaining offences. Id. at 262-63 (emphasis supplied)

Counsel knew defendant was not taking the stand unlike Saxton supra who elected to take the stand and be exposed to DRE 607 and 609(a) impeachment by evidence of convictions of a crime. When a defendant "chooses" to testify his convictions for a felony could be brought out for impeachment purposes[91] the difference between a PFDCF and a PDWPP is that while a PFDCF is permitted (it is a "dependent" felony), a PDWPP is required to be severed because it required "evidence" of defendants past convictions to prove this offense element, to come before the jury.

We are left "scratching our heads" here wondering how and most importantly "why" was the stipulation made by defense counsel in this particular case circumstances. "[D]efendant [is] not satisfied that the stipulation appropriately shielded the jury from his prior convictions." The State "downplays" the significance of the "speculation" that this jury (albeit, an uninstructed jury as to the 'limited purpose" of this stipulation) would, and was given "free-rein" to imagine "what" the nature of the prior crimes defendant committed to where it waqs a felony charge to merely "possess" or even "control" a gun through another person. In fact, the State used this evidence as a launching pad" to introduce other highly prejudicial evidence to reel in front of the jury," of other prior irrelevant actions and "bad

---

[89]Sexton, 397 A.2d 540 of 541 (Del. 1979); Sexton testified at his trial the Court noted this.
[90]McKay, 382 A.2d 260 at 262-63 (Del.Super. 1978)
[91]Accord. State v. Wails, 541 A.2d 591 (Del.Super. 1987); Desmond v. State, 654 A.2d (Del. 1994)

acts,"[92] evidence. Specifically, even this Court recognized that evidence of defendants prior convictions was brought to the attention of this jury during trial. See June 20, 2001, T.T.pgs. 110-113.

> The Court: Okay. The other point I wanted to make is that they [the jury] are going to know he's [the defendant] a person prohibited because he stipulated to that.
> Mr. Hillis: That's absolutely true, Your Honor.
> The Court: And so given that fact, if somebody should know what the Plummer Center is, I don't find it prejudicial in context with a person prohibited. Id. at 113 (emphasis supplied)

And, despite the States contention that "the defendant" was "satisfied" that the jury would "be shielded" from his criminal record is curious since the record does not reflect defendant "knew" or had "knowledge" of this stipulation, therefore, defendant could not be satisfied." In fact, the State deliberately choose to "notify" the jury of defendants "status" within the first five minutes of the trial in the opening statement. See June 19, 2001, T.T.p.6. "And finally, people for various reasons are prohibited from possessing a firearm in this Sate. The defendant was 'one of these people.' He possessed a gun and that's a crime."

A felony charge is a very serious offense. This "shield" was a rather "transparent shield" to be sure. Consider the wording of this stipulation itself.[93] This stipulation allows "speculation" by the jury as to what "evidence that the defendant was a person prohibited by law from owning a firearm, and the jury instructions concerning the "elements" of these charges further emphasis this "status." Particularly, prejudicial because a limiting jury instruction was not given regarding this prior crimes evidence.[94]

The ruling that this Court made supra refusing to grant a mistrial because specifically of this "stipulation" because of the assumed prejudice resulting in the reference by sate witness to defendants prior incarceration as being "released" from the Plummer Center,[95] evidence of defendants prior criminal status. This is similar to the circumstance in Flonnery[96] where the jury was exposed to a remark of "an unspecified felony." Twice, the jury was "left to speculate"

---

[92] DRE 402, 404(a)(b); See Moorhead v. State, 638 A.2d 52, 56 n.4 (Del. 1994) "Evidence of prior acts is not admissible simply because evidence of other acts has been introduced... unless it is relevant, probative, clear, and not unfairly prejudicial."
[93] See 6-21-01 T.T.pgs. 52-53
[94] This will be discussed infra.
[95] See 6-20-01 T.T.pgs. 110-113
[96] Flonnery v. State, 778 A.2d 1044, 1056 n.5,6(Del.2001); See also Loper v. State 637 A.2d 827 (Del.1994)

the nature of defendants criminal background without either a "cautionary," or a "limiting" jury instruction given to the jury instructing them to disregard the "release from Plummer Center," and, to "limit" the jury's fact-finding concerning the stipulation evidence, as required to be given by this Court.[97] Prior "crimes" evidence "limiting" instructions are mandatory since 1988. Howard v. State.[98] The distinction between "discretionary" and "mandatory" jury instructions is explained in Wooters v. State[99] as distinguishing mere "bad acts" to "uncharged criminal behavior," as in Howard supra. A further distinguishment is made between "cautionary" instructions and "limiting" instructions. See Major v. State.[100] Defense counsel in order to claim "strategic or tactical waiver," this "waiver" must be present on the trial record. State v. Dorsey[101] even if it is a "cautionary" instruction. Sawyer v. State.[102] These instructions are required to be given sua sponte by the Court as the evidence dictates. Bullock supra (citing Zimmerman v. State).[103]

　　　　Additionally, counsel's performance was deficient in his failure to request "cautionary" and "limiting" instructions as required under Getz v. State,[104] DeShields v. State,[105] Allen v. State,[106] Milligan v. State,[107] and Cobb v. State,[108] that the jury should be carefully instructed regarding the "limited purpose" for which this type of bad acts, prior acts, or prior crimes evidence is introduced. Indeed, the Delaware Supreme Court in Major supra explains that, the strategic usage of limiting instructions are so the jury understands that the bad acts given in evidence they obviously heard is given a limited use for their fact finding mission. Id. See Also DRE 105.

　　　　There is no evidence in the complete trial record any such instructions were given, or even requested, by counsel, or this Court.

---

[97] Bullock v. State, 775 A.2d 1043 n.4(Del.2001)

[98] Howard ,549 A.2d 692, 694-95 (Del.1988)(after Weber "expanded the scope" to uncharged crimes)

[99] Wooters, 625 A.2d 280("5) (Del. 1993); O'Conner v State 1990 WL725006(Del.Supr.)

[100] Major, 1995 WL236658 (Del. Supreme)

[101] Dorsey ,2001 WL1079013 (Del.Super.) Absence of ruling on record; Holtzman v. State 718 A.2d 528(1998)

[102] Sawyer, 634 A.2d 377 n.4 (Del. 1993)

[103] Zimmerman, 565 A.2d 887, 890 (1990)

[104] Getz, 538 A.2d 726, 734 (Del. 1988) landmark case for Howard supra.

[105] DeShields, 706 A.2d 502, 507 (Del. 1998) explains Getz analysis to be performed.

[106] Allen, 644 A.2d 982, 984-85 (Del. 1994) (relevance)

[107] Milligan 761 A.2d 6 n.6,7 (2000) Court must limit juries consideration of other bad acts by specific instructions.

[108] Cobb, 7.65 A.2d 1252, 1256 (2001)

Regarding the State's Response to defendants prejudice claim on this issue, "[c]learly the possession of the firearm was part of the same transaction," is another example of the State's general tenure toward this case. One of unfairness. It's well established in this Courts holding in McKay supra at 262-63, that a PDWPP does not have a direct relationship to the other offenses of this same exact nature, and can be proven "without reference to the remaining offenses. Id. The prejudice the defendant may suffer is cited in Wiest v. State, (citing McKay supra) and has been described in the following terms:

> (1) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find; (2) the jury may use the evidence of one of the crimes to infere a general criminal dispostion of the defendant in order to find guilt of the other crime or crimes; and (3) the defendant may be subject to embarrassment or confusion in presenting different and separate defenses to different charges. Id. (emphasis added)

The essence of this ground issue is that defendant's counsel's deficient performance that fell below the objective standard of reasonableness caused this prejudicial error. There was no reasonable tactical or strategical value concerning the circumstances of defendants trial that made this stipulation "sound" trial strategy.[109] This unprofessional error was magnified by counsels (and Courts) failure to provide limiting jury instructions to limit the scope of this evidence to only that of the three PDWPP. Counsel's professional judgment was outside the wide scope of professional reasonable representation falling below an objective standard of reasonableness in the totality of these circumstances[110] knowing defendant was not taking the stand "before" trial. Defense Counsels failure to move for severance of these charges particularly in light of the well established McKay decision that explains the "exception" for these particular charges was unreasonable and unprofessional for failure to investigate this clearly favorable avenue of relief.[111] Defendant was denied a fair trial, a result that was unreliable,[112] and there's a reasonable probability that the outcome of the proceedings would have been different but for counsels unprofessional errors.[113] (As this Court noted in

---

[109] See Berryman v. Morton, 100 F.3d 1089 (3rd Cir. 1996)(unreasonable trial strategy)
[110] Strickland v. Washington 466 US 668, 687-88, 690 (1987)
[111] Wiggins v. Smith, 539 US. 510 (2003); Williams v. Taylor, 529 US 362 (2001)
[112] Strickland, 466 US at 687
[113] See Williams v. Taylor, 529 US at 391-92 (Clarified earlier exceptions explained in Nix and Lockhart cases should be narrowly applied.

denying the motion for a mistrial). To prove prejudice the defendant must establish a reasonable probability that the result of the proceeding would have been different. Strickland at 692. The United States Supreme Court rejected the prepostion that defendant must prove [the higher standard] "more likely than not" that the outcome would have been altered. Id. See also Woodford v. Visciotti.[114]

Had Mr. Hillis not introduced this "stipulation" there is a reasonable probability that this court would have rules favorably on the mistrial motion. More importantly, defendants prior criminal convictions and prior status as a convicted felon would not have been before this jury.

Argument For Ground Two:

The State's Response to ground two's joinder is conclusionary in that the State does not provide any legal authority explaining Rule 8(a)'s four requirements elements, or definitions of what circumstances constitute, "the same or similar character" of a robbery offense. The character of the Star Liquorers and 7-11 robberies is discussed above in "facts" section supra and is explained in Drew[115] supra at 92-93 n.12. The State does not explain or provide any legal authority defining what "actual circumstances" provide the relevant evidence to constitute parts of "a common scheme or plan." This is explained in Drew at 90 (citing Pointer v. U.S. 151 US 396 (1894)[116] and McElroy v. US 164 US 76 at 79-80 (1896)[117] and O'Conner v. State[118] where our State Supreme Court describes the "common scheme" exception as involving either:

(1) prior acts which are so unusual and distinctive that their relationship may establish identity,[119] or

---

[114] Woodford v. Visciotti, 537 US 19, 22-23 (2002)
[115] Drew v. U.S. 331 F.2d 35 at 92-93 n.12 (a detailed exposition of the facts is necessary review the actual facts of the hold-up-clothing really doesn't go toward "similarity" nor does the fact of vicinity. The "same or similar character" analysis is how the clerks were asked for the money and the robbers actions. A fundamental difference between the persons contemplating crimes of this character would be the degree to which each was prepared to use force to achieve his objective. Thus, the testimony about the use of the pistol in one case where it was shot twice, and the use of the pistol in the other case takes on an "enchanted significance.")
[116] Pointer 151 US 396 (1894) The S.Ct. addressed a joinder involving a defendant with four counts involving murder of two people on same day, at the same place, with the same kind of instrument was not prejudiced by joinder, because the proof of each crime would have been relevant in a separate trial of the other.
[117] McElroy, 164 US 76 at 79-80, 17 S.Ct. 31 at 32 (1896) states the basic three factors. "In a matter of being held out to be a habitual criminal, in the distinction of the jury or otherwise. "[W]e do not think the statute authorizes the joinder of distinct felonies not provable by the same evidence and in no sense resulting from the same services of acts." Ibid.
[118] O'Conner, 577 A.2d 754 (1990)
[119] Drew supra at 89, 90, 92 (a detailed exposition of the facts to the robbery is necessary)

(2) where the other acts form part of the background of the alleged act, to which it is inextricably related and without which a full understanding of the charged offense is gained. Id. (citing Getz supra 538 A.2d at 733. The Getz Court held that the State could not use "common scheme" exception to introduce evidence of fathers prior sex relations with his daughter because prior acts were isolated events in time depicting no common plan other than multiple instances of sexual gratification. ibid.)

The State concludes that the record supports a legal finding of a "focused time frame," a "similarity of offenses" and "offender descriptions" establish the charged crimes as constituting a common scheme or plan. The premises supporting the State's conclusion are fatally flawed in the following respects. The robberies were committed in a two day period at different times of the day. This is not a "focused time frame" the Supreme Court is concerned with. The focused time frame[120] in O'Conner specifies in part two of the formulas are explained in part, "to which [the other acts] [are] inextricably related and without which a full understanding of the charged act is gained." Id. See Getz at 733; Pope v. State.[121] Analyzing the States legal authority being Coffield v. State[122]specifically as to the focused time frame, the Sate does not tell us that Coffield's robberies were committed"all three in the same morning." The relevance of this is that Coffield's case rests its holding on Younger v. State[123] where the focused time factor material to that holding was specifically attributed to rapes that occurred at about the same time of day, in the same neighborhood, but the Court made it clear that because Younger confessed and linked himself,[124] this being a necessary element of the Younger Court's holding just as the "consistent" exquisite detailed descriptions of Coffield by the victims were a key element in Coffield's holding. Younger supra rests on McDonald v. State[125] and McDonald rests on Bantum v. State.[126] And Bates v. State[127] cited in Coffield, circumstances consisted of a murder and attempted murder within minutes, in the

---

[120]In O'Conner, defendant admitted to opening the doors of two other rooms. Other witnesses testified O'Conner fled each time when they opened the door. This was evidence of similar pattern and closely intertwined in time (within minutes). Another key factor in allowing this evidence was consideration given to fact that defendant was not accused of any other crimes, only opening doors, thus it was unlikely that the jury would seek to punish for merely opening doors. FINALLY the Court did give a limiting instruction immediately to jury "limiting" the use of this evidence to only that of evidence showing a common scheme or plan.

[121]Pope, 632 A.2d 73 n.6,7,8 (1993)(explains intertwining evidence circumstances)

[122]Coffield, 794 A.2d 588 (Del. 2002)

[123]Younger, 496 A.2d 546, 550 (1985)(distinguished in that Younger confessed linking himself to these crimes)

[124]A key factor as in O'Conner, supra.

[125]McDonald 307 A.2d 796, 798 (Del. 1973) circumstances of murder of a mother and the daughter raped a couple hours later, in same house on the same day. The evidence was so inextricably intertwined as to make proof of one crime impossible without the other.

[126]Bantum, 85 A.2d 741 (Del. 1952) circumstances of two victims in the same house, hours apart, on the same day. Accord Pointer v. US, 151 US 396 (1894)(same place, same day)

[127]Bates, 386 A.2d 1139 (Del. 1978)

same place on the same day. Based on well established legal authority in all cases but one, the crimes occurred within minutes or hours, on the same day, at the same place. The only exception was Younger, but this was still at the same time of day, in the same neighborhood with the confession as a distinguishing feature, as to the linkage element.

Contrasting this instant case facts, whereas the robbery of the Star Liquors was late afternoon-early evening and the 7-11 robbery was late night a different time, on a different day, at a different location. The State's conclusion as to the focused time frame concerning the crimes that defendant got convicted of, is incorrect as a matter of law in their formulation, considering the relevant factual circumstances in this case. Even if, and attempt is made to "enlarge the focus" of the time frame element, the first evidentiary gate the State must overcome in the focused "time frame is RELEVANCE." "Remoteness is not a concern, relevance is," as our State Supreme interpreter of laws authoritatively scolded this Court and the State in 1994 in Allen v. State.[128] This determination is made by the Court when evidence is proffed. See DRE 402; Farmer v. State.[129] Evidence must have independent logical relevance to the issue of ultimate fact in the case-in-chief. DeShields v. State.[130] The Supreme Court ruled that the State cannot prove the charged crime by proving another crime against the victim because there was no independent relevance. See Taylor v. State (explaining) and, this DRE 402 relevancy ruling must appear on the record supporting the relevance of the proffered evidence. State v. Dorsey; Holtzman. (same)

In fact, the same type of crime, on the same night, excluded as not being relevant as to the issue of a suspects guilt for a present charged crime because the probative value was out weighted by the prejudice effects, in Hoey v. State. The State's conclusion that the element of a focused time frame that is relevant in this instant case circumstances is not correct, it is a fatally flawed conclusion.

The State also submits that there is a "similarity of offenses" element with the premises of this conclusion based on "'offender descriptions' which are not premises for this element just as, driving the same car stolen from the

---

[128] Allen, 644 A.2d 982, 987-88 n.5,8,10 (1994)(Relevance of evidence the question of whether the trial judge properly formulated and applied legal precepts governing the admissibility of evidence is one of law).

[129] Farmer, 698 A.2d 949 (1997)(relevant evidence).

[130] DeShields, 706 A.2d 502, 507 n.7 (1998).

first offense is not relevant to "this" element. (May be if a car was also carjacked at the later 7-11 robberies this might make that hypothetical evidence more meaningful, but that did not happen.) The O'Conner Court describes this similarity of offenses, as prior acts which are so "unusual and distinctive" that their relationship to the charged offense may establish identity. Id. "In assessing this [type of] evidence a detailed exposition of the facts of each crime is necessary." Drew supra (as cited in Wiest supra) and "relevancy" must be determined. A Getz analysis must be done. See Weist supra at 1195-96(FN3) regarding independent relevance. DeShields supra at 508, Trial Courts "must" carefully examine offers of proof that acts of other misconduct have independent logical relevance. Ibid. The Weist Court makes it clear that this does apply to Joinder of Offenses as explained, "[e]ven if it is determined that

> the prejudice by [defendant] is not sufficient to "require" severance of separate offenses, a crucial factor to be considered in making a final determination [ ] should be whether evidence of one crime would be admissible in the trial of another crime. Id. at 1195-96 [FN3] [Citing Bates supra at 1142 echoing McElroy supra] Traditionally, the evidence of one crime is inadmissible to prove a general disposition to commit another crime, even if the crime is of the same nature and character as the offense charged. Getz supra at 730. Evidence of other offenses is admissible when it has "independent logical relevance" and its probative value to the State has been balance against the prejudicial effect of the defendant. Weist at 1195-96[FN3]

> The record does not support the preposition that evidence of each "set" of robberies[13] would be admissible at

separate trials. Generally, relevance is determined by examining the purpose for which the evidence is offered; that purpose in turn, accommodates concepts of materiality, i.e., the evidence must "be consequential" to action and probative value, i.e., the evidence must advance the likelihood of the fact asserted. Farmer supra. In DeShields the state sought to prove Modus Operandi evidence, the Court held this fact had no independent logical relevance to the material issue in dispute. The Hoey supra at 1179-80 court excluded this same "type" of crime evidence, on the same night as not being relevant to the issue of Hoey's guilt for the present crime charges.

---

[13] As a housekeeping matter, Defendant would like to clarify that he is not arguing that all these charges should have been severed under Rule 14. But only the 3 PDWPP offenses as "held" in ground __ to be separately tried by themselves; the carjacking should be severed from all the rest of these charges; the "sets" of the separate location charges i.e. Defendant is not challenging the properly joined offenses of Poss. Firearm During the Commission of a Felony (PFDCF) and WDDCF (wearing disguise) and Agg. Menacing and Robbery I set of charges as applied to Star Liquors, and these identical "set" of charges concerning the 7-11 robbery. Defendant is challenging the join for of these Star Liquor "set" of charges that were joined with the 7-11 store "set" of charges. Defendant is also challenging the 17th Street joinder of charges to the 7-11 charges.

The State offers no evidence to support its conclusion of "a similarity of offenses. [I]n order to accomplish this a detailed exposition of the facts is necessary. Drew supra at 92. The Drew court in their analysis of United States Supreme Court rulings in Pointer supra and McElroy supra explains that:

> [a] common scheme or plan embracing the commission of two or more crimes so related to each other to proof of one tends to establish the other when for example, the two crimes arise out of a continuing transaction, or the same set of events, the evidence would be independently admissible in separate trials. Id. At 90. Similarly if the facts surrounding the two or more crimes on trial show there is a reasonable probability that the same person committed both crimes due to the concurrence of unusual and distinct facts relating in the matter in which the crimes were committed Id. This device used must be so unusual and distinctive as to be like a signature. Drew (citing McCormick Evidence §157) [cf. O'Conner supra first factor.] Turning to the case at hand, a detailed exposition of the facts is necessary, "the actual facts of the holdup" –the Court pointed out that clothing really doesn't go toward "similarity") nor does the fact of vicinity." Id.

The key to the same or similar character" that is relevant evidence is specifically how the clerks at each location were "asked" for the money. and, the robbers "actions." This evidence is the relevant inquiry concerning the similiarities in the manner in which the offenses were committed to support a reasonable probability that the offenses were committed by the same person from which the jury could be asked to infer that the person was the defendant.

This conclusion is buttressed by other factors. In the [Drew] "robbery," the assailant, at first sign of non-compliance, threatened the clerk with a gun" Drew at 92. Similarly, in this instant case, "at first sign of non-compliance" not only does the suspect threaten the clerk with a gun, his character is "brazen" and "bold", firing his pistol, not once, but twice, the second his demands are not complied with. This character "takes over" the complete store at Star Liquors. And, remains "in control" of himself as well, being described as "calm" and collected. Ordered everybody even the customers on the floor as soon as he entered. He kept his cool, he did not raise his voice, he was not nervous, "just very demanding that you could hear it in his voice." This character pointed his gun directly at the clerk and customers heads, he did not hold it sideways, nor did he shake with nervousness, and this character kkept complete control up to the point of actually taking a car as an escape vehicle and told the owner, "Man, I'm not going to hurt your car, I'm not going to crash or something like that." (An inference that the fellow who owned the car would be getting it back in the future when he was done with it.) This robbery no doubt has the ear-mark of a seasoned professional.

based on the testimonal evidence derived from the Star Liquors robbery.

In the "attempted" robbery [in Drew], there was no threat of violence, in fact the dragon seems to have een most reluctant one indeed. This circumstance could raise a significant doubt as to whether [Drew] was involved in both crimes. A fundamental difference between two person contemplating crimes of this character would be the degree to which each [robber] was prepared to use force to achieve his objective. Drew at 92-93.

Similarly, the contrasting differences between the personality or character of the robber at Star Liquors compared to the suspect at the 7-11 store, using this analysis of "[a] fundamental difference between two people 'contemplating' crimes of this character." It is doubtful that a seasoned robber with the experience of the character at Star Liquors that store does not have a mandatory money drop, contrasts significantly to a 7-11 store which has "advertisements" on the entrance doors, on the service counter, and, other "high visibility" locations that the store "does not carry over fifty-dollars at any time," plus the visible video cameras make a 7-11 store a poor choice for a robber right from the beginning, as these are obvious deterrents.

The contrasting differences continue in this case. In the 7-11 robbery "the dragon" seems to have gotten a lot less ferocious than in Star Liquors. The character here does not have control, he is not calm, he is not collected, and he loses his cool. The robber does not make any attempt to secure, or take control of the store premises. This 7-11 robber is "a nervous robber," the gun "shakes" when he holds it. He has a distinguishing difference in the way he points his gun, he holds his gun "sideways." Also different, this robber did not directly face the gun at the 7-11 clerks, contrasting the Star Liquors robber's actions. This robber also "loses his cool," and calmness, and cusses the clerks. And, he does not rob the customers who were around the store. In fact, this robber lets the clerks walk around and even approach him to within an arms length.

The character and personalities of the Star Liquors robber and the 7-11 robber are probably about as a contrasting character as one could use as a perfect example to illustrate what is not "the same or similar character," as a premises for that element. The testimony about "the use," and, "the handling," of the pistol in these robberies takes on an enchanted significance. The differences in demeanor are totally on opposite sides of the poles. One guy is "cool as

a cucumber" at Star Liquors, the 7-11 guy is as "aggravated as a mad rapid dog." In both cases there were problems

with handling the money. In fact, the Star Liquors guy had more reason to be nervous and lose his cool because he's

got 4 or 5 customers within feet of him, but he does not, even when the clerk drops the money on the floor a couple

times, and the money drawer jams as well. When this sort of thing happens at 7-11, even without the 4 or 5 customers

around him, that robber goes ballistic and screams curse words at the clerks.

There are "acts which are so unusual and distinctive in these cases, but their relationship is ultimately at

odds." They are "not" the same or similar character based on the correct legal standard used to evaluate this element.

The States conclusion is fatally flawed as to these offenses having the same or similar character, or any similarity. These

are surely two separate and distinct robberies committed by two different robbers.

The State concludes its conclusions with an "offender descriptions" with premises of "an individual using a gun,

wearing a disguise, matching a "consistent" physical description." From the review of all the witness testimony, we

already are aware that several descriptions were given as to the gun, from a "long barrel" to "a small one," from "dark

black," to a lighter "charcoal" color. That does not really help us here. Most robbers in this area use guns, and

disguises which many colors and styles were described by witnesses, common as are the four different colors of

bandanas and scarves as well as the several colors of jackets. As for a "consistent" physical description the idea of the

"consistency" goes more toward the "consistent different descriptions" each witness gave.

A review of the actual facts of the holdup goes to "similarity" – clothing or similarity of dress does not offer

evidence of similarity" Drew at 92. Had each witness given a consistent" physical description as was given in Coffield at

590-91 being the same descriptions at all three robbery locations, is in "sharp contrast" to the descriptions given by

witnesses in this instant case. Consider the same "stocky black man, the same "dark blue stocking cap," the same

"dark blue hooded sweatshirt," the same "sunglasses" and the same "small," "silver," handgun. Compare these

descriptions to the 7-11 and Star Liquors descriptions by witnesses, one of which the State supplied a witness with

information after suspect defendant was arrested. Having clearly distinguished Coffield supra as having no precedential

value since its factual context was different in material facts and circumstances, it is obvious that the State has not, did

not, and can not prove there is evidence in this case to support a lawful joinder of the 7-11 set of offenses, to the Star Liquor set of offenses. Two completely different characters committed these offenses, and they were not the same person.[132]

Prejudice to defendant. The defendant in this instant case did claim and substantiate his claim of prejudice, see Ground Two of Petition in pertinent part.

This permitted the jury to cumulate the evidence, and was free to infer a general criminal disposition of the defendant. As a result the defendant was convicted of most of the counts charged....

In fact, the State in their Response failed to address defendants claims of prejudice so they are undisputed.

The State also "sidestepped" "the cause" of defendants failure to challenge the joinder prior to, or, during trial which is clearly stated in Ground Two of Petition.

Trial Counsel was ineffective for failure to move for severance of these charges, failure to object at trial, and failure to identify and raise these claims on direct appeal.

The State relies on Bates supra as cited in Coffield at 595, the language the State uses is, "Here, [defendant] has offered only unsubstantiated speculation about prejudice. His assertion is clearly insufficient under the standard we articulated in Bates v. State." State Response page 10. The substantial difference in the Bates case is that Bates moved for a severance of a "dependant" felony, being a PDWDCF. Of course, there is no possible showing of prejudice because on a PDWDCF charge, (as contrasted to a PDWPP, or other "non-dependant" charges that are not linked to that particular crime) all the necessary elements of the "host offense" are relevant and wholly material, thus, fully admissible to prove the elements of that (PDWDCF) offense, Bates other crimes were minutes apart at the same location.

Prejudice can be shown if one crime joined would not be admissible in trial for the other crimes under DRE 404, this is a crucial factor. Bates at 1142 as cited in Wiest supra. The absence of competent evidence of [defendants] guilt is a factor to be considered. Jenkins v. State.[133]

---

[132] The confusion here was probably the result of the superficial similarity of the two crimes and the way they were committed , and the jury probably was not confused or probably did not misuse the evidence Drew supra at 93

[133] Jenkins, 230 A.2d 262 (1967)

The failure to move for a severance despite a failure to perform a factual investigation, still considering the totality of circumstances portrays a startling ignorance of the law—or just plain inadequate preparation. See Kimmelman at 385. "Failure to conduct any pretrial investigation generally constitutes a clear instance of ineffective assistance of counsel," United States v. Gray [142] "failure to go to the scene of the [crime] and locate potential witnesses, interview witnesses, constituted ineffective counsel." Id. at 711-12. "For counsel to rest on his errors as strategy or defense theory, first necessitates the existence of one. Berryman v. Morton; [143] DeLuca v. Lord [144] (same).

In cases resulting in failure to move for a severance resulting in deficient performance of counsel see United States v. Myers; [145] United States v. Yizar; [146] Williams v. Washington. [147] Passing over clearly inadmissible evidence which is prejudicial to defendant has no strategic value, jurors not likely to remain impartial. Lyons v. Cotter [148] as is counsel failure to request a limiting instruction. Id.

The standard for "outcome" of the proceedings stated in Strickland is explained more fully in Woodford v. Visciotti. [149] The Woodford court explains the "reasonable probability" standard in the prejudice prong specifically rejecting the preposition that defendant had to prove it" more likely than not that the outcome would have been different. (Citing Strickland at 693.) This standard is based on Agurs cited in Strickland "spoke of evidence which raised a reasonable doubt, although not necessarily of such character as to create a substantial likelihood of acquittal . . ." United States v.

---

[142] Gray, 878 F.2d 702, 711-12, n.7, 8 (3rd Cir. 1989);
[143] Berryman, 100 F.3d 1089, 1095 (3rd Cir. 1996)
[144] DeLuca, 77 F.3d 578, 583 (3rd Cir. 1996)
[145] Myers, 892 F.2d 642 (7th Cir. 1990) (same)
[146] Yizar, 956 F.2d 230 (11th Cir. 1992) (same)
[147] Williams, 59 F.3d 673 (7th Cir. 1995) (same)
[148] Lyons, 770 F.2d 529 (6th Cir. 1985); White v. McAninch, 235 F.3d 988, 987-88 (4th Cir. 2000) (whole instruction is
[149] Woodford, 537 US 19 (2002)

Argument III. (Pages 21-27)

Ineffective Counsel for Failure to Object
to Introduction Of Prior Bad Acts, or
Request A Hearing (404) under DeShields
V. State, Del. Supr. 706 A.2d 502.

STANDARDS AND SCOPE OF REVIEW

Whether Superior Court Abused It's Discretion
In It's Denial Of Appellant's Argument III, The
Court Stated "Even if Any juror knew that the
" Plummer Center is A detention facility, No
" prejudice could result because All jurors were
" informed that Defendant is a convicted felon via
" the stipulation". (See DECISION pg. 9)

Argument IV. (Pages 28-33)

In-Court Identification Of Defendant by
Stat Witness Dawn Smith Violated Defendant's
Right to A Fair Trial, when there was "no independent
Origin" for this In-Court Identification.
Defense Counsel was Ineffective for His failure
to Raise this issue on Direct Appeal.

STANDARD AND SCOPE OF REVIEW

Whether Superior Court Abused It's Discretion
In It's Denial of Appellant's Argument IV, The
Court Stated "Defense counsel had no reason
to object to the identification". ... (See DECISION pg. 10)

Appellant will Now present Arguments III AND IV :

Valenzuela-Bernall.[150] Id. at 22. "Undermin[ing] confidence in the outcome" is exactly Stricklands description of what is meant by the "reasonable probability" standard. A reasonable probability sufficient to undermine confidence in the outcome." Strickland at 694. Ibid. Williams supra[151] at 393 ("probably effected the outcome") Woodford at 24.

Defendant has shown this Honorable Court the specific circumstances complained of, the prejudice Mr. Hillis' unprofessional errors have caused, these were not "strategic" decisions. Counsel's performance

is judged in the preparation or failing to properly prepare by failure to investigate both the law and facts known to him and the rules and law and procedure he is held to know as an attorney representing defendants in criminal proceedings. Unless a defendant charged with a serious offense [in this case 24 of them] has counsel able to invoke the procedural and substantial safeguards that distinguish our system of justice, a serious risk of injustice infects the trial itself. Vela v. Estelle.[152]

In summary, this ground is riddled with unprofessional errors each a substantial error in itself. The case law cited is on point.

The errors that cumulated in this case are "way past the standards" needed to meet the prejudice and performance prongs if properly and reasonably applied by this Honorable Court.

Some errors were also made by the Court as well. The actual admission of all these charges and more specifically the failure to provide the jury with the mandatory "limiting" instructions. The cumulative effects of all the errors outlined above surely intensifies each error in the composite format.

For these reasons and those stated throughout Ground Two and its facts and argument sections defendant respectfully prays that this Court reverse these convictions and either vacate the sentences or remand for separate trials.

Argument For Ground Three:

Defendant incorporates the "Procedural History," the "Facts" sections above, as well as the pertinent facts and arguments surrounding Counsel's stipulation to defendant's status on the PDWPP counts that this Court relied on in its determination to deny Defendant's Motion for a Mistrial concerning the State's introduction of evidence that

---

[150]Valenzuela-Bernall. 458 US 853 (1982)

[151]Williams, 529 US 362 (2000)

[152]Vela, 708 F.2d 954 (5ᵗʰ Cir. 1983)

defendant had been "released" from the "Plummer Center."[153] Petitioner's Reply Brief also incorporates these

arguments in ground one and two concerning both Court and Counsel's errors in not having a <u>Getz</u> analysis nor

providing proper limiting instructions to the jury.[154]

The evidence of defendants three sentences was <u>not permitted</u> pursuant to <u>DRE</u> 404(a)(1) and (b), or, <u>DRE</u>

608(a). Detective's testimony <u>elicited</u> from the State was a "responsive answer" to the specific question the State

asked, as defendant had been only alleged to have made only three comments.[155] The pertinent part of this question

and answer consisted of the following:

Q: And did he continue to make statements to you?

A: Yes. After I asked him if he understood his rights.

Q: What exactly did he tell you?

A: . . . he made several statements.[157] One of which he made a statement that he was "released" from the

Plummer Center. A second statement that he made was that he hadn't slept in three days. And a third statement was

to the effect he would brief [sic] that do [sic] 25 years.

Q: And if you could explain Mr. Bacon's demeanor as you observed him on the early morning hours of the

23rd?

A: He was <u>calm</u>. It was almost as if it was <u>an attitude</u>.[158] (Emphasis added)

Counsel could have prevented this highly prejudicial testimonial evidence from being disclosed to the jury

simply by filing a motion in limine to exclude specific evidence on testimony, or motion for pre-trial order prohibiting the

state from examining state's witness concerning defendants "release" from Plummer Center and being awake for three

---

[153]6-20-01 T.T. pgs.110-113
[154]Photocopies of Plummer House news listing escapes from Plummer House generally appearing first in the column and at top of page in our local area newspaper *The News Journal.*
[155]The later of course could not have been accurately accessed under <u>Milligan</u> <u>supra</u> and <u>Cobb</u> <u>supra</u> without a <u>Getz</u> analysis.
[156]6-20-01 T.T. p.110
[157]See Exhibit B and C, Exh. 9 was supplied with 3 statements, Exh. C Oct. 30, 2000, discovery to counsel specifically #1. See <u>DRE</u> 103(c)
[158]6-20-01 T.T. p.111

days, that he might do 25 years.  See Exhibit E for an example of such a motion counsel should have filed upon

receiving discovery.  Although some type of oral agreement may have been conceived between Counsel and State.  The

State certainly did not honor it.[159]

Counsel also "fell asleep at the wheel" when he failed to object to the State's question "and could you explain

or describe for us Mr. Bacon's demeanor . . ."[160]  Objectionable under DRE 401 as to relevancy; DRE 403 prejudicial

effect; DRE 404(a)(1) references to defendants character or demeanor; and DRE 608(b)(2) "specific instances of

conduct to support the [Star Liquors] witness'[s] credibility through investigating officer's testimony."[162]

The prejudicial effects of this evidence were enormous particularly when buttressed with the joinder of all these

sets of crimes, and Counsel's stipulation as to defendants "status" as a convicted criminal.  Compounding this prejudice

is the fact that without a limiting instruction on either of these pieces of evidence, "the jury was left free to cumulate this

evidence" magnifying or intensifying its effect that the defendant was indeed a convicted criminal.

An analysis of the statement evidence leaves the jury free to infer the following: defendants "release" from the

Plummer Center focuses attention to defendants immediate past as being in prison, a convicted criminal. The second

reference that "he hadn't slept in three days" is specific reference to the conduct of defendant and also inadmissible

under DRE 401, 403, 404(a)(1) and 404(b) because defendant having not said anything other than these 3 statements

neither admitted nor denied his participation in these crimes. A Getz analysis was never performed to determine

relevancy; to balance the probative value against prejudice to effects of the defendant; to determine the limited purpose

for such evidence and to give specific instructions to the jury concerning its limited use,[162] Getz at 730-34 and prodigies

of that specific conduct. The evidence that "he would brief [sic] the [sic] do 25 years."

This evidence was particularly damaging considering the context in which this evidence was presented, i.e..

---

[159]6-20-01 T.T. p.112
[160]6-20-01 T.T. p.111
[161]6-19-01 T.T. pgs.38,55
[162]Scott v. State, 642 A.2d 767, (Del. 1994) See also Getz at 730
[163]DRE 401, 402, 403, 404, 405.  See also DeShields supra; Taylor supra (independent logical relevancy) Morehead at 56
(evidence of prior acts) Gregory v. State, 616 A.2d 1198 (Del.1992), Dorsey supra; Savage supra (failing to balance the probative value
against prejudice effects); Millman supra and Forbh supra (court must give specific limited instructions)

reference that defendant was a convicted criminal, an inference logically concluded from defendants "release" from "Plummer Center," the earlier statement made by the State in its opening, "the defendant was one of these people. He possessed a gun and that's a crime." (Emphasis added) The potential prejudice here is that the jury was free to infer that defendant was "an experienced" criminal, because he was aware of the "time" he believed he would do based on "prior experience" of course stemming from his "release" from Plummer Center and his "status" of a person prohibited from PDWPP and the cumulative joinder of 24 felony charges. A common person would reasonably and objectively infer an "experienced criminal" character evidence from this statement.[164]

The State in their Response "sidesteps," and, "downplays" and attempts to "legitimize" this evidence as follows:

(1) To be sure, such evidence was not elicited at trial.[165]

(2) Rather, Detective Spence testified that defendant told him that he had just gotten out of the Plummer Center.

(3) This fact was offered without any explanation as to the connection of the Plummer Center to the Department of Corrections.[166]

(4) No testimony was elicited as to the character[167] of the accused nor was any reference made to prior bad acts requiring the Court to engage in an evidentiary assessment.

(5) As no bad acts evidence was presented, defendants proposed analysis was not required. States Response p.10 (Emphasis added)

Defendants reply to these five contentions by the State is as follows: Regarding the first, that this evidence was not elicited. The State supplied the police report to defense on October 30, 2000. Exhibit B and C. At the bottom of

---

[164] See Holtzman, 718 A.2d 936 (Statement evidence of defendant).
[165] Compare: Exhibits B and C to 6-20-01 T.T. p. 110.
[166] Compare: Exhibits E. General Public Knowledge. The News Journal local area newspaper.
[167] Compare: 6-20-01 T.T. pgs. 110-111 ("...prohibit or determine the Person's demeanor."

this report there are only three statements alleged to have been made by the defendant. Referring to the record, "concerning the statements" defendant made to the witness the State asked witness "what exactly did he tell you?" The police report which the State Deputy Attorneys Office supplied to the defense as a response to their first request, only lists three statements that defendant allegedly "told him." A responsive answer to this rather precise question, i.e., what "exactly" . . . , was the only thing that the detective[168] could respond without being "non-responsive." That is the three alleged statements because there was nothing else the defendant allegedly told this detective according to the report. The State misrepresents this fact to this Court eroding the integrity of these proceedings.

The second misrepresentation to this Court is the State's "mischaracterizing" evidence of defendants "release" from Plummer Center to a "downplayed," "that he had just "gotten out." By mischaracterizing this evidence in the way, relieves the core prejudice of this evidence and is not an accurate inference. Specifically, the jury was presented with "released from the Plummer Center,"[169] as opposed to "just gotten out." The States misrepresentation to this Court by this "mischaracterization"of fact adds to the erosion of the integrity of these proceedings and the Court being hoodwinked and detoured away from the truth concerning these instant proceedings.

The third explanation offered by the State on this issue concerns their "downplaying" of the jury's intelligence and common knowledge because the State offered this fact without any connection as to the Plummer Center to the Department of Corrections. The jury is instructed to discuss the case evidence among all 12 jurors when deliberating to share their views on the evidence. It is common knowledge that people in New Castle County, particularly the juror pool composed of voters, presumably keeps up with their City, County and State activities either through the local area newspaper or Channel 12 news, both of which inform the general public as a whole, whenever there is a "walkaway" from the Plummer Center, and that the police and Department of Corrections officials are looking for that person. Upon capture the person is charged with escape [in202] after conviction.[170] Exhibit D. This Court acknowledged, ". . . . if

---

[168] Compare: Johnson v. State, 550 A.2d 903, 913 F.N.6 (detective is agent of the State)
[169] A person is not "released" from a "voluntary" confinement. They are "released" from jail, "removed" from kidnappers, and
[170] McKay at 262-63

somebody should know what the Plummer Center is, . . . ."[171] One out of the 12 New Castle County jurors would have more likely than not known about the Plummer House and it must be presumed that the jury followed their instructions to discuss the evidence.[172] Without a doubt, interest would be generated concerning particularly a defendant's "release" from anyplace. No instruction was given. Defense counsel should have at a minimum requested a "limiting instruction." While tactically it may have been a good idea not to request a "cautionary instruction,"[173] a "limiting instruction" on evidence of prior crimes activity was mandatory and should have been given by this Court when counsel did not request it.[174] This was potentially prejudicial to defendant because it allowed the jury to draw "unwarranted inferences" and speculate[175] about "what crime did defendant commit to end up in jail,"[176] on other crimes evidence, as an example. This reference to the Plummer Center was "downplayed" by the State.

The fourth contention the State makes is another "misrepresentation" of fact to this Court. The State claims, "No testimony was elicited as to the character of the accused nor was any reference made to prior bad acts requiring the Court to engage in an evidentiary assessment." This was dealt with earlier in the discussion where counsel "fell asleep at the wheel," concerning the State "eliciting" evidence of defendant's demeanor.[177] The question was a specific question, i.e., "And if you could explain or describe for us Mr. Bacon's demeanor. . . ." Any other answer to this specific question would have been "non-responsive." Whether one calls evidence of a persons character, "demeanor," does not mean that because they "characterized" this evidence under an analogous term that they can now claim "no reference to the character of the accused." This detective's testimony response was "elicited" by the State, and its purpose was to support [Star Liquors] witnesses' credibility through the officer's testimony. The State asked Star Liquors witness: "And his [defendant's] demeanor, could you describe that for the jury how he acted in the store?" Witness answers: "He was calm" and second Star Liquors was asked the same question and replied: "He was very calm

---

[171] 6-20-01 T.T. p. 112
[172] Accord, Milligan supra; Cobb supra
[173] Explained: Major v. State, 1995 WL236696 (Del.Apr.20, 1995)
[174] Bullock supra; Howard supra; Holtzman supra
[175] E.g., Farmer supra; Dorsey supra; Savage supra; DeShields supra
[176] Compare: Flannory supra (unspecified crime) see also Lopez supra
[177] 6-20-01 T.T. pgs. 110-111

about it."[178]

The defendant never disputed this evidence anywhere in the record. The detective's testimony is "rebuttal" evidence. This evidence does not have "independent logical relevance" to the States prima-facia case-in-chief. Such extrinsic evidence of defendants character may only be admissible in rebuttal if defendant raises an "affirmative defense."[179] DRE 404(a)(1) Getz at 731. This also applies to prior acts in general. (This is not limited to just prior bad acts or his general bad character) DRE 404(a)(1)

> Evidence of prior acts is not admissible simply because evidence of other prior acts has been introduced. The Getz analysis is designed to ensure that evidence of prior acts [or character and demeanor] is not admitted unless it is relevant, probative, clear and not unfairly prejudicial. Morehead[180]. (Emphasis added)

Certainly, the elicited evidence of defendants "an attitude" falls into this category as well. These explanations that the State gives, to the extent one can buy into them, the proposition that "such evidence was not elicited at trial," it is still clear, however, that this condition was created by the State nonetheless, it cannot be blamed on defendant Bacon, and this Court is reminded that Counsel's errors and responsibility of counsel's errors rest on the State. In fact, the State does not dispute that trial counsel was ineffective for failure to request a DeShields analysis (citing Getz) as, "professionally unreasonable," they simply state, "[a] no bad acts evidence was presented, defendants proposed analysis was not required." Similarly, the State did not dispute counsel's ineffectiveness for failing to request a "limiting instruction" on this evidence, and "instruction" as to which case to use this evidence in.

Defendant incorporates counsel's ineffectiveness arguments raised in Ground One and Two, fully and attaches them to these issues as well.

Defendant fully asserts that each issue raised is a reversible error based on this Court's evidentiary structure to provide defendant with fair trials. Defendant further incorporates Grounds One and Two arguments concerning each issue prejudicial effect equivalent to reversible error and their composite errors magnifies the prejudicial effects.

---

[178]Compare: Scott v. State, 642 A.2d 767 (Del 1994) and 6-19-01 T.T. pgs. 30,65
[179]Accord Taylor supra; DeShields supra; Allen supra
[180]Morehead at 56 n.4

Argument For Ground Four:

> [T]he issue is whether the witness is identifying the defendant solely on the basis of h[er] memory of events at the time of the crime, or whether [s]he is merely remembering the person['s name given to her after defendant was arrested]. Accordingly, in [this] situation, the relevant inquiry includes factors bearing on the accuracy of the witness' identification including n[er] opportunity to view [the criminal at the time of] the crime. Manson v. Brathwaite, 432 US 98 at 122 (1977)

> The Court stated: "[T]he primary evil to be avoided is a very substantial likelihood of irreparable misidentification. It is the likelihood of misidentification which violates a defendant's right to due process." Id. at 124. "[R]eliability is the "linchpin" in determination [of "in-court"] identification testimony[.] The determination depends on the "totality of the circumstances." Ibid. "Under the 'totality of the circumstances' in this [instant] case, there exists "a very substantial likelihood of irreparable identification." Id. at 99 (citation omitted)

Dawn Smith did not have a sufficient opportunity to view the suspect at the time of the crime, she did not accurately describe him before defendant was arrested, and her level of certainty was low.[181]

> It was too great a danger that the [defendant] was convicted because he was a man [Smith] had previously observed near the scene, was thought to be [the] likely offender, [] rather than because [Smith] "really remembered him as the [robber]." Id. at 118 (citation omitted)

> Identification evidence is so convincing to the jury that sweeping exclusionary rules are required. Fairness of the trial is threatened by suggestive confrontation evidence, and, thus, it is said an exclusionary rule has established a constitutional predicate. Id. at 111. There are, of course, several interests to be considered and taken in account. The driving force behind [citations omitted] the Court's concern with problems of eyewitness identification. Usually the witness must testify about an encounter with total strangers under circumstances of emergency or emotional stress. The witness' recollection of the stranger can be distorted easily by the circumstances or by actions of police. Id. at 112.

> The United States Supreme Court in Bruthwaite supra; accord. Walls v. State,[182] "[h]eld that reliability is the 'linchpin' in determining the admissibility of [in-court] identification testimony for confrontations. [T]he determination depends on the "totality of the circumstances." The factors to be weighted against the corrupting effect of suggestive [in-court] identification procedures in assessing reliability are those set out in Niel v. Biggers[183] and include the opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Id. at 114 (citing Biggers supra); Walls supra (emphasis added) [T]urn[ing] then, to the facts of this [instant] case and apply this analysis.

---

[181] See 6-19-01 T.T. pgs. 42-43
[182] Walls, 560 A.2d 1033 (Del. 1989)
[183] Biggers, 409 US 188, 199-200

1. The opportunity to view the criminal at the time of the crime:[184] Dawn Smith testified that one works behind a counter encased in glass, suspect shot out an overhead light, on customer side of the glass, ordered everybody on the floor, she got on the floor, counter base was solid material, then suspect approached opening in glass, had the gun in her face pointed at her head, obstructing her view of suspects face covered with a bandana up to the eyes and the hood from the jacket pulled down to right above the eyes. She removed bills from the end table and was busy picking up dropped bills off the floor, where she was ordered to stay. Finally suspect turned his back to her and left.

2. The degree of attention:[185] Smith testified she tried to get the drawer out of the table that contained the money. She focused on trying to lift the table, and couldn't, so she struggled with the drawer to get that out, she couldn't do that, so she took the money out and threw it at him, some money fell on the floor so she already being on the floor, picked that up and threw it up on the counter at suspect. When she finally did look up at hole in the glass, all she saw was this gun pointed at her, so she planned an escape. Her attention was drawn to the end of the gun barrel, she could not describe color or type of the gun, only it had a long barrel. Detective Spillan interviewed Smith at the scene, for probably a much longer time than it took the suspect to rob the Star Liquors, and under less stressful conditions.

3. The accuracy of prior descriptions: Smith's description was given to Spillan within minutes after the robbery. It included a clothing description, work shoes or boots, shorts, bandana covering his face to this eyes and a blue windbreaker with a hood covering his head down to the top of his eyes, the gun only a long barrel, no color or type. Weight and build was given as skinny, height as a flat 5 feet to 5 feet 2 inches, no facial descriptions, no eye descriptions, no hair descriptions as to color or shape of hair. Specifically, no description of a beard and that the suspect was dark black or brown.

At trial, this witness altered her testimony to reflect the suspect as having a beard, and being light complected, and his name Mr. Bacon. When asked about when detective asked her to described the face of the individual when she

[184] 6-19-01 T.T. pgs.24-31, 24-36, 39, 41-43
[185] 6-19-01 T.T. pgs.24-31, 34-36, 39, 41-43

spoke to him the evening of the robbery she didn't mention anything about a beard, she answered because he had a bandana on his face.[136] And Spillan testified that this witness told him, minutes after the robbery that the suspect was dark black or brown.[137]

Curiously, this witness could not even identify detective Spillan, who interviewed her without pointing a gun in her face and wearing a disguise and under less stressful conditions.[138]  Specifically, even more interesting is that this witness was never shown a photo lineup, nor was defendant taken to her to view as to positively identify him as the suspect. Defendant was never identified by this witness, or any witness as the suspect in this robbery before the trial either in a photo lineup or show up.

4. The witnesses level of certainty demonstrated at the confrontation. There is no dispute the suspect was disguised, no dispute that none of the witnesses picked him out of photo arrays. No dispute that this witness was ever shown a picture of defendant, or viewed him before trial.  This witness could not describe suspects facial features.[139] When asked to describe the face of the suspect witness could not. Her level of certainty was low. Witness brought up questioning the detective, eliciting a physical description of suspect after he was arrested about—did he have a beard.

Although witness claims to have seen the defendant again that night when talking to the detective, this is not brought to his attention. She did not call him and when he called her she failed to mention this alleged encounter because her level of certainty was very low.

5. The time between the crime and confrontation.  Dawn Smith's description of the suspect was given to detective Spillan within minutes of the robbery. The in-court identification by the witness took place almost a full year later. We have the passage of approximately 12 months between the circumstances surrounding this event filled robbery in which the witness was occupied for the most part—defendant holding a gun between his face with a disguise and her face, the focus being on the gun as testified.

[136] 6-19-01 T.T. pgs.24-31, 35-36
[137] 6-20-01 T.T. p.162
[138] 6-19-01 T.T. p.36
[139] 6-19-01 T.T. pgs.25,28,34-36,39,41

These indicators of [Smiths][in]ability to make an accurate identification], in conjunction with] the corrupting effect of th[is] [particular type] of [courtroom] identification itself,] [the] reliability of this [in-court] identification if [also] undermined by the facts that the [defendant] was arrested [3 days later, in a different part of New Castle County, no physical evidence such as fingerprints, or proceeds from the Star Liquors "robbery" were attributed to the defendant. Surely, we can [] say that under the circumstances of this [instant] case there is "a very substantial likelihood of irreparable misidentification." Id. at 116 (citations omitted).

Of course, [] had [detective Spillan] presented [Smith] with a photographic array[190] including so far as practical . . . a reasonable number of persons similar to any person then suspected whose likeness is in the array, [] the use of that procedure would have [legalized the use] of the identification at trial [if this witness did in fact, choose defendant's photo as being that of the suspect] voiding the risk that the evidence would be unreliable. Id. at 117.

The errors made by counsel are clearly apparent on the face of the record. Counsel should have made an oral motion to strike answer of this witness, or, a oral motion to strike a portion of answer of witness upon the grounds of a non-responsive answer,[191] or we move to strike so much as the answer given to the last question as states that "when Mr. Bacon came into the store," upon the grounds that this was a "non-responsive" answer.[192]

In reviewing every case in the Delaware legal digest on this issue, not one case supports a circumstance of "in-court" identification, without as an element the witness identifying the suspect "before trial," either by photo array, lineup, or show up, or specifically identifying the suspect in a clear unobstructed view with lighting, at a close distance, and without a disguise, and must include a descriptive identification to police. There is absolutely no case authority to support a witness identification of a "disguised person" where a witness could not identify the suspect at the time of the crime, and then later post-crime where a witness then claims to have seen the suspect and makes an identification, as in this instant case scenario. No authority to support these specific circumstances.

The identification evidence was extraordinarily prejudicial because the State[] witness case was the State's [] evidence [] that they [] [] [] [] agree[] [] [] specifically that was [] admitted [] [] Counsel should have raised this as a [] Error, [] Object at trial [] and raise this issue on direct Appeal.

[190] Apparently this was supposed to have been planned, but for some reason it was never done. See 6-19-01 T.T. pgs. 34-36. [] [] [] [] Instead it appears that this witness inquired of the detective the arrested suspect's physical description.

[191] See U.S. v. Willis, 759 F.2d 1486 (11th Cir. 1985)[Cert. denied: 474 US 849. (Absent motion by defense counsel to strike testimony, Court and State are not under any duty to strike it)

[192] See Gilbert v. U.S., 366 US 260 at 271 (1967)[]

[193] 6-19-01 T.T. pgs. 34,37-39

Argument V. (pages 33-37)

(I) Ineffective Assistance of Counsel For
Failure to Raise the Amendment of Defendant's
Indictment. Counsel Argued Prior to Trial
Defendant in Appeal and Because he would
have had more favorable record on Direct Appeal.

STANDARD AND SCOPE OF REVIEW

Whether Superior Court Abused It's Discretion
In It's DENIAL OF Appellant's Argument V, The
Court Stated " Defendant can not show any
prejudice resulting from Counsel's conduct ".
(See DECISION pg. 5)

Argument VI, (Pages 37-43)

Prosecutorial Misconduct; Ineffective Assistance
of Counsel for Failure to Identify and Raise this
Super. Ct. Crim. Rule 16(A)(d) Discovery Violation
Concerning A Videotape made of Defendant's
Statement At Police Station; either during Trial
Or on Direct Appeal

STANDARD AND SCOPE OF REVIEW
Whether Superior Court Abused It's Discretion
In It's DENIAL OF Appellant's Argument VI, The
Court Stated "There is nothing in the record to
Support Defendant's Assertion that a statement
Video taped or that the prosecution failed to
Provide Such a tape to the Defence (DECISION pg. 11)

Appellant will now present Argument's VI and VII

(Emphasis supplied)

   The State has no legal authority to support this Ground Four. "Cause" for "no timely objection" has been

made in the "Procedural Standards," "Facts" sections as well as previously listed Grounds One, Two and Three, as

"ineffective assistance of counsel, and trial structural error of evidentiary importance fully described in detail in this

argument and fully embedded in the trial record as to supporting facts. There was a good basis for an Oral Motion for a

Mistrial had counsel not been "sleeping at the wheel." Counsel failed to raise this issue on direct appeal even giving

counsel an allowance in the possibility of facts developing at trial that were not provided to counsel via Rule 16

discovery and Jencks material.[200] At this stage of the proceedings a Motion for Mistrial under the grounds of "no

independent origin" should have been made, or, to minimize the damage, a Motion to Strike as described above, and a

Cautionary Instruction instructing the jury to "disregard the in-court identification made by witness Dawn Smith

regarding her statement that 'Mr. Bacon came into the store.'"[201]

   This identification evidence was particularly and extraordinarily prejudicial to defendant because: the Star

Liquors case was the States "foundation case" that they built the 7-11 case facts on, specifically the car related

evidence, and, the lack of an accurate suspect identification at any of the crime scenes. Counsel should have raised this

as a "plain error" in any event on the direct appeal as it goes in fact to "the heartland of information" needed to start

the ball rolling in the State's case-in-chief proving the identity of the suspect. Ineffective Counsel for failure to object at

trial and failure to raise a meritorious issue on direct appeal has already been addressed, and will be addressed in more

detail at the end of this brief.

## Argument For Ground Five:

   The first issue of ineffective assistance of counsel concerns counsels deficient performance for failing to move

to dismiss Count 15 indictment on its face that the determination of the Grand Jury that there were not sufficient facts to

believe an offense was committed, and, that he was the perpetrator. Because of this fatal defect, the Grand Jury did not

---

[200] Although a quick review of Jencks by a professionally competent attorney would have recognized this "no independent origin"
evidence even before cross-examination.
[201] Explained Major supra (1995 WL2366581)

have sufficient information to indict him on Count 15.[202]

The second issue of counsel's deficient performance concerns counsel's failure to argue the "prejudicial effect" of the amendment which is where the argument counsel failed to develop, actually lies, but counsel "dropped the ball." Superior Court Crim. Rule 7(e) is not relied with complicity. It reads as follows:

> The Court may permit an indictment or an information to be amended at any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced. Id.

The record reflects that the proposed amendment,[203] did not mean to change the offense. Counsel's reliance on Johnson,[204] a case cite that contains a detailed analysis of the prejudicial aspects of the amendment in that case, hence the reason for the prohibition of amendments that go to substance or the elements of an offense. Counsel's lack of understanding of this crucial issue presumably from his lack of research of that case is evident in his oral argument before this Court. In this hearing counsel undermines defendant's position by his deficient performance.

> I could see at first blush it appears that the difference between car keys and a car and U.S. currency is not as severe as the instrumentality of the assault because I think it's a cosmetic difference. Because what Robert Johnson v. State [supra] really touched upon was the Delaware Supreme Court and the Grand Jury's decision that were considered, the facts put before it, to determine whether or not an individual ought to stand trial. Exhibit F: Oral Argument June 21, 2001, p.4; See also Exhibit G Bacon v. State, No. 369, 2001, Appellants Opening Brief pg.7.

> The Superior Court erred because, even if the amendment to the indictment may have been permitted under the Robbery statute and did not charge a different or more serious offense, the amendment violated the Defendants' right to indictment by grand jury under Article 1, Section 8 of the Delaware Constitution. Johnson [supra] Id.

These are not supporting arguments. They go to show counsel's incompetent lack of understanding of Johnson.

The State offers Roberts,[205] but the record of the Oral Argument reflects counsel at least had possession of this

---

[202] Accord: Williamson v. State, 669 A.2d 95 (Del.1995); Mallory v. State, 462 A.2d 1088 (1983); See also, State v. Minnick, 168 A.2d 93, 98 (1960)(Each count of an indictment must normally be considered as an individual count, as though it were a separate indictment standing by itself.)

[203] Although proposed pretrial, the granting of this amendment did not happen until post trial.

[204] Johnson v. State, 711 A.2d 18 (1998).

[205] Roberts v. State, 1996 WL23 (Del.)

case for a time. Exhibit F pg.5. As the State explained at the Oral Argument, Roberts request was a change from a general property allegation of U.S. currency and valuables, which was probably considered in a gray area of non-descriptive property for one element of, theft, an element in a Robbery I. The amendment from a general to a specific, being cigarettes in Roberts case is in complete opposition to this instant cases amendment, i.e., from a specific property description definite to that of U.S. non-definite currency and being general. Counsel dropped the ball on this. Roberts runs in the opposite direction of this instant case's Count 15 amendment relevant circumstances.

Similarly, counsel does not point out the prejudice as significant, in fact, that ball is in his court, and he drops the ball again, i.e., defendant suffered significant prejudice because he was precluded from pursuing his original defense strategy[206] that of the 7-11 robbery, and he was arrested standing near the car on 17th Street, which according to discovery evidence was not the same car, because at the 17th Street car was deemed that of the Star Liquors robbery, while a different car was alleged to have been jacked at 7-11 from Conkey, these are the essential facts regarding the amendment issue. Essential facts are those that will clearly inform the defendant of the precise charge so he may prepare his defense. Green[207]

The preceding fact is one also to be considered in the joinder of indictments issue.

Defendant's original defense was substantially prejudiced by this amendment because he relied on the facts from discovery that were keys and car reported stolen from Conkey. And there were no charges alleging "US currency" being taken from Conkey. The potential for prejudice arises in the nexus between the lack of a charge regarding the "US currency" in the car on 17th Street, and, the fact that another car was alleged to have been used at the 7-11 robberies. By amending the indictment post-trial, or, even the move pre-trial amounted to a change in the State's theory of the case on this count,[208] and altered the evidence concerning the rest of the 7-11 counts as well, that now concerned the car on 17th Street as potential evidence.

[206] Accord, O'Neil v. State, 691 A.2d 50, 55 (Del.1997); State v. Deedon, 189 A.2d 660 (1963)(explains, but distinguishable from defendants case)
[207] State v. Green, 376 A.2d 424 (1977)
[208] Explained, Johnson v. United States, 613 A.2d 1381, 1387 (D.C.App.1992)



Because theft of property is a necessary element in a Robbery I, another issue of potential prejudice arises, US currency from other sources could be used to prove this crime because no definition of the property was given[209] other than US currency which given the context of a Robbery charge is pretty general, and to argue otherwise just does not follow a well reasoned logical path. When a person says "I was robbed," it is generally believed to be US currency.

Defendant was left with no way of defending against this general property element in a trial with seven other victims claiming they too were robbed of US currency.

This amendment, in this instant case went way above a cosmetic difference in terms of the context of defendants defense. The State made a big deal about the change found in the car and the loose bills and "change" found on defendant.[210] (That was actually the envelope of the change found in the car. This was a misrepresentation of material fact by the State as well.)

This testimony came immediately after the 7-11 evidence highlighting this change evidence. This is evidence of substantial potential prejudice to the defendant.

Counsel on direct appeal, "drops the ball" once again, and does not argue the potential prejudice in any way, shape, or form. The case law cited by the Delaware Supreme Court, Robinson,[211] undoubtably supplied by the State in their Response Answer, concerns a factual context totally alien to this instant case facts and specifically Robinson's holding was a very narrow holding considering the adding of an element of "knowledge" through an amendment when the action alleged in the indictment contained enough information[212] that compelled the inference that [Robinson] acted knowingly. Robinson has little bearing on the resolution of the present case.

Counsel was professionally deficient in his performance for failing to argue the potential prejudicial effects of this amendment. This is where the issue lies in Rule 7(e) amendments of this sort. It was particularly harmful in this

---

[209]See generally State v. Minnick, supra ("a crime"); Johnson v. State, supra (citing Harley v. State, 534 A.2d 255 (Del.1987))(Deadly Weapon element "Instrument" must be defined or described)

[210]6-20-01 T.T. pgs.60,109,143

[211]Robinson v. State, 600 A.2d 356 (1991)

[212]"Specifically that Robinson emotionally abused the patient by ridiculing demeaning and making derogatory remarks directed toward the patient" One could not do that without acting knowingly.



instant case. Under the circumstances, i.e., counsel had several chances to get the issue right. A professionally competent counsel would have no doubt. Under these circumstances defendant was not afforded genuine effective legal representation. There is a reasonable degree of probability the outcome in the Oral Argument would have come out different, but for counsel's errors in this respect. Counsels errors in this proceeding were so serious that defendant was deprived of a fair hearing and the result unreliable, because it was undermined by counsel's errors. The material point of any amendment issue rests on its prejudicial effects. Hence, the street rules on amending the substance of an indictment. When amendment goes to form, the issue of inherent prejudice shifts to that of potential prejudice which must be shown by the defendant on a case-by-case basis totality of the circumstances.

This instant case should be reversed based on counsel's errors in his failure to move to dismiss Count 15 indictment for the reasons set forth at the beginning of Ground five, i.e., the first issue . . . .

Case reversal is also requested by on counsel's professional errors of deficient performance concerning his failure to argue the prejudicial effect at this court's oral argument.

Defendant's case should be reversed on ineffective assistance of counsel regarding his unprofessional errors in failing to raise this issue on direct appeal.

If the court does not find a separate reversible error regarding each of these three separate errors, then the combined effect of counsels errors should meet the standard.

A separate and more lenient review should be granted to the separate prejudicial effect caused by this amendment. It is not defendant's fault the State supplied him with professionally deficient counsel and for this court to cause the defendant to meet the higher Strickland—Fretwell standard of review, well it just is not fair, and defendant respectfully requests a de-nova review on the prejudice issue.

Argument For Ground Six

First and foremost the State fails to support their argument with any legal authority. The State misrepresents and also misstates the material facts that are the heartland of this Grounds issues.

Defendant incorporates Ground Three's factual and legal arguments regarding the prejudicial effects of the

evidence concerning the three statements, references to defendants prior acts and behavior, further, incorporate the

defendants several assertions of ineffective assistance of counsel in their varying descriptions.  The relevance as to the

video tape concerning these statements stems from evidence at trial that is contradictive to the States assertion in their

Response concerning the location of these statements and the timing of the Miranda warnings.  The record reflects the

following on June 20, 2001, T.T. pg.110.

> Q: After you arrived at the Wilmington Police Station, what occurred next?
> A: Mr. Bacon began making statements to where I felt it was necessary to read him his Miranda rights.
> (Emphasis added to show that statements were made before Miranda warnings.)

The central issue to Ground Six claim revolves around:  The States failure to disclose the video tape made of
defendants police station statement in a violation of [] Rule 16(a)(d) [] especially when, defendant made a discovery
request. Trial Counsel was ineffective for failure to identify this issue and raise it on appeal.

The State in their October 30, 2000, response[213] to Defendants Rule 16 Discovery Request, did indeed state

"see enclosed. Your client gave a statement which was video taped and will be made available to you," as their

response to defendants first request regarding any statements either written or oral made by defendant that are in

possession and control of the State or their agents.

The specific reason for this Discovery Rule is so defendant received all evidence of any written or oral

statements he may have made, and the context surrounding them.  Defense counsel was ineffective for his failure to

develop facts on the record either pre-trial or at trial regarding the State's "failure to deliver," on their discovery

response.  Although the State claims "[t]his information, specifically the overwriting of the tape was communicated to

defense counsel."  There are two problems with this statement.  (1) Specifically, on 10/30/00, there is not any

reference to this "over-writing" of this video tape; and (2) if counsel received this information at a later date, (as the

State does not tell us when this information of the over-writing was given to counsel), counsel did not relay it to the

defendant at anytime.  In fact, counsel misled the defendant up until the evidence of the three statements came into

evidence that a video tape existed because he did not tell defendant that it did not exist.  Defendant depended on this

---

[213]Exhibits B and C

video taped evidence as his defense against the three statements on the police report via discovery. However, it is defendant's assertion that <u>there is a relevant connection among the three statements and the video tape evidence, and what the video tape evidence would prove</u>: that these three statements were in fact pre <u>Miranda</u> replies to earlier comments made by the original arresting officers at the scene, Officer Spillan, or, comments made by one of the two officers in the police car as defendant was being transported from 17ᵗʰ St. to the police station. The chief investigating officer is Detective Spillan and he knew about the Star Liquors carjacking and robbery, the second attempted robbery, the 7-11 robberies. In a collogue with the defendant at the 17ᵗʰ St. arrest site, Spillan acquired defendant's pedigree information.[214] Usually a suspect is informed after the cuffs are put on that he was arrested for whatever crimes he was charged with. This information being given to the defendant <u>and specifically no evidence of a Miranda warning being given at this 1:56 a.m. to 2:00 a.m. encounter[215]</u> of initial arrest. Defendant may have made response comments to this charge information in the police car during transport just as the State tells us in their Response. However, as officer Spence testified to defendant making statements to where he felt it was necessary to read Codefendant <u>Miranda rights were not done in the police car, it was not done as soon as defendant arrived at the police station at about 2:18 a.m.,[215]</u> it was <u>finally</u> allegedlly done at about 2:30 a.m.. A full ½ hour after defendants arrest on 17ᵗʰ St.

Concerning his evidence, Counsel failed to develop facts surrounding the Wilmington Police Stations Standard Operational Procedure ("SOP") pertinent to suspect processing or booking the explicit usage of video tape footage to observe a newly arrested suspect, the exact location of camera lenses and microphones in relation to the defendants detention in booking and receiving area. Had counsel explored these facts, <u>he may have discovered that a video tape was made of defendant from the exact time he entered this area of the police station and any and all statements, comments by police. Miranda warnings, etc., were caught on not just one video tape but more than one video tape.</u> One tape in the actual processing area where new arrivals are held handcuffed on a bench and processed, fingerprints, mugshots, etc., and <u>another video tape</u> is made in each and every interview room when occupied.

<hr>

[214] 6-20-01 T.T. pgs.166,170,183-184 (pedigree information)
[215] 6-20-01 T.T. pgs.102,114
[216] 6-20-01 T.T. pgs.114

This video tape or video tapes, is the "best evidence" under our Rules of Evidence that defendant refused to be interviewed by the Police concerning all these robberies.[217] This video tape was a crucial piece of defense evidence. It is Brady material for the reasons explained above and below. The lack of handwritten notes goes far to suggest the "unreliability" of the "time line" of defendants alleged response comments. With everything going on during an arrest, other suspects, details fade from the mind particularly where other information has to be remembered. See DRE 803(6)(8). The video tape evidence wholly contradicts Detective Spence's version that after he read the defendant his Miranda rights, "[he] just sat there and the defendant made these three statements [post-Miranda]." Then he is given Miranda rights by Spillan where it can actually be proven and the defendant tells the detective, "I'm not making a statement and I do not want to be interviewed." Defendant did not qualify his observance of the Miranda warnings to the Gulf Station offenses either, he said, "I'm not giving a statement." This contradicts officer Spence's account of his giving the defendant Miranda warnings and defendants "observance of his right clearly covered all the charges," because the State did not produce any statements concerning any of the other charged robberies at different locations either. Specifically and categorically, defendant, once he was aware of his right to remain silent so nothing he said could and would be used against him, refused to speak to police. This evidence is contained on a video tape which was still in existence on 10/30/00.

As the Delaware Supreme Court explains in Johnson:[218]

> The State did not follow the procedure mandated by Rule 16(d). Not only did the State fail to mention that it was not providing complete discovery, but it compounded this error by representing that it [would]. The failure of the State to abide by Rule 16(d) cannot be blamed upon the [defendant]. [reference to FN 6] Id. at 922. The detective[s] [are] agent[s] of the State. The State had a duty to find out about the [video tape] before it responded to the discovery demand. Id. at 913 (FN6) (Emphasis added)

Defendant had a right to this evidence, and under the Johnson ruling we should believe this evidence did in fact exist on

---

[217] Curiously, the State attempts "to limit" this video tape to that of the dismissed Gulf Station offenses, when in fact, there is no evidence of statements made regarding, the carjacking, the robberies, and attempted robbery at Star Liquors, or 7-11 store. There is no clear and convincing evidence that this video tape was "limited" to only that of the Gulf Station offenses, or in fact, had anything to do with the Gulf Station offense.

[218] Johnson v. State, 550 A.2d 903 A.2d 903 at 911 (Del. 1986)("when the State provides a general reply to a specific defense demand [Rule 16], the State is to be held accountable for any inaccuracies in its general reply.")

10/30/00, but after Mr. Lugg, "took over" this case this evidence gets destroyed by getting "overwritten." The

prejudice to defendant and the State's duty to defendant is explained in Johnson.

> Pretrial discovery of oral statements serves significantly to protect the defendants right to a fair trial.
> The State was under a duty to supply the substance of the oral statements (as reflected in the [video
> tape]) without regard to its use or non-use of the [video tape] at trial because the State intended to
> "offer other evidence at the trial" of the statements which had been made by the defendant."
> Johnson at 914.[219]  (Emphasis added)

The video tape evidence made of defendants specific refusal to give a statement or be interviewed by police is

Brady material and satisfies Rule 16(a) six factors criteria explained in Johnson at 912. The relevant facts of

defendant's circumstance are given below paralleling these six factors.

> Rule 16(a) contains a six-part description of an oral statement which is subject to a discovery
> demand. The rule states that the defendant must have made (1) an oral statement (2) which the
> state intents to offer into evidence at the trial (3) made by the defendant whether before or after
> arrest (4) in response to interrogation (5) by any person than known to be a state agent (6) which is
> known to the Attorney General to be within the possession, custody, or control of the State. Superior
> Court Criminal Rule 16(a). Id. at 912

It's undisputed that the video tape evidence of defendant's statement satisfied these criteria as it contained an

oral statement made by defendant, evidence of oral statements was offered into evidence, the statement was made

before or after arrest, in response to an interrogation after the "Miranda warnings" were administered and then asked

to make a statement or be asked a couple of questions, defendant told police he did not want to make a statement nor

answer a couple of questions for an interview by a known state agent, the police. The video tape of this evidence was

known to be in the possession, custody and control the State and Wilmington Police.

There is another aspect of this case concerning the chain-of-custody of this video tape. This was a State Police

investigation, not a Wilmington Police investigation. Investigatory evidentiary procedure concerning evidence tells us,

and had counsel explored this either at a pre-trial hearing or at trial (for direct appeal purposes) that this video tape

would be removed from the Wilmington Police Station by State Police detectives and kept with all the rest of the State

---

[219] Johnson, 550 A.2d at 914 (citing United States v. McCray, 697 F.2d 459, 463 (2nd Cr. 1982)

Police evidence against the defendant. All these robberies were under the State Police jurisdiction,[1] considering the seriousness of these charges and the sheer quantity, one would have to be naive to believe that the State Police did not keep the video tape evidence in this case with their other evidence collected. This evidence is usually stored in an evidence locker and must be checked-in or checked-out by an officer's signature. The chain-of-custody of evidence is established this way. Counsel was deficient in his performance in failing to explore this area as well. Did the tape make it into the State Police evidence locker? If so, then it was "taken-out" of evidence and intentionally destroyed by the State. A clear Brady violation. Defendant moves to expand the record to discover the State Police evidence log concerning the numbers the State Police assigned to the evidence of this instant case.

The State cannot avoid discovery duty by withholding or destroying defense material (by overwriting it). There is no valid reason for refusing disclosure of a defendant's statement. Otherwise, discoverable under Rule 16 on the ground that the rule only applies to evidence offered in the State's case-in-chief either. Johnson supra at 912. See also: DeShields supra at 644 (enbanc). This legal authority is focused toward the States Response in their unsupported attempt to narrow down the video tape recording of defendant's response to the Miranda[2] warnings that he chooses to exercise those rights, that defendant somehow "qualified" his refusal to only that of the Gulf Station charges. Did defendant answer any other questions re any of the other four sets of charges, or give a statement in regards to these other four sets of charges? No, he did not! The State misrepresented this fact.

The States first part of the second paragraph in response to Ground Six states as follows:

> The subject of defendants challenges, however, is not his refusal to be interviewed by Wilmington Police, but rather his past Miranda statements to detective Spence during his transport from 17th and Pine [sic] Streets.

---

[1] Vis-a-vis: Corporal Jones, State Police (SP) Troop 6; Detective Mulvena SP Troop 2; Corporal Spence, SP Troop 2; Detective Chapman, SP evidence detection; Corporal Spillan, SP Robbery Squad Invest.; Officer Hegnan, SP Fingerprint Examiner.
[2] Without getting into a Miranda analysis, this Court should be familiar that a Miranda Warning covers an entire arrest and not just one charge.

the prejudice prong in Strickland)

Counsel's unprofessional errors cannot be excused for his failure to develop facts at trial surrounding the issues of this discovery violation being that of the ambiguous response in the State's Rule 16 response; see Johnson 550 A.2d 903, 911, 913; the SOP's of Wilmington Police Station concerning the taping of suspects; the specific location and placement of video tape lens and microphones at Wilmington Police Station; the chain-of-custody of this video tape clearly State Police evidence and not that of Wilmington Police so the tape would have been removed to State Police evidence; the procedure of logging chain-of-custody at State Police evidence storage, and discovery of the defendant's evidence logbook entries.

This was a case of 24 felony charges against his client. Counsel "dropped the ball" over and over here. Defendant asserts that each one of the above errors is a reversible error in itself, and, in their compound form clearly call for a finding of ineffective assistance of counsel and the prejudice as well.

Defendant also requests a separate de nova standard of review based on the prejudicial aspects that they not be held to a plain error standard of review, because it is not defendant's fault he was supplied with ineffective counsel by the State.

Finally, none of the above unprofessional errors could be categorized as either tactical or strategical for the defense. Counsel acted outside the scope of professional reasonable representation and there is a reasonable probability that the outcome of these proceedings would have come out differently and counsel's errors were probably sufficient to undermine confidence in the outcome. Counsel's errors were so serious as to deprive the defendant a fair trial, a trial whose result is unreliable.

Lockhart v. Fretwell, supra explains that the Strickland outcome determination test for prejudice is not the exclusive standard for prejudice clarifying that the primary focus of the prejudice prong of that test under the 6th Amendment is the reliability of the result and the fairness of trial Id. at 368-370. More specifically the Court held the prejudice component of Strickland tests " . . . focuses on the question whether Counsels deficient performance renders the result of the trial unreliable or proceeding fundamentally unfair." id. at 372

CONCLUSION

The unfair presumption for "Stolen property" where the person made charged with actual theft is too strict. After that the "possessing stolen property" unless there is reliable evidence to prove otherwise.

Nobody Identified the Defendant positively at any of the crime scenes, and certainly not in this car. The State's proof is circumstantial evidence that Defendant touched mirror.

We still do not a driver we have an inference from the robbery that the car was at the store, but the occupant or occupants have not been Identified, and can not be inferred from the inference.

The missing Nexus Defense Counsel should have guarded his client case concerning any evidence the State tried to offer which would unlawfully "bridge" this Nexus they needed to prove their case.

One very potent illegal piece of evidence came in the State's Opening, caused by Counsel's stipulation that changed the jury's attitude to "want to convict" the Defendant.

The next very damaging evidence concerning this "linkage" or "Nexus" came through the State's first witness who made an unreliable "In-Court" Identification, based primarily on detectives description of Defendant After he was arrested.

The State offers Character evidence of Defendant's Attitude placing the focus that not only was the Defendant a convicted criminal, but he was "a professional" or "Experienced" criminal to boot.

## Certificate of Service

I, _Seyearl C. Bacon_, hereby certify that I have served a true and correct cop(ies) of the attached: _Post Conviction_ _Appeal_ upon the following parties/person (s):

TO: _Loren C. Meyer_        TO: _J. P. Meyer_
_Dept. Of Justice_            _119 E. Del. Canal Ct._
_820 N. French St._          _Middletown, Del._
_Wilmington, Del._
_19801_                      _19709_


TO: _Hon. Judge Susan C. Delpesco_ TO: _____
_Superior Court_             _____
_500 N. King St._            _____
_Wilmington, Del._           _____
_19801_                      _____


BY PLACING SAME IN A SEALED ENVELOPE and depositing same in the United States Mail at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, DE 19977.

On this _20_ day of _January_ 2006