Westlaw.

116 S.Ct. 2174                                                                                              Page 1
518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal
D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

▷Lewis v. Casey
U.S.Ariz.,1996.

Supreme Court of the United States
Samuel A. LEWIS, Director, Arizona Department Of
ment Of Corrections, et al., Petitioners,
v.
Fletcher CASEY, Jr., et al.
**No. 94-1511.**

Argued Nov. 29, 1995.
Decided June 24, 1996.

Inmates brought civil rights action alleging that
Arizona prison officials violated their constitutional
right of access to the courts. The United States
District Court for the District of Arizona, Muecke, J.,
834 F.Supp. 1553, found constitutional violations and
granted injunctive relief. Arizona Department of
Corrections appealed. The Ninth Circuit Court of
Appeals, Pregerson, Circuit Judge, 43 F.3d 1261,
affirmed in part, and vacated and remanded in part.
Certiorari was granted. The Supreme Court, Scalia,
Justice, held that: (1) inmate claiming denial of
access to courts cannot establish relevant actual
injury simply by establishing that his prison's law
library or legal assistance program is subpar in some
theoretical sense; (2) finding that only two inmates,
who were illiterate or non-English speakers, suffered
actual injury as a result of inability to receive
adequate legal assistance did not support systemwide
injunction mandating detailed, systemwide changes
in Arizona Department of Corrections' prison law
libraries and its legal assistance program; (3) so long
as delays in receiving legal materials or legal
assistance to lockdown prisoners, who were most
dangerous and violent prisoners in Arizona prison
system, were product of prison regulations
reasonably related to legitimate penological interests,
delays of up to 16 days did not violate constitutional
right of access to the courts, even if they resulted in
actual injury; and (4) order mandating detailed,
systemwide changes in Arizona Department of
Corrections' prison law libraries and legal assistance
programs was improper as having been developed
through a process that failed to give adequate
consideration to views of state prison authorities.

Reversed and remanded.

Thomas, Justice, filed a concurring opinion.

Souter, Justice, filed an opinion concurring in part,
dissenting in part, and concurring in the judgment in
which Ginsburg and Breyer, Justices, joined.

Stevens, Justice, filed a dissenting opinion.

West Headnotes

**[1] Federal Civil Procedure 170A ⟐103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases
Standing is jurisdictional and not subject to waiver.

**[2] Federal Civil Procedure 170A ⟐103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases
"Doctrine of standing" is a constitutional principle
that prevents courts of law from undertaking tasks
assigned to political branches.

**[3] Constitutional Law 92 ⟐2450**

92 Constitutional Law
    92XX Separation of Powers
        92XX(C) Judicial Powers and Functions
            92XX(C)1 In General
                92k2450 k. Nature and Scope in
General. Most Cited Cases
    (Formerly 92k67)

**Constitutional Law 92 ⟐2580**

92 Constitutional Law
    92XX Separation of Powers

116 S.Ct. 2174                                                                    Page 2
518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
(Cite as: 518 U.S. 343, 116 S.Ct. 2174)

92XX(C) Judicial Powers and Functions
  92XX(C)5 Political Questions
    92k2580 k. In General. Most Cited Cases
  (Formerly 92k68(1))

**Federal Civil Procedure 170A ☞103.2**

170A Federal Civil Procedure
  170AII Parties
    170AII(A) In General
      170Ak103.1 Standing
        170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
It is role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not role of courts, but that of political branches, to shape institutions of government in such fashion as to comply with the laws and the Constitution.

**[4] Prisons 310 ☞4(11)**

310 Prisons
  310k4 Regulation and Supervision
    310k4(10) Access to Courts and Public Officials
      310k4(11) k. Access to Counsel; Paralegal Counsel and Inmate Assistance. Most Cited Cases

**Prisons 310 ☞4(13)**

310 Prisons
  310k4 Regulation and Supervision
    310k4(10) Access to Courts and Public Officials
      310k4(13) k. Law Books and Law Libraries, Legal Materials, and Opportunity for Legal Work. Most Cited Cases
Because Supreme Court decision in *Bounds,* which held that fundamental constitutional right of access to courts requires prison authorities to assist inmates in preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law, did not create an abstract, free-standing right to a law library or legal assistance, inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. U.S.C.A. Const.Amend. 14.

**[5] Prisons 310 ☞4(10.1)**

310 Prisons
  310k4 Regulation and Supervision
    310k4(10) Access to Courts and Public Officials
      310k4(10.1) k. In General. Most Cited Cases

**Prisons 310 ☞4(11)**

310 Prisons
  310k4 Regulation and Supervision
    310k4(10) Access to Courts and Public Officials
      310k4(11) k. Access to Counsel; Paralegal Counsel and Inmate Assistance. Most Cited Cases

**Prisons 310 ☞4(13)**

310 Prisons
  310k4 Regulation and Supervision
    310k4(10) Access to Courts and Public Officials
      310k4(13) k. Law Books and Law Libraries, Legal Materials, and Opportunity for Legal Work. Most Cited Cases
Insofar as right of access to the courts vindicated by *Bounds* is concerned, meaningful access to the courts is the touchstone, and inmate therefore must go one step further and demonstrate that alleged shortcomings in library or legal assistance program hindered his efforts to pursue a legal claim. U.S.C.A. Const.Amend. 14.

**[6] Prisons 310 ☞4(11)**

310 Prisons
  310k4 Regulation and Supervision
    310k4(10) Access to Courts and Public Officials
      310k4(11) k. Access to Counsel; Paralegal Counsel and Inmate Assistance. Most Cited Cases

**Prisons 310 ☞4(13)**

310 Prisons
  310k4 Regulation and Supervision
    310k4(10) Access to Courts and Public Officials
      310k4(13) k. Law Books and Law

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

Libraries, Legal Materials, and Opportunity for Legal Work. Most Cited Cases

Although Supreme Court decision in *Bounds,* holding that right of access to the courts requires prison authorities to assist inmates in preparation and filing of meaningful legal papers by providing inmates with adequate law libraries or adequate assistance from persons trained in the law, itself made no mention of an actual-injury requirement, it did not eliminate that constitutional prerequisite. U.S.C.A. Const.Amend. 14.

**[7] Prisons 310 🗝4(10.1)**

310 Prisons
    310k4 Regulation and Supervision
      310k4(10) Access to Courts and Public Officials
        310k4(10.1) k. In General. Most Cited Cases

**Prisons 310 🗝4(13)**

310 Prisons
    310k4 Regulation and Supervision
      310k4(10) Access to Courts and Public Officials
        310k4(13) k. Law Books and Law Libraries, Legal Materials, and Opportunity for Legal Work. Most Cited Cases

*Bounds*' injury requirement for inmate's claim of denial of access to the courts is not satisfied by just any type of frustrated legal claim; *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims; rather, the tools it requires to be provided are those that inmates need in order to attack their sentences, directly or collaterally, and in order to challenge conditions of confinement. U.S.C.A. Const.Amend. 14.

**[8] Injunction 212 🗝189**

212 Injunction
    212V Permanent Injunction and Other Relief
      212k189 k. Nature and Scope of Relief. Most Cited Cases

Finding that only two inmates, who were illiterate or non-English speakers, suffered actual injury as a result of inability to receive adequate legal assistance did not support systemwide injunction mandating

detailed, systemwide changes in Arizona Department of Corrections' prison law libraries and its legal assistance program. U.S.C.A. Const.Amend. 14.

**[9] Prisons 310 🗝4(11)**

310 Prisons
    310k4 Regulation and Supervision
      310k4(10) Access to Courts and Public Officials
        310k4(11) k. Access to Counsel; Paralegal Counsel and Inmate Assistance. Most Cited Cases

**Prisons 310 🗝4(13)**

310 Prisons
    310k4 Regulation and Supervision
      310k4(10) Access to Courts and Public Officials
        310k4(13) k. Law Books and Law Libraries, Legal Materials, and Opportunity for Legal Work. Most Cited Cases

When any inmate, even an illiterate or non-English-speaking inmate, shows that an actionable claim which he desired to bring has been lost or rejected, or that presentation of claim is currently being prevented, because capability of filing suit has not been provided, he demonstrates that the state has failed to furnish adequate law libraries or adequate assistance from persons trained in the law in violation of constitutional right of access to the courts. U.S.C.A. Const.Amend. 14.

**[10] Prisons 310 🗝4(11)**

310 Prisons
    310k4 Regulation and Supervision
      310k4(10) Access to Courts and Public Officials
        310k4(11) k. Access to Counsel; Paralegal Counsel and Inmate Assistance. Most Cited Cases

**Prisons 310 🗝4(13)**

310 Prisons
    310k4 Regulation and Supervision
      310k4(10) Access to Courts and Public Officials
        310k4(13) k. Law Books and Law Libraries, Legal Materials, and Opportunity for Legal Work. Most Cited Cases

So long as delays in providing legal materials or legal

assistance to lockdown prisoners, who were most dangerous and violent prisoners in Arizona prison system, were product of prison regulations reasonably related to legitimate penological interests, delays of up to 16 days did not violate constitutional right of access to the courts, even if they resulted in actual injury. U.S.C.A. Const.Amend. 14.

**[11]** Prisons 310 ☞4(3)

310 Prisons
    310k4 Regulation and Supervision
        310k4(2) Judicial Supervision
            310k4(3) k. State Prisons. Most Cited Cases
District court order mandating detailed, systemwide changes in Arizona Department of Corrections' prison law libraries and legal assistance programs was improper as having been developed through a process that failed to give adequate consideration to views of state prison authorities. U.S.C.A. Const.Amend. 14.

**\*\*2176\*343**Syllabus[FN\*]

> [FN\*] The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.*

Respondents, who are inmates of various prisons operated by the Arizona Department of Corrections (ADOC), brought a class action against petitioners, ADOC officials, alleging that petitioners were furnishing them with inadequate legal research facilities and thereby depriving them of their right of access to the courts, in violation of *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72. The District Court found petitioners to be in violation of *Bounds* and issued an injunction mandating detailed, systemwide changes in ADOC's prison law libraries and in its legal assistance programs. The Ninth Circuit affirmed both the finding of a *Bounds* violation and the injunction's major terms.

*Held:* The success of respondents' systemic challenge was dependent on their ability to show widespread actual injury, and the District Court's failure to identify anything more than isolated instances of actual injury renders its finding of a systemic *Bounds* violation invalid. Pp. 2178-2186.

(a) *Bounds* did not create an abstract, free standing right to a law library or legal assistance; rather, the right that *Bounds* acknowledged was the right of *access to the courts.* E.g., 430 U.S., at 817, 821, 828, 97 S.Ct., at 1492-1493, 1494, 1498. Thus, to establish a *Bounds* violation, the "actual injury" that an inmate must demonstrate is that the alleged shortcomings in the prison library or legal assistance program have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. This requirement derives ultimately from the doctrine of standing. Although *Bounds* made no mention of an actual injury requirement, it can hardly be thought to have eliminated that constitutional prerequisite. Pp. 2179-2181.

(b) Statements in *Bounds* suggesting that prison authorities must also enable the prisoner to *discover* grievances, and to *litigate effectively* once in court, 430 U.S., at 825-826, and n. 14, 97 S.Ct., at 1496-1497 and n. 14, have no antecedent in this Court's pre-*Bounds* cases, and are now disclaimed. Moreover, *Bounds* does not guarantee inmates the wherewithal to file any and every type of legal claim, but requires only that they be provided with the tools to attack their sentences, directly or collaterally, and to challenge the conditions of their confinement. Pp. 2181-2182.

**\*344** c) The District Court identified only two instances of actual injury: It found that ADOC's failures with respect to illiterate prisoners had resulted in the dismissal with prejudice of inmate Bartholic's lawsuit and the inability of inmate Harris to file a legal action. P. 2182.

(d) These findings as to injury do not support the systemwide injunction ordered by the District Court. The remedy must be limited to the inadequacy that produced the injury in fact that the plaintiff has established; that this is a class action changes **\*\*2177** nothing, for even named plaintiffs in a class action must show that they personally have been injured, see, *e.g., Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 40, n. 20, 96 S.Ct. 1917, 1925, n. 20, 48 L.Ed.2d 450.* Only one named plaintiff, Bartholic, was found to have suffered actual injury-as a result of ADOC's failure to provide the special services he would have needed, in light of his particular disability (illiteracy), to avoid dismissal of his case. Eliminated from the proper scope of the

injunction, therefore, are provisions directed at special services or facilities required by non-English speakers, by prisoners in lockdown, and by the inmate population at large. Furthermore, the inadequacy that caused actual injury to illiterate inmates Bartholic and Harris was not sufficiently widespread to justify systemwide relief. There is no finding, and no evidence discernible from the record, that in ADOC prisons other than those occupied by Bartholic and Harris illiterate inmates cannot obtain the minimal help necessary to file legal claims. Pp. 2183-2184.

(e) There are further reasons why the order here cannot stand. In concluding that ADOC's restrictions on lockdown inmates were unjustified, the District Court failed to accord the judgment of prison authorities the substantial deference required by cases such as *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261-2262, 96 L.Ed.2d 64. The court also failed to leave with prison officials the primary responsibility for devising a remedy. Compare *Preiser v. Rodriguez,* 411 U.S. 475, 492, 93 S.Ct. 1827, 1837-1838, 36 L.Ed.2d 439. The result of this improper procedure was an inordinately intrusive order. Pp. 2185-2186.

43 F.3d 1261, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined, and in Parts I and III of which SOUTER, GINSBURG, GINSBURG, and BREYER, JJ, joined. THOMAS, J., filed a concurring opinion, *post,* p. 2186. SOUTER, J., filed an opinion concurring in part, dissenting in part, and concurring in the judgment, in which GINSBURG and BREYER, JJ., joined, *post,* p. 2200. STEVENS, J., filed a dissenting opinion, *post,* p. 2206.

*345 Grant Woods, Phoenix, AZ, for petitioners.
Elizabeth Alexander, Washington, DC, for respondents. For U.S. Supreme Court briefs, see:1995 WL 490050 (Pet.Brief)1995 WL 577632 (Resp.Brief)1995 WL 638521 (Reply.Brief)
*346 Justice SCALIA delivered the opinion of the Court.

In *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), we held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.,* at 828, 97 S.Ct., at 1498. Petitioners, who are officials of the Arizona Department of Corrections (ADOC), contend that the United States District Court for the District of Arizona erred in finding them in violation of *Bounds,* and that the court's remedial order exceeded lawful authority.

I

Respondents are 22 inmates of various prisons operated by ADOC. In January 1990, they filed this class action "on behalf of all adult prisoners who are or will be incarcerated by the State of Arizona Department of Corrections," App. 22, alleging that petitioners were "depriving [respondents] of their rights of access to the courts and counsel protected by the First, Sixth, and Fourteenth Amendments,"*id.,* at 34. Following a 3-month bench trial, the District Court ruled in favor of respondents, finding that "[p]risoners have a constitutional right of access to the courts that is adequate, effective and meaningful,"834 F.Supp. 1553, 1566 (1992), citing *Bounds, supra,* at 822, 97 S.Ct., at 1495, and that "[ADOC's] system fails to comply with constitutional standards,"834 F.Supp., at 1569. The court identified a variety of shortcomings of the ADOC system, in matters ranging from the training of **2178 library staff, to the updating of legal materials, to the availability of photocopying services. In addition to these general findings, *347 the court found that two groups of inmates were particularly affected by the system's inadequacies: "[l]ockdown prisoners" (inmates segregated from the general prison population for disciplinary or security reasons), who "are routinely denied physical access to the law library" and "experience severe interference with their access to the courts,"id., at 1556; and illiterate or non-English-speaking inmates, who do not receive adequate legal assistance, *id., at 1558.*

Having thus found liability, the court appointed a Special Master "to investigate and report about" the appropriate relief-that is (in the court's view), "how best to accomplish the goal of constitutionally adequate inmate access to the courts." App. to Pet. for Cert. 87a. Following eight months of investigation, and some degree of consultation with both parties, the Special Master lodged with the court a proposed permanent injunction, which the court proceeded to adopt, substantially unchanged. The 25-page injunctive order, see *id.,* at 61a-85a, mandated

116 S.Ct. 2174                                                                    Page 6
518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal
D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

sweeping changes designed to ensure that ADOC would "provide meaningful access to the Courts for all present and future prisoners,"*id.,* at 61a. It specified in minute detail the times that libraries were to be kept open, the number of hours of library use to which each inmate was entitled (10 per week), the minimal educational requirements for prison librarians (a library science degree, law degree, or paralegal degree), the content of a videotaped legal-research course for inmates (to be prepared by persons appointed by the Special Master but funded by ADOC), and similar matters. *Id.,* at 61a, 67a, 71a. The injunction addressed the court's concern for lockdown prisoners by ordering that "ADOC prisoners in all housing areas and custody levels shall be provided regular and comparable visits to the law library," except that such visits "may be postponed on an individual basis because of the prisoner's documented inability to use the law library without creating *348 a threat to safety or security, or a physical condition if determined by medical personnel to prevent library use." *Id.,* at 61a. With respect to illiterate and non-English-speaking inmates, the injunction declared that they were entitled to "direct assistance" from lawyers, paralegals, or "a sufficient number of at least minimally trained prisoner Legal Assistants"; it enjoined ADOC that "[p]articular steps must be taken to locate and train bilingual prisoners to be Legal Assistants." *Id.,* at 69a-70a.

Petitioners sought review in the Court of Appeals for the Ninth Circuit, which refused to grant a stay prior to argument. We then stayed the injunction pending filing and disposition of a petition for a writ of certiorari. 511 U.S. 1066, 114 S.Ct. 1638, 128 L.Ed.2d 360 (1994). Several months later, the Ninth Circuit affirmed both the finding of a *Bounds* violation and, with minor exceptions not important here, the terms of the injunction. 43 F.3d 1261 (1994). We granted certiorari, 514 U.S. 1126, 115 S.Ct. 1997, 131 L.Ed.2d 999 (1995).

II

[1] Although petitioners present only one question for review, namely, whether the District Court's order "exceeds the constitutional requirements set forth in *Bounds*," Brief for Petitioners (i), they raise several distinct challenges, including renewed attacks on the court's findings of *Bounds* violations with respect to illiterate, non-English-speaking, and lockdown prisoners, and on

the breadth of the injunction. But their most fundamental contention is that the District Court's findings of injury were inadequate to justify the finding of *systemwide* injury and hence the granting of systemwide relief. This argument has two related components. First, petitioners claim that in order to establish a violation of *Bounds,* an inmate must show that the alleged inadequacies of a prison's library facilities or legal assistance program caused him "actual injury"-that is, "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." *349 Brief for Petitioners 30.[FN1] Second, **2179 they claim that the District Court did not find enough instances of actual injury to warrant systemwide relief. We agree that the success of respondents' systemic challenge was dependent on their ability to show widespread actual injury, and that the court's failure to identify anything more than isolated instances of actual injury renders its finding of a systemic *Bounds* violation invalid.

> FN1. Respondents contend that petitioners failed properly to present their "actual injury" argument to the Court of Appeals. Brief for Respondents 25-26. Our review of petitioners' briefs before that court leads us to conclude otherwise, and in any event, as we shall discuss, the point relates to standing, which is jurisdictional and not subject to waiver. See *United States v. Hays,* 515 U.S. 737, 742, 115 S.Ct. 2431, 2434-2435, 132 L.Ed.2d 635 (1995);*FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 230-231, 110 S.Ct. 596, 607-608, 107 L.Ed.2d 603 (1990). Justice SOUTER recognizes the jurisdictional nature of this point, *post,* at 2200, which is difficult to reconcile with his view that we should not "reach out to address" it, *post,* at 2201.

A

[2][3] The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches. See *Allen v. Wright,* 468 U.S. 737, 750-752, 104 S.Ct. 3315, 3324-3325, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471-476, 102 S.Ct. 752, 757-761, 70

116 S.Ct. 2174

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
(Cite as: 518 U.S. 343, 116 S.Ct. 2174)

Page 7

L.Ed.2d 700 (1982). It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution. In the context of the present case: It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts; it is for the political branches of the State and Federal Governments to manage prisons in such fashion that official interference with the presentation of claims will not occur. *350 Of course, the two roles briefly and partially coincide when a court, in granting relief against actual harm that has been suffered, or that will imminently be suffered, by a particular individual or class of individuals, orders the alteration of an institutional organization or procedure that causes the harm. But the distinction between the two roles would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly. If-to take another example from prison life-a healthy inmate who had suffered no deprivation of needed medical treatment were able to claim violation of his constitutional right to medical care, see *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), simply on the ground that the prison medical facilities were inadequate, the essential distinction between judge and executive would have disappeared: it would have become the function of the courts to assure adequate medical care in prisons.

The foregoing analysis would not be pertinent here if, as respondents seem to assume, the right at issue-the right to which the actual or threatened harm must pertain-were the right to a law library or to legal assistance. But *Bounds* established no such right, any more than *Estelle* established a right to a prison hospital. The right that *Bounds* acknowledged was the (already well-established) right of *access to the courts*. E.g., *Bounds*, 430 U.S., at 817, 821, 828, 97 S.Ct., at 1492-1493, 1494, 1498. In the cases to which *Bounds* traced its roots, we had protected that right by prohibiting state prison officials from actively interfering with inmates' attempts to prepare legal documents, *e.g.*, *Johnson v. Avery*, 393 U.S. 483, 484, 489-490, 89 S.Ct. 747, 748, 750-751, 21 L.Ed.2d 718 (1969), or file them, *e.g.*, *Ex parte Hull*, 312 U.S. 546, 547-549, 61 S.Ct. 640, 640-642, 85 L.Ed. 1034 (1941), and by requiring state courts to

waive filing fees, *e.g.*, *Burns v. Ohio*, 360 U.S. 252, 258, 79 S.Ct. 1164, 1168-1169, 3 L.Ed.2d 1209 (1959), or transcript fees, *e.g.*, *Griffin v. Illinois*, 351 U.S. 12, 19, 76 S.Ct. 585, 590-591, 100 L.Ed. 891 (1956), for indigent inmates. *Bounds* focused on the same entitlement of access to the courts. Although it affirmed a court **2180 order *351 requiring North Carolina to make law library facilities available to inmates, it stressed that that was merely "one constitutionally acceptable method to assure meaningful access to the courts," and that "our decision here ... does not foreclose alternative means to achieve that goal." 430 U.S., at 830, 97 S.Ct., at 1499. In other words, prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id., at 825, 97 S.Ct., at 1496.*

[4][5] Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. That would be the precise analog of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary. Insofar as the right vindicated by *Bounds* is concerned, "meaningful access to the courts is the touchstone," *id., at 823, 97 S.Ct., at 1495* (internal quotation marks omitted), and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

[6] Although *Bounds* itself made no mention of an actual-injury requirement, it can hardly be thought to have eliminated that constitutional prerequisite. And actual injury is apparent on the face of almost all the opinions in the 35-year line of access-to-courts cases on which *Bounds* relied, see *352id., at 821-825, 97 S.Ct., at 1494-1497.*[FN2] Moreover, the assumption of an actual-injury requirement seems to us implicit in the opinion's statement that "we

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362

**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

encourage local experimentation" in various methods of assuring access to the courts. *Id., at 832, 97 S.Ct., at 1500.* One such experiment, for example, might replace libraries with some minimal access to legal advice and a system of court-provided forms such as those that contained the original complaints in two of the more significant inmate-initiated cases in recent years, *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), and *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)-forms that asked the inmates to provide only the facts and not to attempt any legal analysis. We hardly think that what we meant by "experimenting" with such an alternative was simply announcing it, whereupon suit would immediately lie to declare it theoretically inadequate and bring the experiment to a close. We **2181 think we envisioned, instead, that the new *353 program would remain in place at least until some inmate could demonstrate that a nonfrivolous [FN3] legal claim had been frustrated or was being impeded.[FN4]

FN2. Justice STEVENS suggests that *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), establishes that even a lost *frivolous* claim establishes standing to complain of a denial of access to courts, see *post,* at 2208. As an initial matter, that is quite impossible, since standing was neither challenged nor discussed in that case, and we have repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect. See, *e.g., Federal Election Comm'n v. NRA Political Victory Fund,* 513 U.S. 88, 97, 115 S.Ct. 537, 542-543, 130 L.Ed.2d 439 (1994);*United States v. More,* 3 Cranch 159, 172, 2 L.Ed. 397 (1805) (Marshall, C.J.) (statement at oral argument). On the merits, however, it is simply not true that the prisoner's claim in *Hull* was frivolous. We rejected it because it had been procedurally defaulted, by *inter alia,* failure to object at trial and failure to include a transcript with the petition, 312 U.S., at 551, 61 S.Ct., at 642-643. If all procedurally defaulted claims were frivolous, Rule 11 business would be brisk indeed. Justice STEVENS's assertion that "we held that the smuggled petition had insufficient merit even to require an answer from the State,"*post,* at 2208, is misleading. The attorney general of Michigan appeared in the case, and our opinion discussed the merits of the claim at some length, see 312 U.S., at 549-551, 61 S.Ct., at 641-643. The posture of the case was such, however, that we treated the claim "as a motion for leave to file a petition for writ of habeas corpus,"*id., at 550, 61 S.Ct., at 642;* after analyzing petitioner's case, we found it "insufficient to compel *an order requiring the warden to answer," id., at 551, 61 S.Ct., at 642* (emphasis added). That is not remotely equivalent to finding that the underlying claim was frivolous.

FN3. Justice SOUTER believes that *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), guarantees prison inmates the right to present frivolous claims-the determination of which suffices to confer standing, he says, because it assumes that the dispute " 'will be presented in an adversary context and in a form historically viewed as capable of judicial resolution,' " *post,* at 2203, quoting *Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). This would perhaps have seemed like good law at the time of *Flast,* but our later opinions have made it explicitly clear that *Flast* erred in assuming that assurance of "serious and adversarial treatment" was the only value protected by standing. See, *e.g., United States v. Richardson,* 418 U.S. 166, 176-180, 94 S.Ct. 2940, 2946-2948, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 220-223, 94 S.Ct. 2925, 2931-2933, 41 L.Ed.2d 706 (1974). *Flast* failed to recognize that this doctrine has a separation-of-powers component, which keeps courts within certain traditional bounds vis-à-vis the other branches, concrete adverseness or not. That is where the "actual injury" requirement comes from. Not everyone who can point to some "concrete" act and is "adverse" can call in the courts to examine the propriety of executive action, but only someone who has been *actually injured.* Depriving someone of an arguable (though not yet established) claim inflicts actual injury because it deprives him of something of value-arguable claims are settled, bought, and sold. Depriving someone of a frivolous claim, on the other hand, deprives him of nothing at

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions.

FN4. Justice SOUTER suggests that he would waive this actual-injury requirement in cases "involving substantial, systemic deprivation of access to court"-that is, in cases involving " 'a direct, substantial and continuous ... limit on legal materials,' " "total denial of access to a library," or " '[a]n *absolute* deprivation of access to *all* legal materials,' " *post,* at 2204, and n. 2. That view rests upon the expansive understanding of *Bounds* that we have repudiated. Unless prisoners have a freestanding right to libraries, a showing of the sort Justice SOUTER describes would establish no *relevant* injury in fact, *i.e.,* injury-in-fact *caused by the violation of legal right.* See *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324-3325, 82 L.Ed.2d 556 (1984). Denial of access to the courts could not possibly cause the harm of inadequate libraries, but only the harm of lost, rejected, or impeded legal claims.

Of course, Justice SOUTER's proposed exception is unlikely to be of much real-world significance in any event. Where the situation is so extreme as to constitute "an *absolute* deprivation of access to *all* legal materials," finding a prisoner with a claim affected by this extremity will probably be easier than proving the extremity.

**\*354** It must be acknowledged that several statements in *Bounds* went beyond the right of access recognized in the earlier cases on which it relied, which was a right to bring to court a grievance that the inmate wished to present, see, *e.g., Ex parte Hull,* 312 U.S., at 547-548, 61 S.Ct., at 640-641;*Griffin v. Illinois,* 351 U.S., at 13-16, 76 S.Ct., at 588-589;*Johnson v. Avery,* 393 U.S., at 489, 89 S.Ct., at 750-751. These statements appear to suggest that the State must enable the prisoner to *discover* grievances, and to *litigate effectively* once in court. See *Bounds,* 430 U.S., at 825-826, and n. 14, 97 S.Ct., at 1497, and n. 14. These elaborations upon the right of access to the courts have no antecedent in our pre-*Bounds* cases, and we now disclaim them. To demand the conferral of such sophisticated legal capabilities upon a mostly uneducated and indeed largely illiterate prison population is effectively to demand permanent provision of counsel, which we do not believe the

Constitution requires.

[7] Finally, we must observe that the injury requirement is not satisfied by just any type of frustrated legal claim. Nearly all of the access-to-courts cases in the *Bounds* line involved attempts by inmates to pursue direct appeals from the convictions for which they were incarcerated, see *Douglas v. California,* 372 U.S. 353, 354, 83 S.Ct. 814, 815, 9 L.Ed.2d 811 (1963); *Burns v. Ohio,* 360 U.S., at 253, 258, 79 S.Ct., at 1166, 1168-1169;*Griffin v. Illinois, supra,* at 13, 18, 76 S.Ct., at 588, 590;*Cochran v. Kansas,* 316 U.S. 255, 256, 62 S.Ct. 1068, 1069, 86 L.Ed. 1453 (1942), or habeas petitions, see *Johnson v. Avery, supra,* at 489, 89 S.Ct., at 750-751;*Smith v. Bennett,* 365 U.S. 708, 709-710, 81 S.Ct. 895, 896-897, 6 L.Ed.2d 39 (1961); *Ex parte Hull, supra,* at 547-548, 61 S.Ct., at 640-641. In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), we extended this universe of relevant claims only slightly, to "civil rights actions"-*i.e.,* actions under 42 U.S.C. § 1983 to vindicate **\*\*2182** "basic constitutional rights." 418 U.S., at 579, 94 S.Ct., at 2986. Significantly, we felt compelled to justify even this slight extension of the right of access to the courts, stressing that "the demarcation line between civil rights actions and habeas**\*355** petitions is not always clear," and that "[i]t is futile to contend that the Civil Rights Act of 1871 has less importance in our constitutional scheme than does the Great Writ."*Ibid.* The prison law library imposed in *Bounds* itself was far from an all-subject facility. In rejecting the contention that the State's proposed collection was inadequate, the District Court there said:

"This Court does not feel inmates need the entire U.S.Code Annotated. Most of that code deals with federal laws and regulations that would never involve a state prisoner....

"It is also the opinion of this Court that the cost of N.C. Digest and Modern Federal Practice Digest will surpass the usefulness of these research aids. They cover mostly areas not of concern to inmates." [FN5] Supplemental App. to Pet. for Cert. in *Bounds v. Smith,* O.T.1976, No. 75-915, p. 18.

FN5. The District Court order in this case, by contrast, required ADOC to stock each library with, *inter alia,* the Arizona Digest, the Modern Federal Practice Digest, Corpus Juris Secundum, and a full set of the United States Code Annotated, and to provide a 30-40 hour videotaped legal research course covering "relevant tort and civil law,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

including immigration and family issues." App. to Pet. for Cert. 69a, 71a; 834 F.Supp. 1553, 1561-1562 (Ariz.1992).

In other words, *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

#### *356 B

[8] Here the District Court identified only two instances of actual injury. In describing ADOC's failures with respect to illiterate and non-English-speaking prisoners, it found that "[a]s a result of the inability to receive adequate legal assistance, prisoners who are slow readers have had their cases dismissed with prejudice," and that "[o]ther prisoners have been unable to file legal actions." 834 F.Supp., at 1558. Although the use of the plural suggests that several prisoners sustained these actual harms, the court identified only one prisoner in each instance. *Id.,* at 1558, nn. 37 (lawsuit of inmate Bartholic dismissed with prejudice), 38 (inmate Harris unable to file a legal action).

[9] Petitioners contend that "any lack of access experienced by these two inmates is not attributable to unconstitutional State policies," because ADOC "has met its constitutional obligations." Brief for Petitioners 32, n. 22. The claim appears to be that all inmates, including the illiterate and non-English speaking, have a right to nothing more than "physical access to excellent libraries, *plus* help from legal assistants and law clerks." *Id.,* at 35. This misreads *Bounds,* which as we have said guarantees no particular methodology but rather the conferral of a capability-the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts. When any inmate, even an illiterate or non-English-speaking inmate, shows that an actionable claim of this nature which he desired to bring has been lost or rejected, or that the presentation of such a claim is currently being prevented, because this capability of filing suit has not been provided, he demonstrates that the State has

failed to furnish "*adequate* law libraries or *adequate* assistance from persons trained in the law," *Bounds,* 430 U.S., at 828, 97 S.Ct., at 1498 (emphasis added). Of course, we leave it to prison officials to determine how best to ensure that inmates with language problems have a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement. But it is *357 that capability, rather than the capability of turning pages in a law library, that is the touchstone.

#### **2183 C

Having rejected petitioners' argument that the injuries suffered by Bartholic and Harris do not count, we turn to the question whether those injuries, and the other findings of the District Court, support the injunction ordered in this case. The actual-injury requirement would hardly serve the purpose we have described above-of preventing courts from undertaking tasks assigned to the political branches-if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration. The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established. See *Missouri v. Jenkins,* 515 U.S. 70, 88, 89, 115 S.Ct. 2038, 2049-2050, 132 L.Ed.2d 63 (1995) ("[T]he nature of the ... remedy is to be determined by the nature and scope of the constitutional violation" (citation and internal quotation marks omitted)).

This is no less true with respect to class actions than with respect to other suits. "That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' " *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 40, n. 20, 96 S.Ct. 1917, 1925, n. 20, 48 L.Ed.2d 450 (1976), quoting *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975). The general allegations of the complaint in the present case may well have sufficed to claim injury by named plaintiffs, and hence standing to demand remediation, with respect to various alleged inadequacies in the prison system, including failure to provide adequate legal assistance to non-English-speaking inmates and lockdown prisoners. That point is irrelevant now, however, for we are beyond the

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

pleading stage.

*358 "Since they are not mere pleading requirements, but rather an indispensable part of the plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 2136-2137, 119 L.Ed.2d 351 (1992) (citations and internal quotation marks omitted).

After the trial in this case, the court found actual injury on the part of only one named plaintiff, Bartholic; and the cause of that injury-the inadequacy which the suit empowered the court to remedy-was failure of the prison to provide the special services that Bartholic would have needed, in light of his illiteracy, to avoid dismissal of his case. At the outset, therefore, we can eliminate from the proper scope of this injunction provisions directed at special services or special facilities required by non-English speakers, by prisoners in lockdown, and by the inmate population at large. If inadequacies of this character exist, they have not been found to have harmed any plaintiff in this lawsuit, and hence were not the proper object of this District Court's remediation.[FN6]

FN6. Justice STEVENS concludes, in gross, that Bartholic's and Harris's injuries are "sufficient to satisfy any constitutional [standing] concerns,"*post,* at 2207-2208. But standing is not dispensed in gross. If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review. That is of course not the law. As we

have said, "[n]or does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Blum v. Yaretsky,* 457 U.S. 991, 999, 102 S.Ct. 2777, 2783, 73 L.Ed.2d 534 (1982). As even Justice SOUTER concedes, the inability of respondents to produce *any* evidence of actual injury to other than *illiterate* inmates (Bartholic and Harris) "dispose[s] of the challenge to remedial orders insofar as they touch non-English speakers and lockdown prisoners." *Post,* at 2201.

Contrary to Justice STEVENS's suggestion, see *post,* at 2208, n. 4, our holding that respondents lacked standing to complain of injuries to non-English speakers and lockdown prisoners does *not* amount to "a conclusion that the class was improper." The standing determination is quite separate from certification of the class. Again, *Blum* proves the point: In that case, we held that a class of " 'all residents of skilled nursing and health related nursing facilities in New York State who are recipients of Medicaid benefits' " lacked standing to challenge transfers to higher levels of care, even though they had standing to challenge discharges and transfers to lower levels; but we did not disturb the class definition. See 457 U.S., at 997, n. 11, 999-1002, 102 S.Ct., at 2782, n. 11, 2783-2785.

**2184*359 As to remediation of the inadequacy that caused Bartholic's injury, a further question remains: Was that inadequacy widespread enough to justify systemwide relief? The only findings supporting the proposition that, in all of ADOC's facilities, an illiterate inmate wishing to file a claim would be unable to receive the assistance necessary to do so were (1) the finding with respect to Bartholic, at the Florence facility, and (2) the finding that Harris, while incarcerated at Perryville, had once been "unable to file [a] legal actio[n]." 834 F.Supp., at 1558. These two instances were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief. See *Dayton Bd. of Ed. v. Brinkman,* 433 U.S. 406, 417, 97 S.Ct. 2766, 2774, 53 L.Ed.2d 851 (1977) ( "[I]nstead of tailoring a remedy commensurate with the three specific violations, the Court of Appeals imposed a systemwide remedy going beyond their scope"); *id.,* at 420, 97 S.Ct., at 2776 ("[O]nly if there has been a systemwide impact may there be a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

systemwide remedy"); *360*Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979) ("The scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class").

To be sure, the District Court also noted that "the trial testimony ... indicated that there are prisoners who are unable to research the law because of their functional illiteracy,"834 F.Supp., at 1558. As we have discussed, however, the Constitution does not require that prisoners (literate or illiterate) be able to conduct generalized research, but only that they be able to present their grievances to the courts-a much more limited capability that can be produced by a much more limited degree of legal assistance. Apart from the dismissal of Bartholic's claim with prejudice, and Harris's inability to file his claim, there is no finding, and as far as we can discern from the record no evidence, that in Arizona prisons illiterate prisoners cannot obtain the minimal help necessary to file particular claims that they wish to bring before the courts. The constitutional violation has not been shown to be systemwide, and granting a remedy beyond what was necessary to provide relief to Harris and Bartholic was therefore improper.[FN7]

> FN7. Our holding regarding the inappropriateness of systemwide relief for illiterate inmates does not rest upon the application of standing rules, but rather, like Justice SOUTER'S conclusion, upon "the respondents' failure to prove that denials of access to illiterate prisoners pervaded the State's prison system,"*post,* at 2002. In one respect, however, Justice SOUTER'S view of this issue differs from ours. He believes that systemwide relief would have been appropriate "[h]ad the findings shown libraries in shambles throughout the prison system,"*ibid,.*That is consistent with his view, which we have rejected, that lack of access to adequate library facilities qualifies as relevant injury in fact, see n. 4, *supra.*

Contrary to Justice SOUTER'S assertion, *post,* at 2202, the issue of systemwide relief has nothing to do with the law governing class actions. *Whether or not* a class of plaintiffs with frustrated nonfrivolous claims *exists,* and no matter how *extensive* this class may be, unless it was established that violations with respect to that class occurred in all institutions of Arizona's system, there was no basis for a remedial decree imposed upon all those institutions. However

inadequate the library facilities may be as a theoretical matter, various prisons may have other means (active assistance from "jailhouse lawyers," complaint forms, etc.) that suffice to prevent the legal harm of denial of access to the courts. Courts have no power to presume and remediate harm that has not been established.

**2185*361 III

There are further reasons why the order here cannot stand. We held in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), that a prison regulation impinging on inmates' constitutional rights "is valid if it is reasonably related to legitimate penological interests." *Id., at 89, 107 S.Ct., at 2261.* Such a deferential standard is necessary, we explained,

"if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.' Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Ibid.* (citation omitted), quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977).

These are the same concerns that led us to encourage "local experimentation" in *Bounds,* see *supra,* at 2180, and we think it quite obvious that *Bounds* and *Turner* must be read *in pari materia.*

[10] The District Court here failed to accord adequate deference to the judgment of the prison authorities in at least three significant respects. First, the court concluded that ADOC's restrictions on lockdown prisoners' access to law libraries were unjustified. *Turner 's* principle of deference has special force with regard to that issue, since the inmates in lockdown include "the most dangerous and violent prisoners in the Arizona prison system," and other inmates presenting special disciplinary and security concerns. Brief for Petitioners 5. The District Court made much of the fact *362 that lockdown prisoners routinely experience delays in receiving legal materials or legal assistance, some as long as 16 days, 834 F.Supp., at 1557, and n. 23, but so long as they are the product of prison regulations reasonably related to legitimate penological interests, such delays are not of constitutional significance, even

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

where they result in actual injury (which, of course, the District Court did not find here).

Second, the injunction imposed by the District Court was inordinately-indeed, wildly-intrusive. There is no need to belabor this point. One need only read the order, see App. to Pet. for Cert. 61a-85a, to appreciate that it is the *ne plus ultra* of what our opinions have lamented as a court's "in the name of the Constitution, becom[ing] ... enmeshed in the minutiae of prison operations." *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979).

[11] Finally, the order was developed through a process that failed to give adequate consideration to the views of state prison authorities. We have said that "[t]he strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors ... also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons." *Preiser v. Rodriguez,* 411 U.S. 475, 492, 93 S.Ct. 1827, 1837-1838, 36 L.Ed.2d 439 (1973). For an illustration of the proper procedure in a case such as this, we need look no further than *Bounds* itself. There, after granting summary judgment for the inmates, the District Court refrained from " 'dictat[ing] precisely what course the State should follow.' " *Bounds,* 430 U.S., at 818, 97 S.Ct., at 1493. Rather, recognizing that "determining the 'appropriate relief to be ordered ... presents a difficult problem,' " the court " 'charge[d] the Department of Correction with the task of devising a Constitutionally sound program' to assure inmate access to the courts." *Id.,* at 818-819, 97 S.Ct., at 1493. The State responded with a proposal, which the District Court ultimately approved with minor changes, after considering objectionsraised **\*363** by the inmates. *Id.,* at 819-820, 97 S.Ct., at 1493-1494. We praised this procedure, observing that the court had "scrupulously respected the limits on [its] role," by "not ... thrust[ing] itself into prison administration" and instead permitting "[p]rison administrators [to] exercis[e] wide discretion within the bounds of constitutional requirements." *Id.,* at 832-833, 97 S.Ct., at 1500.

As *Bounds* was an exemplar of what should be done, this case is a model of what **\*\*2186** should not. The District Court totally failed to heed the admonition of *Preiser.* Having found a violation of the right of access to the courts, it conferred upon its special master, a law professor from Flushing, New York, rather than upon ADOC officials, the responsibility for devising a remedial plan. To make matters worse, it severely limited the remedies that the master could choose. Because, in the court's view, its order in an earlier access-to-courts case (an order that adopted the recommendations of the same special master) had "resolved successfully" most of the issues involved in this litigation, the court instructed that as to those issues it would implement the earlier order statewide, "with any modifications that the parties and Special Master determine are necessary due to the particular circumstances of the prison facility." App. to Pet. for Cert. 88a (footnote omitted). This will not do. The State was entitled to far more than an opportunity for rebuttal, and on that ground alone this order would have to be set aside.[FN8]

FN8. Justice STEVENS believes that the State of Arizona "is most to blame for the objectionable character of the final [injunctive] order,"*post,* at 2209, for two reasons: First, because of its lack of cooperation in prison litigation three to five years earlier before the same judge, see *Gluth v. Kangas,* 773 F.Supp. 1309 (Ariz.1988). But the rule that federal courts must "giv[e] the States the first opportunity to correct the errors made in the internal administration of their prisons,"*Preiser v. Rodriguez,* 411 U.S. 475, 492, 93 S.Ct. 1827, 1837-1838, 36 L.Ed.2d 439 (1973), is not to be set aside when a judge decides that a State was insufficiently cooperative in *a different, earlier case.* There was no indication of obstructive tactics by the State in the present case, from which one ought to have concluded that the State had learned its lesson. Second, Justice STEVENS contends that the State failed vigorously to oppose application of the *Gluth* methodology to the present litigation. But surely there was no reasonable doubt that the State objected to that methodology. Justice STEVENS demands from the State, we think, an unattainable degree of courage and foolishness in insisting that, having been punished for its recalcitrance in the earlier case by the imposition of the *Gluth* methodology, it antagonize the District Court further by "zealously" insisting that that methodology, recently vindicated on appeal, must be abandoned. It sufficed, we

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

think, for the State to submit for the record at every turn that "Defendants' objections and suggestions for modifications shall not be deemed a waiver of these Defendants' right to appeal prior rulings and orders of this Court or appeal from the subsequent final Order setting forth the injunctive relief regarding legal access issues," see, *e.g.*, App. 221, 225, 231, 239, 243.

**\*364** \* \* \*

For the foregoing reasons, we reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice THOMAS, concurring.

The Constitution charges federal judges with deciding cases and controversies, not with running state prisons. Yet, too frequently, federal district courts in the name of the Constitution effect wholesale takeovers of state correctional facilities and run them by judicial decree. This case is a textbook example. Dissatisfied with the quality of the law libraries and the legal assistance at Arizona's correctional institutions, the District Court imposed a statewide decree on the Arizona Department of Corrections (ADOC), dictating in excruciatingly minute detail a program to assist inmates in the filing of lawsuits-right down to permissible noise levels in library reading rooms. Such gross overreaching by a federal district court simply cannot be tolerated in our federal system. Principles of federalism and separation of powers dictate that exclusive responsibility for administering state prisons resides with the State and its officials.

**\*365** Of course, prison officials must maintain their facilities consistent with the restrictions and obligations imposed by the Constitution. In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), we recognized as part of the State's constitutional obligations a duty to provide prison inmates with law libraries or other legal assistance at state expense, an obligation we described as part of a loosely defined "right of access to the courts" enjoyed by prisoners. While the Constitution may guarantee state inmates an opportunity to bring suit to vindicate their federal constitutional rights, I find no basis in the Constitution-and *Bounds* cited none-for the right to have the government finance the endeavor.

**\*\*2187** I join the majority opinion because it places sensible and much-needed limitations on the seemingly limitless right to assistance created in *Bounds* and because it clarifies the scope of the federal courts' authority to subject state prisons to remedial decrees. I write separately to make clear my doubts about the validity of *Bounds* and to reiterate my observation in *Missouri v. Jenkins*, 515 U.S. 70, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995), that the federal judiciary has for the last half century been exercising "equitable" powers and issuing structural decrees entirely out of line with its constitutional mandate.

I

A

This case is not about a right of "access to the courts." There is no proof that Arizona has prevented even a single inmate from filing a civil rights lawsuit or submitting a petition for a writ of habeas corpus. Instead, this case is about the extent to which the Constitution requires a State to finance or otherwise assist a prisoner's efforts to bring suit against the State and its officials.

In *Bounds v. Smith, supra,* we recognized for the first time a "fundamental constitutional right" of all inmates to have the State "assist [them] in the preparation and filing of meaningful legal papers." *Id., at 828, 97 S.Ct., at 1498.* We were not explicit **\*366** as to the forms the State's assistance must take, but we did hold that, at a minimum, States must furnish prisoners "with adequate law libraries or adequate assistance from persons trained in the law." *Ibid.* Although our cases prior to *Bounds* occasionally referenced a constitutional right of access to the courts, we had never before recognized a freestanding constitutional right that requires the States to "shoulder affirmative obligations," *id., at 824, 97 S.Ct., at 1496,* in order to "insure that inmate access to the courts is adequate, effective, and meaningful,"*id., at 822, 97 S.Ct., at 1495.*

Recognition of such broad and novel principles of constitutional law are rare enough under our system of law that I would have expected the *Bounds* Court to explain at length the constitutional basis for the right to state-provided legal materials and legal assistance. But the majority opinion in *Bounds* failed

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

to identify a single provision of the Constitution to support the right created in that case, a fact that did not go unnoticed in strong dissents by Chief Justice Burger and then-Justice REHNQUIST. See *id., at 833-834, 97 S.Ct., at 1501* (opinion of Burger, C. J.) ("The Court leaves us unenlightened as to the source of the 'right of access to the courts' which it perceives or of the requirement that States 'foot the bill' for assuring such access for prisoners who want to act as legal researchers and brief writers"); *id., at 840, 97 S.Ct., at 1504* (opinion of REHNQUIST, J.) ("[T]he 'fundamental constitutional right of access to the courts' which the Court announces today is created virtually out of whole cloth with little or no reference to the Constitution from which it is supposed to be derived"). The dissents' calls for an explanation as to which provision of the Constitution guarantees prisoners a right to consult a law library or a legal assistant, however, went unanswered. This is perhaps not surprising: Just three years before *Bounds* was decided we admitted that the "[t]he precise rationale" for many of the "access to the courts" cases on which *Bounds* relied had "never been explicitly stated," and that no Clause that had thus far been advanced "by itself provides **\*367** an entirely satisfactory basis for the result reached." *Ross v. Moffitt, 417 U.S. 600, 608-609, 94 S.Ct. 2437, 2443, 41 L.Ed.2d 341 (1974).*

The weakness in the Court's constitutional analysis in *Bounds* is punctuated by our inability, in the 20 years since, to agree upon the constitutional source of the supposed right. We have described the right articulated in *Bounds* as a "consequence" of due process, *Murray v. Giarratano, 492 U.S. 1, 11, n. 6, 109 S.Ct. 2765, 2771, n. 6, 106 L.Ed.2d 1 (1989)* (plurality opinion) (citing *Procunier v. Martinez, 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974)),* as an "aspect" of equal protection, *492 U.S., at 11, n. 6, 109 S.Ct., at 2771, n. 6* (citation omitted), or as an "equal protection guarantee," *Pennsylvania v. Finley, 481 U.S. 551, 557, 107 S.Ct. 1990, 1994, 95 L.Ed.2d 539 (1987).* In no instance, however, have we **\*\*2188** engaged in rigorous constitutional analysis of the basis for the asserted right. Thus, even as we endeavor to address the question presented in this case-whether the District Court's order "exceeds the constitutional requirements set forth in *Bounds,*" Pet. for Cert. i-we do so without knowing which Amendment to the Constitution governs our inquiry.

It goes without saying that we ordinarily require more exactitude when evaluating asserted constitutional rights. "As a general matter, the Court has always been reluctant" to extend constitutional protection to "un-chartered area[s]," where the "guideposts for responsible decisionmaking ... are scarce and open-ended." *Collins v. Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992).* It is a bedrock principle of judicial restraint that a right be lodged firmly in the text or tradition of a specific constitutional provision before we will recognize it as fundamental. Strict adherence to this approach is essential if we are to fulfill our constitutionally assigned role of giving full effect to the mandate of the Framers without infusing the constitutional fabric with our own political views.

B

In lieu of constitutional text, history, or tradition, *Bounds* turned primarily to precedent in recognizing the right to state assistance in the researching and filing of prisoner **\*368** claims. Our cases, however, had never recognized a right of the kind articulated in *Bounds,* and, in my opinion, could not reasonably have been read to support such a right. Prior to *Bounds,* two lines of cases dominated our so-called "access to the courts" jurisprudence. One of these lines, rooted largely in principles of equal protection, invalidated state filing and transcript fees and imposed limited affirmative obligations on the States to ensure that their criminal procedures did not discriminate on the basis of poverty. These cases recognized a right to *equal* access, and any affirmative obligations imposed (*e.g.,* a free transcript or counsel on a first appeal as of right) were strictly limited to ensuring equality of access, not access in its own right. In a second line of cases, we invalidated state prison regulations that restricted or effectively prohibited inmates from filing habeas corpus petitions or civil rights lawsuits in federal court to vindicate federally protected rights. While the cases in this line did guarantee a certain amount of access to the federal courts, they imposed no affirmative obligations on the States to facilitate access, and held only that States may not "abridge or impair" prisoners' efforts to petition a federal court for vindication of federal rights. *Ex parte Hull, 312 U.S. 546, 549, 61 S.Ct. 640, 641-642, 85 L.Ed. 1034 (1941).* Without pausing to consider either the reasoning behind, or the constitutional basis for, each of these independent lines of case law, the Court in *Bounds* engaged in a loose and selective reading of our precedents as it created a freestanding and novel right to state-supported legal assistance. Despite the

Court's purported reliance on prior cases, *Bounds* in fact represented a major departure both from precedent and historical practice.

1

In a series of cases beginning with *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), the Court invalidated state rules that required indigent criminal defendants to pay for trial transcripts or to pay other fees necessary to have their appeals **\*369** or habeas corpus petitions heard. According to the *Bounds* Court, these decisions "struck down restrictions and required remedial measures to insure that inmate access to the courts is adequate, effective, and meaningful." 430 U.S., at 822, 97 S.Ct., at 1495. This is inaccurate. Notwithstanding the suggestion in *Bounds,* our transcript and fee cases did *not* establish a freestanding right of access to the courts, meaningful or otherwise.

In *Griffin* for instance, we invalidated an Illinois rule that charged criminal defendants a fee for a trial transcript necessary to secure full direct appellate review of a criminal conviction. See 351 U.S., at 13-14, 76 S.Ct., at 588;*id., at 22, 76 S.Ct., at 592* (Frankfurter, J., concurring in judgment). See also *Ross v. Moffitt, supra,* at 605-606, 94 S.Ct., at 2441-2442. Though we held the fee to be unconstitutional, our decision did not turn on the effectiveness or **\*\*2189** adequacy of the access afforded to criminal defendants generally. We were quite explicit in reaffirming the century-old principle that "a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review *at all.*" *Griffin, supra,* at 18, 76 S.Ct., at 590 (emphasis added) (citing *McKane v. Durston,* 153 U.S. 684, 687-688, 14 S.Ct. 913, 914-915, 38 L.Ed. 867 (1894)). Indeed, the Court in *Griffin* was unanimous on this point. See 351 U.S., at 21, 76 S.Ct., at 591-592 (Frankfurter, J., concurring in judgment) ("[I]t is now settled that due process of law does not require a State to afford review of criminal judgments"); *id., at 27, 76 S.Ct., at 594* (Burton, J., dissenting) ("Illinois, as the majority admit, could thus deny an appeal altogether in a criminal case without denying due process of law"); *id., at 36, 76 S.Ct., at 599* (Harlan, J., dissenting) ("The majority of the Court concedes that the Fourteenth Amendment does not require the States to provide for any kind of appellate review").[FN1] In light of the *Griffin* Court's unanimous **\*370** pronouncement that a State is not constitutionally required to provide *any* court access to criminals who wish to challenge their convictions, the *Bounds* Court's description of *Griffin* as ensuring " 'adequate and effective appellate review,' " 430 U.S., at 822, 97 S.Ct., at 1495 (quoting *Griffin, supra,* at 20, 76 S.Ct., at 591), is unsustainable.

> FN1. We reaffirmed this principle almost two decades later, and just three years before *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), in *Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), where we observed that *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and "[s]ucceeding cases invalidated ... financial barriers to the appellate process, at the same time reaffirming the traditional principle that a State is not obliged to provide any appeal at all for criminal defendants." 417 U.S., at 606, 94 S.Ct., at 2442 (citing *McKane v. Durston,* 153 U.S. 684, 14 S.Ct. 913, 38 L.Ed. 867 (1894)). See also 417 U.S., at 611, 94 S.Ct., at 2444.

Instead, *Griffin* rested on the quite different principle that, while a State is not obliged to provide appeals in criminal cases, the review a State chooses to afford must not be administered in a way that excludes indigents from the appellate process solely on account of their poverty. There is no mistaking the principle that motivated *Griffin:*

"It is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all. But that is not to say that a State that does grant appellate review can do so in a way that discriminates against some convicted defendants on account of their poverty.... [A]t all stages of the proceedings the Due Process and Equal Protection Clauses protect [indigent persons] from invidious discriminations....

"... There can be no equal justice where the kind of trial a man gets depends on the amount of money he has. Destitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts." 351 U.S., at 18-19, 76 S.Ct., at 591 (plurality opinion) (citation omitted).

Justice Frankfurter, who provided the fifth vote for the majority, confirmed in a separate writing that it was invidious discrimination, and not the denial of adequate, effective, or meaningful access to the

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

courts, that rendered the Illinois regulation unconstitutional: "[W]hen a State deems it wise *371 and just that convictions be susceptible to review by an appellate court, it cannot by force of its exactions draw a line which precludes convicted indigent persons ... from securing such a review...." *Id., at 23, 76 S.Ct., at 593* (opinion concurring in judgment). Thus, contrary to the characterization in *Bounds,Griffin* stands not for the proposition that all inmates are entitled to adequate appellate review of their criminal convictions, but for the more modest rule that, if the State chooses to afford appellate review, it "can no more discriminate on account of poverty than on account of religion, race, or color." *Griffin, supra, at 17, 76 S.Ct., at 590* (plurality opinion).[FN2]

> **FN2.** This is what Justice Brennan came to call the "*Griffin* equality principle," *United States v. MacCollom, 426 U.S. 317, 331, 96 S.Ct. 2086, 2094, 48 L.Ed.2d 666 (1976)* (dissenting opinion), and it provided the rationale for a string of decisions that struck down a variety of state transcript and filing fees as applied to indigent prisoners. *Bounds* cited a number of these cases in support of the right to "adequate, effective and meaningful" access to the courts. See *430 U.S., at 822, and n. 8, 97 S.Ct., at 1495, and n. 8.* But none of the transcript and fee cases on which *Bounds* relied were premised on a substantive standard of court access. Rather, like *Griffin,* these cases were primarily concerned with invidious discrimination on the basis of wealth. See, *e.g., Smith v. Bennett, 365 U.S. 708, 709, 81 S.Ct. 895, 896, 6 L.Ed.2d 39 (1961)* ("[T]o interpose any financial consideration between an indigent prisoner of the State and his exercise of a state right to sue for his liberty is to deny that prisoner the equal protection of the laws"); *Gardner v. California, 393 U.S. 367, 370-371, 89 S.Ct. 580, 583, 21 L.Ed.2d 601 (1969)* ("[I]n the context of California's habeas corpus procedure denial of a transcript to an indigent marks the same invidious discrimination which we held impermissible in ...*Griffin* ").

**2190 If we left any doubt as to the basis of our decision in *Griffin,* we eliminated it two decades later in *Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963),* where we held for the first time that States must provide assistance of counsel on a first appeal as of right for all indigent defendants. Like *Griffin,Douglas* turned not on a right of access *per se,* but rather on the right not to be denied, on the basis of poverty, access afforded to others. We did not say in *Douglas* that indigents have a right to a "meaningful appeal" that could not be realized absent appointed counsel. Cf. *Bounds, 430 U.S., at 823, 97 S.Ct., at 1495-1496.*372 What we did say is that, in the absence of state-provided counsel, "[t]here is lacking that equality demanded by the Fourteenth Amendment where the rich man, who appeals as of right, enjoys the benefit of counse [l] ... while the indigent ... is forced to shift for himself." *Douglas, supra, at 357-358, 83 S.Ct., at 817.* Just as in *Griffin,* where "we held that a State may not grant appellate review in such a way as to discriminate against some convicted defendants on account of their poverty,"*Douglas, 372 U.S., at 355, 83 S.Ct., at 815,* the evil motivating our decision in *Douglas* was "discrimination against the indigent," *ibid.*[FN3]

> **FN3.** There is some discussion of due process by the plurality in *Griffin,* see *351 U.S., at 17-18, 76 S.Ct., at 589-590,* and a passing reference to "fair procedure" in *Douglas, 372 U.S., at 357, 83 S.Ct., at 816.* These unexplained references to due process, made in the course of equal protection analyses, provide an insufficient basis for concluding that the regulations challenged in *Griffin* and *Douglas* independently violated the Due Process Clause. And attempts in subsequent cases to salvage a role for the Due Process Clause in this context and to explain the difference between the equal protection and due process analyses in *Griffin* have, in my opinion, been unpersuasive. See *Evitts v. Lucey, 469 U.S. 387, 402-405, 105 S.Ct. 830, 839-841, 83 L.Ed.2d 821 (1985); Bearden v. Georgia, 461 U.S. 660, 665-667, 103 S.Ct. 2064, 2068-2070, 76 L.Ed.2d 221 (1983).* In any event, there do not appear to have been five votes in *Griffin* in support of a holding under the Due Process Clause; subsequent transcript and fee cases turned primarily, if not exclusively, on equal protection grounds, see, *e.g., Smith v. Bennett, supra, at 714, 81 S.Ct., at 898;* and the *Douglas* Court, with its "obvious emphasis" on equal protection, *372 U.S., at 361, 83 S.Ct., at 818-819* (Harlan, J.,

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

dissenting), does not appear to have reached the due process question, notwithstanding Justice Harlan's supposition to the contrary, see *id.,* at 360-361, 83 S.Ct., at 818-819.

It is difficult to see how due process could be implicated in these cases, given our consistent reaffirmation that the States can abolish criminal appeals altogether consistently with due process, *e.g., Ross v. Moffitt,* 417 U.S., at 611, 94 S.Ct., at 2444. The fact that a State affords some access "does not automatically mean that a State then acts unfairly," and hence violates due process, by denying indigents assistance "at every stage of the way." *Ibid.* Under our cases, "[u]nfairness results only if indigents are singled out by the State and denied meaningful access to the appellate system because of their poverty," a question "more profitably considered under an equal protection analysis." *Ibid.*

**\*373** Our transcript and fee cases were, therefore, limited holdings rooted in principles of equal protection. In *Bounds,* these cases were recharacterized almost beyond recognition, as the Court created a new and different right on behalf of prisoners-a right to have the State pay for law libraries or other forms of legal assistance without regard to the equality of access. Only by divorcing our prior holdings from their reasoning, and by elevating dicta over constitutional principle, was the Court able to reach such a result.

The unjustified transformation of the right to nondiscriminatory access to the courts into the broader, untethered right to legal assistance generally would be reason enough for me to conclude that *Bounds* was wrongly decided. However, even assuming that *Bounds* properly relied upon the *Griffin* line of cases for the proposition for which those **\*\*2191** cases actually stood, the *Bounds* Court failed to address a significant intervening development in our jurisprudence: the fact that the equal protection theory underlying *Griffin* and its progeny had largely been abandoned prior to *Bounds.* The provisions invalidated in our transcript and fee cases were all facially neutral administrative regulations that had a disparate impact on the poor; there is no indication in any of those cases that the State imposed the challenged fee with the purpose of deliberately discriminating against indigent defendants. See, *e.g., Douglas, supra,* at 361, 83 S.Ct., at 819 (Harlan, J., dissenting) (criticizing the Court for invalidating a state law "of general applicability" solely because it "may affect the poor

more harshly than it does the rich"). In the years between *Douglas* and *Bounds,* however, we rejected a disparate-impact theory of the Equal Protection Clause. That the doctrinal basis for *Griffin* and its progeny has largely been undermined-and in fact had been before *Bounds* was decided-confirms the invalidity of the right to law libraries and legal assistance created in *Bounds.*

We first cast doubt on the proposition that a facially neutral law violates the Equal Protection Clause solely because **\*374** it has a disparate impact on the poor in *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). In *Rodriguez,* the respondents challenged Texas' traditional system of financing public education under the Equal Protection Clause on the ground that, under that system, "some poorer people receive less expensive educations than other more affluent people." *Id.,* at 19, 93 S.Ct., at 1289. In rejecting the claim that this sort of disparate impact amounted to unconstitutional discrimination, we declined the respondents' invitation to extend the rationale of *Griffin,Douglas,* and similar cases. We explained that, under those cases, unless a group claiming discrimination on the basis of poverty can show that it is "*completely unable* to pay for some desired benefit, and as a consequence, ... sustained an *absolute deprivation* of a meaningful opportunity to enjoy that benefit," 411 U.S., at 20, 93 S.Ct., at 1290 (emphasis added), strict scrutiny of a classification based on wealth does not apply. Because the respondents in *Rodriguez* had not shown that "the children in districts having relatively low assessable property values are receiving *no* public education," but rather claimed only that "they are receiving a poorer quality education than that available to children in districts having more assessable wealth,"*id.,* at 23, 93 S.Ct., at 1291 (emphasis added), we held that the "Texas system does not operate to the peculiar disadvantage of any suspect class,"*id.,* at 28, 93 S.Ct., at 1294. After *Rodriguez,* it was clear that "wealth discrimination alone [does not] provid[e] an adequate basis for invoking strict scrutiny,"*id.,* at 29, 93 S.Ct., at 1294, and that, "at least where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages,"*id.,* at 24, 93 S.Ct., at 1291. See also *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 458, 108 S.Ct. 2481, 2487-2488, 101 L.Ed.2d 399 (1988); *Harris v. McRae,* 448 U.S. 297, 322-323, 100 S.Ct. 2671, 2690-2691, 65 L.Ed.2d 784 (1980); *Maher v. Roe,* 432 U.S. 464, 470-471, 97 S.Ct. 2376,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2380-2381, 53 L.Ed.2d 484 (1977).[FN4]

FN4. The absence of a prison law library or other state-provided legal assistance can hardly be said to deprive inmates absolutely of an opportunity to bring their claims to the attention of a federal court. Clarence Earl Gideon, perhaps the most celebrated *pro se* prisoner litigant of all time, was able to obtain review by this Court even though he had no legal training and was incarcerated in a prison that apparently did not provide prisoners with law books. See Answer to Respondent's Response to Pet. for Cert. in *Gideon v. Wainwright,* O.T.1962, No. 155, p. 1 ("[T]he petitioner is not a *[sic]* attorney or versed in law nor does not have the law books to copy down the decisions of this Court.... Nor would the petitioner be allowed to do so").

Like anyone else seeking to bring suit without the assistance of the State, prisoners can seek the advice of an attorney, whether *pro bono* or paid, and can turn to family, friends, other inmates, or public interest groups. Inmates can also take advantage of the liberal pleading rules for *pro se* litigants and the liberal rules governing appointment of counsel. Federal fee-shifting statutes and the promise of a contingency fee should also provide sufficient incentive for counsel to take meritorious cases.

**2192*375** We rejected a disparate-impact theory of the Equal Protection Clause altogether in *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976), decided just one Term before *Bounds.* There we flatly rejected the idea that "a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another." 426 U.S., at 242, 96 S.Ct., at 2049. We held that, absent proof of discriminatory purpose, a law or official act does not violate the Constitution "*solely* because it has a ... disproportionate impact." *Id.,* at 239, 96 S.Ct., at 2047 (emphasis in original). See also *id.,* at 240, 96 S.Ct., at 2048 (acknowledging "the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose"). At bottom, *Davis* was a recognition of the "settled rule that the Fourteenth Amendment guarantees equal laws, not equal results." *Personnel Administrator of Mass. v. Feeney,*

442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979).[FN5]

FN5. Our decisions in *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), and *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), validated the position taken by Justice Harlan in his dissents in *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). As Justice Harlan persuasively argued in *Douglas,* facially neutral laws that disproportionately impact the poor "do not deny equal protection to the less fortunate for one essential reason: the Equal Protection Clause does not impose on the States 'an affirmative duty to lift the handicaps flowing from differences in economic circumstances.' To so construe it would be to read into the Constitution a philosophy of leveling that would be foreign to many of our basic concepts of the proper relations between government and society. The State may have a moral obligation to eliminate the evils of poverty, but it is not required by the Equal Protection Clause to give to some whatever others can afford." *Id.,* at 362, 83 S.Ct., at 819 (dissenting opinion). See also *Griffin,* 351 U.S., at 35-36, 76 S.Ct., at 598-599 (Harlan, J., dissenting); *id.,* at 29, 76 S.Ct., at 595 (Burton, J., dissenting) ("The Constitution requires the equal protection of the law, but it does not require the States to provide equal financial means for all defendants to avail themselves of such laws").

*376 The *Davis* Court was motivated in no small part by the potentially radical implications of the *Griffin/Douglas* rationale. As Justice Harlan recognized in *Douglas:* "Every financial exaction which the State imposes on a uniform basis is more easily satisfied by the well-to-do than by the indigent." 372 U.S., at 361, 83 S.Ct., at 819 (dissenting opinion). Under a disparate-impact theory, Justice Harlan argued, regulatory measures always considered to be constitutionally valid, such as sales taxes, state university tuition, and criminal penalties, would have to be struck down. See *id.,* at 361-362, 83 S.Ct., at 818-819.[FN6] Echoing Justice

Harlan, we rejected in *Davis* the disparate-impact approach in part because of the recognition that "[a] rule that a statute designed to serve neutral ends is nevertheless **377** invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average affluent than to the more affluent white." *426 U.S., at 248, 96 S.Ct., at 2051.***2193** See also *id., at 248, n. 14, 96 S.Ct., at 2051, n. 14.*

> FN6. Although he concurred in the judgment in *Griffin,* Justice Frankfurter expressed similar concerns. He emphasized that "the equal protection of the laws [does not] deny a State the right to make classifications in law when such classifications are rooted in reason,"*id., at 21, 76 S.Ct., at 592,* and that "a State need not equalize economic conditions,"*id., at 23, 76 S.Ct., at 592.* Justice Frankfurter acknowledged that differences in wealth are "contingencies of life which are hardly within the power, let alone the duty, of a State to correct or cushion." *Ibid.* He also expressed concern that if absolute equality were required, a State would no longer be able to "protect itself so that frivolous appeals are not subsidized and public moneys not needlessly spent." *Id., at 24, 76 S.Ct., at 593.* See also *United States v. MacCollom,* 426 U.S., at 330, 96 S.Ct., at 2093-2094 (Blackmun, J., concurring in judgment) (the Constitution does not "require that an indigent be furnished every possible legal tool, no matter how speculative its value, and no matter how devoid of assistance it may be, merely because a person of unlimited means might choose to waste his resources in a quest of that kind").

Given the unsettling ramifications of a disparate-impact theory, it is not surprising that we eventually reached the point where we could no longer extend the reasoning of *Griffin* and *Douglas.* For instance, in *Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), decided just three years before *Bounds,* we declined to extend *Douglas* to require States to provide indigents with counsel in discretionary state appeals or in seeking discretionary review in this Court. We explained in *Ross* that "[t]he Fourteenth Amendment 'does not require absolute equality or precisely equal advantages,' "417 U.S., at 612, 94 S.Ct., at 2444 (quoting *Rodriguez, 411 U.S., at 24, 93 S.Ct., at 1291-1292),* and that it "does [not] require the State to 'equalize economic conditions,' "417 U.S., at 612, 94 S.Ct., at 2444 (quoting *Griffin,* 351 U.S., at 23, 76 S.Ct., at 592-593 (Frankfurter, J., concurring in judgment)). We again declined to extend *Douglas* in *Pennsylvania v. Finley,* 481 U.S., at 555, 107 S.Ct., at 1993, where we rejected a claim that the Constitution requires the States to provide counsel in state postconviction proceedings. And we found *Ross* and *Finley* controlling in *Murray v. Giarratano,* 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989), where we held that defendants sentenced to death, like all other defendants, have no right to state-appointed counsel in state collateral proceedings. See also *United States v. MacCollom,* 426 U.S. 317, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976) (federal habeas statute permitting district judge to deny free transcript to indigent petitioner raising frivolous claim does not violate the Constitution).

In sum, the *Bounds* Court's reliance on our transcript and fee cases was misplaced in two significant respects. First, **378** those cases did not stand for the proposition for which *Bounds* cited them: They were about *equal* access, not access *per se.* Second, the constitutional basis for *Griffin* and its progeny had been seriously undermined in the years preceding *Bounds.* Thus, even to the extent that *Bounds* intended to rely on those cases for the propositions for which they actually stood, their underlying rationale had been largely discredited. These cases, rooted in largely obsolete theories of equal protection, do not support the right to law libraries and legal assistance recognized in *Bounds.* Our repeated holdings declining to extend these decisions only confirm this conclusion.

2

The *Bounds* Court relied on a second line of cases in announcing the right to state-financed law libraries or legal assistance for prisoners. These cases, beginning with our decision in *Ex parte Hull,* prevent the States from imposing arbitrary obstacles to attempts by prisoners to file claims asserting federal constitutional rights. Although this line deals with access in its own right, and not equal access as in *Griffin* and *Douglas,* these cases do not impose

116 S.Ct. 2174                                                                                                    Page 21
518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal
D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

any affirmative obligations on the States to improve the prisoners' chances of success.

*Bounds* identified *Ex parte Hull* as the first case to "recogniz[e]" a "constitutional right of access to the courts." 430 U.S., at 821-822, 97 S.Ct., at 1494. In *Ex parte Hull,* we considered a prison regulation that required prisoners to submit their habeas corpus petitions to a prison administrator before filing them with the court. Only if the administrator determined that a petition was " 'properly drawn' " could the prisoner submit it in a federal court. 312 U.S. at 548-549, 61 S.Ct., at 641-642 (quoting regulation). We invalidated the regulation, but the right we acknowledged in doing so bears no resemblance to the right generated in *Bounds.*

Our reasoning in *Ex parte Hull* consists of a straightforward, and rather limited, principle:
*379 "[T]he state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus. Whether a petition for writ of habeas corpus addressed to a federal court is properly drawn and what allegations it must contain are questions for that court alone to determine." 312 U.S., at 549, 61 S.Ct., at 642.

The "right of access" to the courts articulated in *Ex parte Hull* thus imposed no affirmative obligations on the States; we stated only that a State may not "abridge or impair" a **2194 prisoner's ability to file a habeas petition in federal court.[FN7]*Ex parte Hull* thus provides an extraordinarily weak starting point for concluding that the Constitution requires States to fund and otherwise assist prisoner legal research by providing law libraries or legal assistance.

FN7. The Court's rationale appears to have been motivated more by notions of federalism and the power of the federal courts than with the rights of prisoners. Our citation of three nonhabeas cases which held that a state court's determination on a matter of federal law is not binding on the Supreme Court supports this conclusion. See *Ex parte Hull,* 312 U.S., at 549, 61 S.Ct., at 641-642, citing *First Nat. Bank of Guthrie Center v. Anderson,* 269 U.S. 341, 346, 46 S.Ct. 135, 137, 70 L.Ed. 295 (1926) (the power of the Supreme Court to review independently state-court determinations of claims "grounded on the Constitution or a law of

the United States" is "general, and is a necessary element of this Court's power to review judgments of state courts in cases involving the application and enforcement of federal laws"); *Erie R. Co. v. Purdy,* 185 U.S. 148, 152, 22 S.Ct. 605, 607, 46 L.Ed. 847 (1902) (" '[T]he question whether a right or privilege, claimed under the Constitution or laws of the United States, was distinctly and sufficiently pleaded and brought to the notice of a state court, is itself a Federal question, in the decision of which this court, on writ of error, is not concluded by the view taken by the highest court of the State' " (citation omitted)); *Carter v. Texas,* 177 U.S. 442, 447, 20 S.Ct. 687, 689, 44 L.Ed. 839 (1900) (same).

Two subsequent decisions of this Court worked a moderate expansion of *Ex parte Hull.*The first, *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), invalidated a Tennessee prison regulation that prohibited inmates from advising or assisting one another in the preparation of habeas corpus petitions. In striking down the regulation, the Court twice quoted *380*Ex parte Hull 's* holding that a State may not "abridge or impair" a petitioner's efforts to file a petition for a writ of habeas corpus. See 393 U.S., at 486-487, 488, 89 S.Ct., at 749-750, 750. In contrast to *Ex parte Hull,* however, *Johnson* focused not on the respective institutional roles of state prisons and the federal courts but on "the fundamental importance of the writ of habeas corpus in our constitutional scheme." 393 U.S., at 485, 89 S.Ct., at 749. Still, the Court did not hold that the Constitution places an affirmative obligation on the States to facilitate the filing of habeas petitions. The Court held only that a State may not "den[y] or obstruc[t]" a prisoner's ability to file a habeas petition. *Ibid.* We extended the holding of *Johnson* in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), where we struck down a similar regulation that prevented inmates from assisting one another in the preparation of civil rights complaints. We held that the "right of access to the courts, upon which *Avery* was premised, is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." *Id.,* at 579, 94 S.Ct., at 2986. Again, the right was framed exclusively in the negative. See *ibid.*(opportunity to file a civil rights action may not be "denied"). Thus, prior to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal
D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

*Bounds,* "if a prisoner incarcerated pursuant to a final judgment of conviction [was] not prevented from physical access to the federal courts in order that he may file therein petitions for relief which Congress has authorized those courts to grant, he ha[d] been accorded the only constitutional right of access to the courts that our cases ha[d] articulated in a reasoned way." *Bounds, 430 U.S., at 839-840, 97 S.Ct., at 1504* (REHNQUIST, J., dissenting) (citing *Ex parte Hull* ).

That *Ex parte Hull,Johnson,* and *Wolff* were decided on different constitutional grounds from *Griffin* and *Douglas* is clear enough. According to *Bounds,* however, "[e]ssentially the same standards of access were applied" in all of these *381 cases. *430 U.S., at 823, 97 S.Ct., at 1495.* This observation was wrong, but the equation of these two lines of cases allowed the *Bounds* Court to preserve the "affirmative obligations" element of the equal access cases, the rationale of which had largely been undermined prior to *Bounds,* by linking it with *Ex parte Hull,* which had not been undermined by later cases but which imposed no affirmative obligations. In the process, *Bounds* forged a right with no basis in precedent or constitutional**2195 text: a right to have the State "shoulder affirmative obligations" in the form of law libraries or legal assistance to ensure that prisoners can file meaningful lawsuits. By detaching *Griffin ' s* right to equal access and *Ex parte Hull 's* right to physical access from the reasoning on which each of these rights was based, the *Bounds* Court created a virtually limitless right. And though the right was framed in terms of law libraries and legal assistance in that case, the reasoning is much broader, and this Court should have been prepared under the *Bounds* rationale to require the appointment of capable state-financed counsel for any inmate who wishes to file a lawsuit. See *Bounds, supra,* at 841, 97 S.Ct., at 1504 (REHNQUIST, J., dissenting) (observing that "the logical destination of the Court's reasoning" in *Bounds* is "lawyers appointed at the expense of the State"). See also *ante,* at 2181.We have not, however, extended *Bounds* to its logical conclusion. And though we have not overruled *Bounds,* we have undoubtedly repudiated its reasoning in our consistent rejection of the proposition that the States must provide counsel beyond the trial and first appeal as of right. See *Ross, 417 U.S., at 612, 94 S.Ct., at 2444-2445;Finley, 481 U.S., at 555, 107 S.Ct., at 1993;Giarratano, 492 U.S., at 3-4, 109 S.Ct., at 2766-2767* (plurality opinion).

In the end, I agree that the Constitution affords prisoners what can be termed a right of access to the courts. That right, rooted in the Due Process Clause and the principle articulated in *Ex parte Hull,* is a right not to be arbitrarily prevented from lodging a claimed violation of a federal right in a federal court. The State, however, is not constitutionally**382 required to finance or otherwise assist the prisoner's efforts, either through law libraries or other legal assistance. Whether to expend state resources to facilitate prisoner lawsuits is a question of policy and one that the Constitution leaves to the discretion of the States.

There is no basis in history or tradition for the proposition that the State's constitutional obligation is any broader. Although the historical record is relatively thin, those who have explored the development of state-sponsored legal assistance for prisoners agree that, until very recently, law libraries in prisons were "nearly nonexistent." A. Flores, Werner's Manual for Prison Law Libraries 1 (2d ed.1990). Prior to *Bounds,* prison library collections (to the extent prisons had libraries) commonly reflected the correctional goals that a State wished to advance, whether religious, educational, or rehabilitative. Although some institutions may have begun to acquire a minimal collection of legal materials in the early part of this century, law-books generally were not included in prison libraries prior to the 1950's. See W. Coyle, Libraries in Prisons 54-55 (1987). The exclusion of lawbooks was consistent with the recommendation of the American Prison Association, which advised prison administrators nationwide to omit federal and state law-books from prison library collections. See American Prison Association, Objectives and Standards for Libraries in Adult Prisons and Reformatories, in Library Manual for Correctional Institutions 101, 106-107 (1950). The rise of the prison law library and other legal assistance programs is a recent phenomenon, and one generated largely by the federal courts. See Coyle, *supra,* at 54-55; B. Vogel, Down for the Count: A Prison Library Handbook 87-89 (1995). See also Ihrig, Providing Legal Access, in Libraries Inside: A Practical Guide for Prison Librarians 195 (R. Rubin & D. Suvak eds. 1995) (establishment of law libraries and legal service programs due to "inmate victories in the courts within the last two decades"). Thus, far from recognizing a long tradition *383 of state-sponsored legal assistance for prisoners, *Bounds* was in fact a major "disruption to traditional

prison operation." Vogel, *supra, at 87.*

The idea that prisoners have a legal right to the assistance that they were traditionally denied is also of recent vintage. The traditional, pre-*Bounds* view of the law with regard to the State's obligation to facilitate prisoner lawsuits by providing law libraries and legal assistance was articulated in *Hatfield v. Bailleaux,* 290 F.2d 632 (CA9),cert. denied, 368 U.S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59 (1961):

"State authorities have no obligation under the federal Constitution to provide library **2196 facilities and an opportunity for their use to enable an inmate to search for legal loopholes in the judgment and sentence under which he is held, or to perform services which only a lawyer is trained to perform. All inmates are presumed to be confined under valid judgments and sentences. If an inmate believes he has a meritorious reason for attacking his, he must be given an opportunity to do so. But he has no due process right to spend his prison time or utilize prison facilities in an effort to discover a ground for overturning a presumptively valid judgment.

"Inmates have the constitutional right to waive counsel and act as their own lawyers, but this does not mean that a non-lawyer must be given the opportunity to acquire a legal education. One question which an inmate must decide in determining if he should represent himself is whether in view of his own competency and general prison regulations he can do so adequately. He must make the decision in the light of the circumstances existing. The state has no duty to alter the circumstances to conform with his decision." 290 F.2d, at 640-641.

Consistent with the traditional view, the lower courts understood the Constitution only to guarantee prisoners a right *384 to be free from state interference in filing papers with the courts:

"[A]ccess to the courts means the opportunity to prepare, serve and file whatever pleadings or other documents are necessary or appropriate in order to commence or prosecute court proceedings affecting one's personal liberty, or to assert and sustain a defense therein, and to send and receive communications to and from judges, courts and lawyers concerning such matters." *Id., at 637.*

See also *Oaks v. Wainwright,* 430 F.2d 241, 242 (CA5 1970) (affirming dismissal of prisoner's complaint alleging denial of access to library and legal materials on ground that prisoner had not alleged that "he has in any way been denied access to

the courts ..., that he has ever lost the right to commence, prosecute or appeal in any court, or that he has been substantially delayed in obtaining a judicial determination in any proceeding"). Thus, while courts held that a prisoner is entitled to attack his sentence without state interference, they also consistently held that "[p]rison regulations are not required to provide prisoners with the time, the correspondence privileges, the materials or other facilities they desire for the special purpose of trying to find some way of making attack upon the presumptively valid judgments against them." *Lee v. Tahash,* 352 F.2d 970, 973 (CA8 1965). "If the purpose was not to hamper inmates in gaining reasonable access to the courts with regard to their respective criminal matters, and if the regulations and practices do not interfere with such reasonable access," the inquiry was at an end. *Hatfield,* 290 F.2d, at 640. That access could have been facilitated without impairing effective prison administration was considered "immaterial." *Ibid.*

Quite simply, there is no basis in constitutional text, pre-*Bounds* precedent, history, or tradition for the conclusion that the constitutional right of access imposes affirmative *385 obligations on the States to finance and support prisoner litigation.

II

A

Even when compared to the federal judicial overreaching to which we have now become accustomed, this is truly a remarkable case. The District Court's order vividly demonstrates the danger of continuing to afford federal judges the virtually unbridled equitable power that we have for too long sanctioned. We have here yet another example of a federal judge attempting to "direc[t] or manag[e]" the reconstruction of entire institutions and bureaucracies, with little regard for the inherent limitations on [his] authority." *Missouri v. Jenkins,* 515 U.S., at 126, 115 S.Ct., at 2067-2068 (THOMAS, J., concurring). And we will continue to see cases like this unless we take more serious steps to curtail the use of equitable power by the federal courts.

**2197 Principles of federalism and separation of powers impose stringent limitations on the equitable power of federal courts. When these

principles are accorded their proper respect, Article III cannot be understood to authorize the Federal Judiciary to take control of core state institutions like prisons, schools, and hospitals, and assume responsibility for making the difficult policy judgments that state officials are both constitutionally entitled and uniquely qualified to make. See *id., at 131-133, 115 S.Ct., at 2070-2071.* Broad remedial decrees strip state administrators of their authority to set long-term goals for the institutions they manage and of the flexibility necessary to make reasonable judgments on short notice under difficult circumstances. See *Sandin v. Conner, 515 U.S. 472, 482-483, 115 S.Ct. 2293, 2299, 132 L.Ed.2d 418 (1995).* At the state level, such decrees override the "State's discretionary authority over its own program and budgets and forc[e] state officials to reallocate state resources and funds to the [district court's] plan at the expense of other citizens, other government programs, and other institutions**386** not represented in court." *Jenkins, 515 U.S., at 131, 115 S.Ct., at 2070* (THOMAS, J., concurring). The federal judiciary is ill equipped to make these types of judgments, and the Framers never imagined that federal judges would displace state executive officials and state legislatures in charting state policy.

Though we have sometimes closed our eyes to federal judicial overreaching, as in the context of school desegregation, see *id., at 124-125, 115 S.Ct., at 2066-2067,* we have been vigilant in opposing sweeping remedial decrees in the context of prison administration. "It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez, 411 U.S. 475, 491-492, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973).* In this area, perhaps more than any other, we have been faithful to the principles of federalism and separation of powers that limit the Federal Judiciary's exercise of its equitable powers in all instances.

*Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974),* articulated the governing principles:

"Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the

problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America **387** are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities." *Id., at 404-405, 94 S.Ct. at 1807* (footnotes omitted).[FN8]

> FN8. *Martinez* was overruled on other grounds in *Thornburgh v. Abbott, 490 U.S. 401, 413-414, 109 S.Ct. 1874, 1881-1882, 104 L.Ed.2d 459 (1989).* We have consistently reaffirmed *Martinez,* however, in all respects relevant to this case, namely, that "the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management" and that prison administrators are entitled to "considerable deference." *490 U.S., at 407-408, 109 S.Ct., at 1879.* See also *Turner v. Safley, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987)* (relying on *Martinez* for the principle that " 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform' " (citation omitted)).

**2198** State prisons should be run by the state officials with the expertise and the primary authority for running such institutions. Absent the most "extraordinary circumstances," *Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 137, 97 S.Ct. 2532, 2544, 53 L.Ed.2d 629 (1977)* (Burger, C.J., concurring), federal courts should refrain from meddling in such affairs. Prison administrators have a difficult enough job without

federal-court intervention. An overbroad remedial decree can make an already daunting task virtually impossible.[FN9]

> FN9. The constitutional and practical concerns identified in *Martinez* have also resulted in a more deferential standard of review for prisoner claims of constitutional violations. In *Turner v. Safley,* we held that a prison regulation is valid if it is "reasonably related to legitimate penological interests," even when it "impinges on inmates' constitutional rights." 482 U.S., at 89, 107 S.Ct., at 2261. A deferential standard was deemed necessary to keep the courts out of the day-to-day business of prison administration, which "would seriously hamper [prison officials'] ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Ibid.* A more stringent standard of review "would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby 'unnecessarily perpetuat [ing] the involvement of the federal courts in affairs of prison administration.' " *Ibid.* (quoting *Martinez,* 416 U.S., at 407, 94 S.Ct., at 1808).

   *388 I realize that judges, "no less than others in our society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination." *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979). But judges occupy a unique and limited role, one that does not allow them to substitute their views for those in the executive and legislative branches of the various States, who have the constitutional authority and institutional expertise to make these uniquely nonjudicial decisions and who are ultimately accountable for these decisions. Though the temptation may be great, we must not succumb. The Constitution is not a license for federal judges to

further social policy goals that prison administrators, in their discretion, have declined to advance.

                                    B

   The District Court's opinion and order demonstrate little respect for the principles of federalism, separation of powers, and judicial restraint that have traditionally governed federal judicial power in this area. In a striking arrogation of power, the District Court sought to micromanage every aspect of Arizona's "court access program" in all institutions statewide, dictating standard operating procedures and subjecting the state system to ongoing federal supervision. A *389 sweeping remedial order of this nature would be inappropriate in any case. That the violation sought to be remedied was so minimal, to the extent there was any violation at all, makes this case all the more alarming.

   The District Court cited only one instance of a prison inmate having a case dismissed due to the State's alleged failure to provide sufficient assistance, and one instance of another inmate who was unable to file an action. See 834 F.Supp. 1553, 1558, and nn. 37-38 (Ariz.1992). All of the other alleged "violations" found by the District Court related not to court access, but to library facilities and legal assistance. Many of these violations were trivial, such as a missing pocket part to a small number of volumes in just a few institutions. *Id., at 1562.* And though every facility in the Arizona system already contained law libraries that greatly exceeded prisoner needs,[FN10] the District Court **2199 found the State to be in violation because some of its prison libraries lacked Pacific Second Reporters. *Ibid.* The District Court also struck down regulations that clearly pass muster under *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), such as restrictions at some facilities on "brows[ing] the shelves," 834 F.Supp., at 1555, the physical exclusion from the library of "lockdown" inmates, who are the most dangerous and disobedient *390 prisoners in the prison population, *id., at 1556,* and the allowance of phone calls only for "legitimate pressing legal issues," *id., at 1564.*

> FN10. The Arizona prison system had already adopted a policy of statewide compliance with an injunction that the same District Judge in this case imposed on a single institution in an earlier case. In compliance with that decree, which the

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal
D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

District Court termed the "Muecke list," 834 F.Supp., at 1561, every facility in the Arizona correctional system had at least one library containing, at a minimum, the following volumes: United States Code Annotated; Supreme Court Reporter; Federal Reporter Second; Federal Supplement; Shepard's U.S. Citations; Shepard's Federal Citations; Local Rules for the Federal District Court; Modern Federal Practice Digests; Federal Practice Digest (Second); Arizona Code Annotated; Arizona Reports; Shepard's Arizona Citations; Arizona Appeals Reports; Arizona Law of Evidence (Udall); ADC Policy Manual; 108 Institutional Management Procedures; Federal Practice and Procedure (Wright); Corpus Juris Secundum; and Arizona Digest. *Id., at 1561-1562.*

To remedy these and similar "violations," the District Court imposed a sweeping, indiscriminate, and systemwide decree. The microscopically detailed order leaves no stone unturned. It covers everything from training in legal research to the ratio of typewriters to prisoners in each facility. It dictates the hours of operation for all prison libraries statewide, without regard to inmate use, staffing, or cost. It guarantees each prisoner a minimum two-hour visit to the library per trip, and allows the prisoner, not prison officials, to determine which reading room he will use. The order tells ADOC the types of forms it must use to take and respond to prisoner requests for materials. It requires all librarians to have an advanced degree in library science, law, or paralegal studies. If the State wishes to remove a prisoner from the law library for disciplinary reasons, the order requires that the prisoner be provided written notice of the reasons and factual basis for the decision within 48 hours of removal. The order goes so far as to dictate permissible noise levels in law library reading rooms and requires the State to "take all necessary steps, and correct any structural or acoustical problems." App. to Pet. for Cert. 68a.

The order also creates a "legal assistance program," imposing rules for the selection and retention of prisoner legal assistants. *Id.,* at 69a. It requires the State to provide all inmates with a 30-40 hour videotaped legal research course, covering everything from habeas corpus and claims under 42 U.S.C. § 1983 to torts, immigration, and family law. Prisoner legal assistants are required to have an

additional 20 hours of live instruction. Prisoners are also entitled to a minimum of three 20-minute phone calls each week to an attorney or legal organization, without regard to the purpose for the call; the order expressly requires Arizona to install extra phones to accommodate the increased use. Of course, **\*391** legal supplies are covered under the order, which even provides for "ko-rec-type" to correct typographical errors. A Special Master retains ongoing supervisory power to ensure that the order is followed.

The District Court even usurped authority over the prison administrator's core responsibility: institutional security and discipline. See *Bell v. Wolfish,* 441 U.S., at 546, 99 S.Ct., at 1878 ("[M]aintaining institutional security and preserving internal order and discipline" are the central goals of prison administration). Apparently undeterred by this Court's repeated admonitions that security concerns are to be handled by prison administrators, see, *e.g., ibid.,* the District Court decreed that "ADOC prisoners in *all*... custody levels shall be provided regular and comparable visits to the law library." App. to Pet. for Cert. 61a (emphasis added). Only if prison administrators can "documen[t]" an individual prisoner's "inability to use the law library without creating a threat to safety or security" may a potentially dangerous prisoner be kept out of the library, *ibid.,* and even then the decision must be reported to the Special Master. And since, in the District Court's view, "[a] prisoner cannot adequately use the law library under restraint, including handcuffs and shackles,"*id.,* at 67a, the State is apparently powerless to take steps to ensure that inmates known to be violent do not injure other inmates or prison guards while in the law library "researching" their claims. This "one free bite" approach conflicts both **\*\*2200** with our case law, see *Hewitt v. Helms,* 459 U.S. 460, 474, 103 S.Ct. 864, 872-873, 74 L.Ed.2d 675 (1983), and with basic common sense. The District Court apparently misunderstood that a prison is neither a law firm nor a legal aid bureau. Prisons are inherently dangerous institutions, and decisions concerning safety, order, and discipline must be, and always have been, left to the sound discretion of prison administrators.

Like the remedial decree in *Jenkins,* the District Court's order suffers from flaws characteristic of overly broad remedial decrees. First, "the District Court retained jurisdiction**\*392** over the implementation and modification of the remedial

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

decree, instead of terminating its involvement after issuing its remedy." 515 U.S., at 134, 115 S.Ct., at 2071 (THOMAS, J., concurring). Arizona correctional officials must continually report to a Special Master on matters of internal prison administration, and the District Court retained discretion to change the rules of the game if, at some unspecified point in the future, it feels that Arizona has not done enough to facilitate court access. Thus, the District Court has "inject[ed] the judiciary into the day-to-day management of institutions and local policies-a function that lies outside of our Article III competence." *Id., at 135, 115 S.Ct., at 2072.* The District Court also "failed to target its equitable remedies in this case specifically to cure the harm suffered by the victims" of unconstitutional conduct. *Id., at 136, 115 S.Ct., at 2072.* We reaffirmed in *Jenkins* that "the nature of the [equitable] remedy is to be determined by the nature and scope of the constitutional violation." *Id., at 88, 115 S.Ct., at 2049* (majority opinion) (citation and internal quotation marks omitted). Yet, in this case, when the District Court found the law library at a handful of institutions to be deficient, it subjected the entire system to the requirements of the decree and to ongoing federal supervision. And once it found that lockdown inmates experienced delays in receiving law books in some institutions, the District Court required all facilities statewide to provide physical access to all inmates, regardless of custody level. And again, when it found that some prisoners in some facilities were untrained in legal research, the District Court required the State to provide all inmates in all institutions with a 30-40 hour videotaped course in legal research. The remedy far exceeded the scope of any violation, and the District Court far exceeded the scope of its authority.

The District Court's order cannot stand under any circumstances. It is a stark example of what a district court should *not* do when it finds that a state institution has violated the Constitution. Systemwide relief is never appropriate**393** in the absence of a systemwide violation, and even then should be no broader and last no longer than necessary to remedy the discrete constitutional violation.

Justice SOUTER, with whom Justice GINSBURG and Justice BREYER join, concurring in part, dissenting in part, and concurring in the judgment.

I agree with the Court on certain, fundamental points: the case before us involves an injunction whose scope has not yet been justified by the factual findings of the District Court, *ante,* at 2184, one that

was imposed through a "process that failed to give adequate consideration to the views of state prison authorities,"*ante,* at 2185, and that does not reflect the deference we accord to state prison officials under *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), *ante,* at 2185. Although I therefore concur in the judgment and in portions of the Court's opinion, reservations about the Court's treatment of standing doctrine and about certain points unnecessary to the decision lead me to write separately.

I

The question accepted for review was a broadside challenge to the scope of the District Court's order of systemic or classwide relief, issued in reliance on *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), not whether proof of actual injury is necessary to establish standing to litigate a *Bounds* claim. The parties' discussions of actual injury, in their petition for certiorari, in their briefs, and during oral argument, focused upon the ultimate finding of liability and the scope of the injunction. Indeed, **2201** petitioners specifically stated that "[a]lthough the lack of a showing of injury means that Respondents are not entitled to any relief, the State does not contend that the Respondents lacked standing to raise these claims in the first instance. Respondents clearly met the threshold of an actual case or controversy pursuant to Article III of the United States Constitution. They simply failed to prove *394 the existence of a constitutional violation, including causation of injury, that would entitle them to relief." Brief for Petitioners 33, n. 23.FN1

> FN1. Moreover, the issue of actual injury, even as framed by the parties, received relatively short shrift; only small portions of the parties' briefs addressed the issue, see Brief for Petitioners 30-33; Reply Brief for Petitioners 11-13; Brief for Respondents 25-30, and a significant portion of that discussion concentrated upon whether the issue should even be addressed by the Court, Reply Brief for Petitioners 12-13; Brief for Respondents 25-27.

While we are certainly free ourselves to raise an issue of standing as going to Article III jurisdiction, and must do so when we would lack jurisdiction to deal with the merits, see *Mount Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 278, 97 S.Ct. 568, 571-

116 S.Ct. 2174                                                                                       Page 28
518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal
D.A.R. 7362
(Cite as: 518 U.S. 343, 116 S.Ct. 2174)

572, 50 L.Ed.2d 471 (1977), there is no apparent question that the standing of at least one of the class-action plaintiffs suffices for our jurisdiction and no dispute that standing doctrine does not address the principal issue in the case. We may thus adequately dispose of the basic issue simply by referring to the evidentiary record. That is what I would do, for my review of the cases from the Courts of Appeals either treating or bearing on the subject of *Bounds* standing convinces me that there is enough reason for debate about its appropriate elements that we should reach no final conclusions about it. That is especially true since we have not had the "benefit of briefing and argument informed by an appreciation of the potential breadth of the ruling." *Missouri v. Jenkins,* 515 U.S. 70, 139, 115 S.Ct. 2038, 2074, 132 L.Ed.2d 63 (1995) (SOUTER, J., dissenting). Addressing issues of standing may not amount to the significant breakdown in our process of orderly adjudication represented by *Missouri v. Jenkins,* but the Court does reach out to address a difficult conceptual question that is unnecessary to resolution of this case, was never addressed by the District Court or Court of Appeals, and divides what would otherwise presumably have been a unanimous Court.

**\*395** That said, I cannot say that I am convinced that the Court has fallen into any error by invoking standing to deal with the District Court's orders addressing claims by and on behalf of non-English speakers and prisoners in lockdown. While it is true that the demise of these prisoners' *Bounds* claims could be expressed as a failure of proof on the merits (and I would so express it), it would be equally correct to see these plaintiffs as losing on standing. "A determination even at the end of trial that the court is not prepared to award any remedy that would benefit the plaintiff[s] may be expressed as a conclusion that the plaintiff[s] lack[k] standing." 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3531.6, p. 478 (2d ed. 1984) (Wright & Miller).

Although application of standing doctrine may for our purposes dispose of the challenge to remedial orders insofar as they touch non-English speakers and lockdown prisoners, standing principles cannot do the same job in reviewing challenges to the orders aimed at providing court access for the illiterate prisoners. One class representative has standing, as the Court concedes, and with the right to sue thus established, standing doctrine has no further part to play in considering the illiterate prisoners' claims. More

specifically, the propriety of awarding classwide relief (in this case, affecting the entire prison system) does not require a demonstration that some or all of the unnamed class could themselves satisfy the standing requirements for named plaintiffs.

"[Unnamed plaintiffs] need not make any individual showing of standing [in order to obtain relief], because the standing focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court. Whether or not the named plaintiff who meets individual standing requirements may assert the **\*\*2202** rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends **\*396** rather on meeting the prerequisites of Rule 23 governing class actions." 1 H. Newberg & A. Conte, Newberg on Class Actions § 2.07, pp. 2-40 to 2-41 (3d ed.1992).

See also 7B Wright & Miller § 1785.1, at 141 ("As long as the representative parties have a direct and substantial interest, they have standing; the question whether they may be allowed to present claims on behalf of others ... depends not on standing, but on an assessment of typicality and adequacy of representation"). This analysis is confirmed by our treatment of standing when the case of a named class-action plaintiff protesting a durational residence requirement becomes moot during litigation because the requirement becomes satisfied; even then the question is not whether suit can proceed on the standing of some unnamed members of the class, but whether "the named representative [can continue] to 'fairly and adequately protect the interests of the class.' " *Sosna v. Iowa,* 419 U.S. 393, 403, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975) (quoting Fed. Rule Civ. Proc. 23(a)).

Justice SCALIA says that he is not applying a standing rule when he concludes (as I also do) that systemic relief is inappropriate here. *Ante,* at 2184, n. 7. I accept his assurance. But he also makes it clear, by the same footnote, that he does not rest his conclusion (as I rest mine) solely on the failure to prove that in every Arizona prison, or even in many of them, the State denied court access to illiterate prisoners, a point on which I take it every Member of the Court agrees. Instead, he explains that a failure to prove that more than two illiterate prisoners suffered prejudice to nonfrivolous claims is (at least in part) the reason for reversal. Since he does not intend to be applying his standing rule in so saying, I assume he is applying a class-action rule (requiring a denial of

classwide relief when trial evidence does not show the existence of a class of injured claimants). But that route is just as unnecessary and complicating as the route through standing. (Indeed, the distinction between standing and class-action rules might be practically irrelevant**397** in this case, however important as precedent for other cases.)

While the propriety of the order of systemic relief for illiterate prisoners does not turn on the standing of class members, and certainly need not turn on class-action rules, it clearly does turn on the respondents' failure to prove that denials of access to illiterate prisoners pervaded the State's prison system. Leaving aside the question whether that failure of proof might have been dealt with by reconsidering the class certification, see Fed. Rule Civ. Proc. 23(c)(1); *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); 7B Wright & Miller, *supra,* § 1785, at 128-136, the state of the evidence simply left the District Court without an adequate basis for the exercise of its equitable discretion in issuing an order covering the entire system.

The injunction, for example, imposed detailed rules and requirements upon each of the State's prison libraries, including rules about library hours, supervision of prisoners within the facilities, request forms, educational and training requirements for librarian and their staff members, prisoners' access to the stacks, and inventory. Had the findings shown libraries in shambles throughout the prison system, this degree of intrusion might have been reasonable. But the findings included the specific acknowledgment that "[g]enerally, the facilities appear to have complete libraries." 834 F.Supp. 1553, 1568 (Ariz.1992). The District Court found only that certain of the prison libraries did not allow inmates to browse the shelves, only that some of the volumes in some of the libraries lacked pocket parts, only that certain librarians at some of the libraries lacked law or library science degrees, and only that some prison staff members have no training in legal research. Given that adequately stocked libraries go far in satisfying the *Bounds* requirements, it was an abuse of discretion for the District Court to aggregate discrete, small-bore problems in individual prisons and to treat them as if **\*\*2203** each prevailed throughout the prison system, **\*398** for the purpose of justifying a broad remedial order covering virtually every aspect of each prison library.

Other elements of the injunction were simply unsupported by any factual finding. The District Court, for example, made no factual findings about problems prisoners may have encountered with noise in any library, let alone any findings that noise violations interfered with prisoners' access to the courts. Yet it imposed a requirement across the board that the State correct all "structural or acoustical problems." App. to Pet. for Cert. 68a. It is this overreaching of the evidentiary record, not the application of standing or even class-action rules, that calls for the judgment to be reversed.

Finally, even with regard to the portions of the injunction based upon much stronger evidence of a *Bounds* violation, I would remand simply because the District Court failed to provide the State with an ample opportunity to participate in the process of fashioning a remedy and because it seems not to have considered the implications that *Turner* holds for this case. For example, while the District Court was correct to conclude that prisoners who experience delays in receiving books and receive only a limited number of books at the end of that delay have been denied access to the courts, it is unlikely that a proper application of *Turner* would have justified its decision to order the State to grant lockdown prisoners physical access to the stacks, given the significance of the State's safety interest in maintaining the lockdown system and the existence of an alternative, an improved paging system, acceptable to the respondents. Brief for Respondents 39.

## II

Even if I were to reach the standing question, however, I would not adopt the standard the Court has established. In describing the injury requirement for standing, we have spoken of it as essential to an Article III case or controversy that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as **\*399** capable of judicial resolution." *Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). We ask a plaintiff to prove "actual or threatened injury" to ensure that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

I do not disagree with the Court that in order to meet these standards (in a case that does not involve substantial systemic deprivation of access), a prisoner suing under *Bounds* must assert something more than an abstract desire to have an adequate library or some other access mechanism. Nevertheless, while I believe that a prisoner must generally have some underlying claim or grievance for which he seeks judicial relief, I cannot endorse the standing requirement the Court now imposes.

On the Court's view, a district court may be required to examine the merits of each plaintiff's underlying claim in order to determine whether he has standing to litigate a *Bounds* claim. *Ante,* at 2181, n. 3. The Court would require a determination that the claim is "nonfrivolous," *ante,* at 2181, in the legal sense that it states a claim for relief that is at least arguable in law and in fact. I, in contrast, would go no further than to require that a prisoner have some concrete grievance or gripe about the conditions of his confinement, the validity of his conviction, or perhaps some other problem for which he would seek legal redress, see Part III-B, *infra* (even though a claim based on that grievance might well fail sooner or later in the judicial process).

There are three reasons supporting this as a sufficient standard. First, it is the existence of an underlying grievance, not its ultimate legal merit, that gives a prisoner a concrete interest in the litigation and will thus assure the serious and adversarial treatment of the *Bounds* claim. **\*400** Second, *Bounds* recognized a right of access for those who seek adjudication, not just for sure winners**\*\*2204** or likely winners or possible winners. See *Bounds, 430 U.S., at 824, 825, 828, 97 S.Ct., at 1496, 1496-1497, 1498* (describing the constitutional right of access without limiting the right to prisoners with meritorious claims); see also *ante,* at 2181 (describing the right of access even before *Bounds* as covering "a grievance that the inmate wished to present ..." (citations omitted)). Finally, insistence on a "nonfrivolous claim" rather than a "concrete grievance" as a standing requirement will do no more than guarantee a lot of preliminary litigation over nothing. There is no prison system so blessed as to lack prisoners with nonfrivolous complaints. They will always turn up, or be turned up, and one way or the other the *Bounds* litigation will occur.

That last point may be, as the Court says, the answer to any suggestion that there need be no underlying claim requirement for a *Bounds* claim of complete and systemic denial of all means of court access. But in view of the Courts of Appeals that have seen the issue otherwise,[FN2] I would certainly**\*401** reserve that issue for the day it might actually be addressed by the parties in a case before us.

FN2. See, *e.g., Jenkins v. Lane, 977 F.2d 266, 268-269 (C.A.7 1992)* (waiving the requirement that a prisoner prove prejudice "where the prisoner alleges a direct, substantial and continuous, rather than a 'minor and indirect,' limit on legal materials" on the ground that "a prisoner without any access to materials cannot determine the pleading requirements of his case, including the necessity of pleading prejudice"); cf. *Strickler v. Waters, 989 F.2d 1375, 1385, n. 16 (C.A.4 1993)* (acknowledging the possibility that injury may be presumed in some situations, *e.g.,* total denial of access to a library), cert. denied, *510 U.S. 949, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993); Sowell v. Vose, 941 F.2d 32, 35 (C.A.1 1991)* (acknowledging that a prisoner may not need to prove prejudice when he alleges "[a]n *absolute* deprivation of access to *all* legal materials" (emphases in original)). Dispensing with any underlying claim requirement in such instances would be consistent with the rule of equity dealing with threatened injury. See, *e.g., Farmer v. Brennan, 511 U.S. 825, 845, 114 S.Ct. 1970, 1983, 128 L.Ed.2d 811 (1994)* (holding that a prisoner need not suffer physical injury before obtaining relief because " '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief" ") (quoting *Pennsylvania v. West Virginia, 262 U.S. 553, 593, 43 S.Ct. 658, 663-664, 67 L.Ed. 1117 (1923)); Helling v. McKinney, 509 U.S. 25, 33, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993)* (observing that prisoners may obtain relief "even though it was not alleged that the likely harm would occur immediately and even though the possible [harm] might not affect all of those [at risk]") (discussing *Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978))*). If the State

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

denies prisoners all access to the courts, it is hardly implausible for a prisoner to claim a protected stake in opening some channel of access.

In sum, I would go no further than to hold (in a case not involving substantial, systemic deprivation of access to court) that Article III requirements will normally be satisfied if a prisoner demonstrates that (1) he has a complaint or grievance, meritorious or not,[FN3] about the prison system or the validity of his conviction [FN4] that he would raise if his library research (or advice, or judicial review of a form complaint, or other means of "access" chosen by the State) were to indicate that he had an actionable claim; and (2) the access scheme provided by the prison is so inadequate that he cannot research, consult about, file, or litigate the claim, as the case may be.

FN3. See *Harris v. Young,* 718 F.2d 620, 622 (C.A.4 1983) ("It is unfair to force an inmate to prove that he has a meritorious claim which will require access until after he has had an opportunity to see just what his rights are"); see also *Magee v. Waters,* 810 F.2d 451, 452 (C.A.4 1987) (suggesting that a prisoner must identify the "specific problem he wishe[s] to research"); cf. *Vandelft v. Moses,* 31 F.3d 794, 798 (C.A.9 1994) (dismissing a *Bounds* claim in part because the prisoner "simply failed to show that the restrictions on *library* access had any effect on his access to the *court* relative to his personal restraint petition" (emphases in original)), cert. denied, 516 U.S. 825, 116 S.Ct. 91, 133 L.Ed.2d 47 (1995); *Casteel v. Pieschek,* 3 F.3d 1050, 1056 (C.A.7 1993) (it is enough if the prisoner merely "identif[ies] the constitutional right the defendant allegedly violated and the specific facts constituting the deprivation"); *Chandler v. Baird,* 926 F.2d 1057, 1063 (C.A.11 1991) ("[T]here was no allegation in the complaint or in plaintiff's deposition that he was contemplating a challenge at that time [of the deprivation] to the conditions of his confinement"); *Martin v. Tyson,* 845 F.2d 1451, 1456(CA7) (dismissing a claim in part because the prisoner "does not point to any claim that he was unable to pursue"), cert. denied, 488 U.S. 863, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988).

FN4. I do not foreclose the possibility of certain other complaints, see text accompanying n. 2, *supra,* and Part III-B, *infra.*

**\*402** While a more stringent standing requirement would, of course, serve to curb **\*\*2205** courts from interference with prison administration, that legitimate object is adequately served by two rules of existing law. *Bounds* itself makes it clear that the means of providing access is subject to the State's own choice. If, for example, a State wishes to avoid judicial review of its library standards and the adequacy of library services, it can choose a means of access involving use of the complaint-form procedure mentioned by the Court today. *Ante,* at 2180.And any judicial remedy, whatever the chosen means of court access, must be consistent with the rule in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), that prison restrictions are valid if reasonably related to valid penological interests. *Turner 's* level of scrutiny surely serves to limit undue intrusions and thus obviates the need for further protection. In the absence of evidence that the *Turner* framework does not adequately channel the discretion of federal courts, there would be no reason to toughen standing doctrine to provide an additional, and perhaps unnecessary, protection against this danger.

But instead of relying on these reasonable and existing safeguards against interference, the Court's resolution of this case forces a district court to engage in extensive and, I believe, needless enquiries into the underlying merit of prisoners' claims during the initial and final stages of a trial, and renders properly certified classes vulnerable to constant challenges throughout the course of litigation. The risk is that district courts will simply conclude that prisoner class actions are unmanageable. What, at the least, the Court overlooks is that a class action lending itself to a systemwide order of relief consistent with *Turner* avoids the multiplicity of separate suits and remedial orders that undermine the efficiency of a United States district court just as surely as it can exhaust the legal resources of a much-sued state prison system.

**\*403** III

A

There are, finally, two additional points on

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

which I disagree with the Court. First, I cannot concur in the suggestion that *Bounds* should be overruled to the extent that it requires States choosing to provide law libraries for court access to make them available for a prisoner's use in the period between filing a complaint and its final disposition. *Ante,* at 2181-2182. *Bounds* stated the obvious reasons for making libraries available for these purposes, 430 U.S., at 825-826, 97 S.Ct., at 1496-1497, and developments since *Bounds* have confirmed its reasoning. With respect to habeas claims, for example, the need for some form of legal assistance is even more obvious now than it was then, because the restrictions developed since *Bounds* have created a "substantial risk" that prisoners proceeding without legal assistance will never be able to obtain review of the merits of their claims. See *McFarland v. Scott,* 512 U.S. 849, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994) (discussing these developments). Nor should discouragement from the number of frivolous prison suits lead us to doubt the practical justifiability of providing assistance to a *pro se* prisoner during trial. In the past few years alone, we have considered the petitions of several prisoners who represented themselves at trial and on appeal, and who ultimately prevailed. See, *e.g., Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

B

Second, I see no reason at this point to accept the Court's view that the *Bounds* right of access is necessarily restricted to attacks on sentences or challenges to conditions of confinement. See *ante,* at 2181-2182. It is not clear to me that a State may force a prisoner to abandon all opportunities to vindicate rights outside these two categories no matter how significant. We have already held that prisoners do not entirely**404** forfeit certain fundamental rights, including the right to marry, *Turner v. Safley, supra,* at 95, 107 S.Ct., at 2265; the right to free speech, **2206***Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 1878-1879, 104 L.Ed.2d 459 (1989); and the right to free exercise of religion, see *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). One can imagine others that would arguably entitle a prisoner to some limited right of access to court. See, *e.g., Lassiter v. Department of Social Servs. of Durham Cty.,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)

(parental rights); *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (divorce); cf. *Wong Yang Sung v. McGrath,* 339 U.S. 33, 49-50, 70 S.Ct. 445, 453-454, 94 L.Ed. 616 (1950) (deportation). This case does not require us to consider whether, as a matter of constitutional principle, a prisoner's opportunities to vindicate rights in these spheres may be foreclosed, and I would not address such issues here.

IV

I therefore concur in Parts I and III of the Court's opinion, dissent from Part II, and concur in the judgment.

Justice STEVENS, dissenting.

The Fourteenth Amendment prohibits the States from depriving any person of life, liberty, or property without due process of law. While at least one 19th-century court characterized the prison inmate as a mere "slave of the State," *Ruffin v. Commonwealth,* 62 Va. 790, 796 (1871), in recent decades this Court has repeatedly held that the convicted felon's loss of liberty is not total. See *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987); *e.g., Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). "Prison walls do not ... separat[e] ... inmates from the protections of the Constitution,"*Turner,* 482 U.S., at 84, 107 S.Ct., at 2259, and even convicted criminals retain some of the liberties enjoyed by all who live outside those walls in communities to which most prisoners will someday return.

Within the residuum of liberty retained by prisoners are freedoms identified in the First Amendment to the Constitution: **\*405** freedom to worship according to the dictates of their own conscience, *e.g., O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); *Cruz,* 405 U.S., at 321, 92 S.Ct., at 1081, freedom to communicate with the outside world, *e.g., Thornburgh v. Abbott,* 490 U.S. 401, 411-412, 109 S.Ct. 1874, 1880-1881, 104 L.Ed.2d 459 (1989), and the freedom to petition their government for a redress of grievances, *e.g., Johnson v. Avery,* 393 U.S. 483, 485, 89 S.Ct. 747, 748-749, 21 L.Ed.2d 718 (1969). While the exercise of these freedoms may of course be regulated and constrained by their custodians, they may not be obliterated either actively or passively. Indeed, our cases make it clear that the States must take certain affirmative steps to protect some of the

116 S.Ct. 2174                                             Page 33
518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal
D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

essential aspects of liberty that might not otherwise survive in the controlled prison environment.

The "well-established" right of access to the courts, *ante,* at 2179, is one of these aspects of liberty that States must affirmatively protect. Where States provide for appellate review of criminal convictions, for example, they have an affirmative duty to make transcripts available to indigent prisoners free of charge. *Griffin v. Illinois,* 351 U.S. 12, 19-20, 76 S.Ct. 585, 590-591, 100 L.Ed. 891 (1956) (requiring States to waive transcript fees for indigent inmates); see also *Burns v. Ohio,* 360 U.S. 252, 257-258, 79 S.Ct. 1164, 1168-1169, 3 L.Ed.2d 1209 (1959) (requiring States to waive filing fees for indigent prisoners). It also protects an inmate's right to file complaints, whether meritorious or not, see *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941) (affirming right to file habeas petitions even if prison officials deem them meritless, in case in which petition at issue was meritless), and an inmate's right to have access to fellow inmates who are able to assist an inmate in preparing, "with reasonable adequacy," such complaints. *Johnson,* 393 U.S., at 489, 89 S.Ct., at 750-751; *Wolff v. McDonnell,* 418 U.S. 539, 580, 94 S.Ct. 2963, 2986-2987, 41 L.Ed.2d 935 (1974).[FN1] And for almost two **2207 decades, it has explicitly *406 included the right of prisoners to have access to "adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). As the Court points out, States are free to "experiment" with the types of legal assistance that they provide to inmates, *ante,* at 2180- as long as the experiment provides adequate access.

FN1. See also *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972) ( "The right of access to the courts is indeed but one aspect of the right of petition. See *Johnson v. Avery,* 393 U.S. 483, 485 [89 S.Ct. 747, 748-749, 21 L.Ed.2d 718];*Ex parte Hull,* 312 U.S. 546, 549 [61 S.Ct. 640, 641-642, 85 L.Ed. 1034]"); *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 2169, 76 L.Ed.2d 277 (1983) ("[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"); *id.,* at 743, 103 S.Ct., at 2170.

The right to claim a violation of a constitutional provision in a manner that will be recognized by the courts is also embedded in those rights recognized by the Constitution's text and our interpretations of it. Without the ability to access the courts and draw their attention to constitutionally improper behavior, all of us-prisoners and free citizens alike-would be deprived of the first-and often the only-"line of defense" against constitutional violations. *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977); see *Wolff v. McDonnell,* 418 U.S., at 579, 94 S.Ct., at 2986 (recognition of constitutional rights "would be diluted if inmates, often 'totally or functionally illiterate,' were unable to articulate their complaints to the courts"); cf. *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (allowing plaintiff alleging violation of Fourth Amendment rights access to the courts through a cause of action directly under the Constitution).

The constitutional violations alleged in this case are similar to those that the District Court previously found in one of Arizona's nine prisons. See *Gluth v. Kangas,* 773 F.Supp. 1309 (Ariz.1988), aff'd, 951 F.2d 1504 (C.A.9 1991). The complaint in this case was filed in 1990 by 22 prisoners on behalf of a class including all inmates in the Arizona prison system. The prisoners alleged that the State's institutions provided inadequate access to legal materials or other assistance, App. 31-33, and that as a result, "[p]risoners are harmed by the denial of meaningful access to the courts." *Id.,* at 32. The District Court agreed, concluding that the State had failed, throughout its prison system, to provide adequate access to legal materials, particularly for those in administrative segregation, *407 or "lockdown," and that the State had failed to provide adequate legal assistance to illiterate and non-English speaking inmates. After giving all the parties an opportunity to participate in the process of drafting the remedy, the court entered a detailed (and I agree excessively so, see *infra,* at 2208) order to correct the State's violations.

As I understand the record, the State has not argued that the right of effective access to the courts, as articulated in *Bounds,* should be limited in any way. It has not challenged the standing of the named plaintiffs to represent the class, nor has it questioned the propriety of the District Court's order allowing the case to proceed as a class action. I am also unaware of any objection having been made in the District Court to the plaintiffs' constitutional standing in this case, and the State appears to have conceded

standing with respect to most claims in the Court of Appeals.[FN2] Yet the majority chooses to address these issues unnecessarily and, in some instances, incorrectly.

> FN2. See Opening Brief for Appellant in No. 93-17169(CA9), pp. 29-30; Reply Brief for Defendant/Appellants in No. 93-17169(CA9), p. 14, n. 20. The State directly questioned constitutional standing only with respect to two narrow classes of claims: the standard for indigency (a claim on which the State was successful below) and, in its reply brief, photocopying.

For example, although injury in fact certainly is a jurisdictional issue into which we inquire absent objection from the parties, even the majority finds on the record that at least two of the plaintiffs had standing in this case, *ante*, at 2182,[FN3]**408 which should be sufficient**2208 to satisfy any constitutional concerns.[FN4] Yet the Court spends 10 pages disagreeing.

> FN3. In all likelihood, the District Court's failure to articulate additional specific examples of missing claims was due more to the fact that the State did not challenge the constitutional standing of the prisoners in the District Court than to a lack of actual evidence relating to such lost claims. Now that the District Court and prisoners are on notice that standing is a matter of specific concern, it is free on remand to investigate the record or other evidence that the parties could make available regarding other claims that have been lost because of inadequate facilities.

> FN4. If named class plaintiffs have standing, the standing of the class members is satisfied by the requirements for class certification. 1 H. Newberg & A. Conte, Newberg on Class Actions § 2.01, p. 2-3 (3d ed.1992); *ante*, at 2201-2202 (SOUTER, J., concurring in part, dissenting in part, and concurring in judgment). Because the State did not challenge that certification, it is rather late in the game to now give it the advantage of a conclusion that the class was improper (even if it is-although illiterate inmates, it seems to me, are not positioned much differently with respect to English

language legal materials than are non-English speaking prisoners).

Even if we had reason to delve into standing requirements in this case, the Court's view of those requirements is excessively strict. I think it perfectly clear that the prisoners had standing, even absent the specific examples of failed complaints. There is a constitutional right to effective access, and if a prisoner alleges that he personally has been denied that right, he has standing to sue.[FN5] One of our first cases to address directly the right of access to the courts illustrates this principle particularly well. In *Ex parte Hull,* we reviewed the constitutionality of a state prison's rule that impeded an inmate's access to the courts. The rule authorized corrections officers to intercept mail addressed to a court and refer it to the legal investigator for the parole board to determine whether there was sufficient merit in the claim to justify its submission to a court. Meritless claims were simply not delivered. Petitioner Hull succeeded in smuggling papers to his father, who in turn delivered them to this Court. Although we held that the smuggled petition had insufficient merit even to require an answer from the *409 State, 312 U.S., at 551, 61 S.Ct., at 642-643, we nevertheless held that the regulation was invalid for the simple and sufficient reason that "the state and its officers may not abridge or impair petitioner's right to apply to a federal court for writ of habeas corpus." *Id., at 549, 61 S.Ct., at 642.

> FN5. Although a prisoner would lose on the merits if he alleged that the deprivation of that right occurred because the State, for example, did not provide him with access to on-line computer databases, he would also certainly have "standing" to make his claim. The Court's argument to the contrary with respect to most of the prisoners in this case, it seems to me, is not as much an explication of the principles of standing, but the creation of a new rule requiring prisoners making *Bounds* claims to demonstrate prejudice flowing from the lack of access.

At first glance, the novel approach adopted by the Court today suggests that only those prisoners who have been refused the opportunity to file claims later found to have arguable merit should be able to challenge a rule as clearly unconstitutional as the one addressed in *Hull.*Perhaps the standard is somewhat lower than it appears in the first instance; using *Hull*

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal
D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

as an example, the Court suggests that even facially meritless petitions can provide a sufficient basis for standing. See *ante,* at 2180, n. 2. Nonetheless, because prisoners are uniquely subject to the control of the State, and because unconstitutional restrictions on the right of access to the courts-whether through nearly absolute bars like that in *Hull* or through inadequate legal resources-frustrate the ability of prisoners to identify, articulate, and present to courts injuries flowing from that control, I believe that any prisoner who claims to be impeded by such barriers has alleged constitutionally sufficient injury in fact.

My disagreement with the Court is not complete: I am persuaded-as respondents' counsel essentially has conceded-that the relief ordered by the District Court was broader than necessary to redress the constitutional violations identified in the District Court's findings. I therefore agree that the case should be remanded. I cannot agree, however, with the Court's decision to use the case as an opportunity to meander through the laws of standing and access to the courts, expanding standing requirements here and limiting rights there,[FN6] when the most obvious **2209 concern in *410 the case is with the simple disjunct between the limited scope of the injuries articulated in the District Court's findings and the remedy it ordered as a result. Because most or all of petitioners' concerns regarding the order could be addressed with a simple remand, I see no need to resolve the other constitutional issues that the Court reaches out to address.

> FN6. In addition to the Court's discussion of "standing," the opinion unnecessarily enters into discussion about at least two other aspects of the scope of the *Bounds* right. First, the Court concludes that the *Bounds* right does not extend to any claims beyond attacks on sentences and conditions of confinement. *Ante,* at 2182. But given its subsequent finding that only two plaintiffs have met its newly conjured rule of standing, see *ibid.,* its conclusion regarding the scope of the right is purely dicta. Second, the Court argues that the *Bounds* right does not extend to the right to "discover" grievances, or to "litigate effectively" once in court. *Ante,* at 2181 (emphasis deleted). This statement is also largely unnecessary given the Court's emphasis in Part III on the need for the District Court both to tailor its remedy to the

constitutional violations it has discovered and the requirement that it remain respectful of the difficult job faced by state prison administrators.

Moreover, I note that the State has not asked for these limitations on *Bounds.* While I doubt that Arizona will object to its unexpected windfall, its briefs in the District Court, Court of Appeals, and this Court have argued that the District Court order simply went further than was necessary given the injuries identified in its own opinion. See Brief for Petitioners 13-16. By agreeing with that proposition but nonetheless going on to extend unrequested relief, the Court oversteps the scope of the debate presented in this case. Whenever we take such a step, we venture unnecessarily onto dangerous ground.

The Court is well aware that much of its discussion preceding Part III is unnecessary to the decision. Reflecting on its view that the District Court railroaded the State into accepting its order lock, stock, and barrel, the Court concludes on the last page of its decision that "[t]he State was entitled to far more than an opportunity for rebuttal, and on that ground alone this order would have to be set aside." *Ante,* at 2186. To the extent that the majority suggests that the order in this case is flawed because of a breakdown in the process of court-supervised negotiation that should generally precede systemic relief, I agree with it. I also agree that the failure in that process "*alone* " would justify a remand *411 in this case. I emphatically disagree, however, with the Court's characterization of who is most to blame for the objectionable character of the final order. Much of the blame for its breadth, I propose, can be placed squarely in the lap of the State.

A fair evaluation of the procedures followed in this case must begin with a reference to *Gluth,* the earlier case in which the same District Judge found petitioners guilty of a systemic constitutional violation in one facility. In that case the District Court expressly found that the state officials had demonstrated "a callous unwillingness to face the issues" and had pursued "diversion[ary] tactics" that "forced [the court] to take extraordinary measures." 773 F.Supp., at 1312, 1314. Despite the Court's request that they propose an appropriate remedy, the officials refused to do so. It is apparent that these defense tactics played an important role in the court's decision to appoint a Special Master to assist in the fashioning of the remedy that was ordered in *Gluth.* Only after that order had been affirmed by the Court

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

of Appeals did respondents commence this action seeking to obtain similar relief for the entire inmate population.

After a trial that lasted for 11 days over the course of two months, the District Court found that several of petitioners' policies denied illiterate and non-English-speaking prisoners meaningful access to the courts. Given the precedent established in *Gluth,* the express approval of that plan by the Court of Appeals, and the District Court's evaluation of the State's conclusions regarding the likelihood of voluntary remedial schemes, particularly in view of the State's unwillingness to play a constructive role in the remedy stage of that case, the District Court not unreasonably entered an order appointing the same Special Master and directing him to propose a similar remedy in this case. Although the District Court instructed the parties to submit specific objections to the remedial template derived from *Gluth,* see App. to Pet. for Cert. 89a, nothing in the court's order prevented the **\*412** State from submitting its own proposals without waiving its right to challenge the findings on the liability issues or its right to object to any remedial proposals by either the Master or the respondents. The District Court also told the parties that it would consider settlement offers, and instructed the Master to provide "such guidance and counsel as either of the parties may **\*\*2210** request to effect such a settlement." *Id.,* at 95a.

In response to these invitations to participate in the remedial process, the State filed only four half-hearted sets of written objections over the course of the six months during which the Special Master was evaluating the court's proposed order. See App. 218-221, 225-228, 231-238, and 239-240. Although the Master rejected about half of these narrow objections, he accepted about an equal number, noting that the State's limited formal participation had been "important" and "very helpful." Proposed Order (Permanent Injunction) in No. CIV 90-0054 (D.Ariz.), p. iii. After the Master released his proposed order, the State offered another round of objections. See App. 243-250. Although the District Court informed the Master that the objections could be considered, they did not have to be; the court reasonably noted that the State had been aware for six months about the potential scope of the order, and that it could have mounted the same objections prior to the deadline that the court had set at the beginning of the process. *Id.,* at 251-253.

One might have imagined that the State, faced with the potential of this "inordinately-indeed, wildly-intrusive" remedial scheme, *ante,* at 2185, would have taken more care to protect its interests before the District Court and the Special Master, particularly given the express willingness of both to consider the State's objections. Having failed to zealously represent its interests in the District Court, the State's present complaints seem rather belated; the Court has generally been less than solicitous to claims that have **\*413** not been adequately pressed below. Cf., *e.g., McCleskey v. Zant,* 499 U.S. 467, 488-489, 111 S.Ct. 1454, 1467-1468, 113 L.Ed.2d 517 (1991); compare *ante,* at 2186, n. 8 (State made boilerplate reservation of rights in each set of objections), with *Gray v. Netherland,* 518 U.S. 152, 163, 116 S.Ct. 2074, 2081, 135 L.Ed.2d 457 (1996) ("[I]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court").

The State's lack of interest in representing its interests is clear not only from the sparse objections in the District Court, but from proceedings both here and in the Court of Appeals. In argument before both courts, counsel for the prisoners have conceded that certain aspects of the consent decree exceeded the necessary relief. See, *e.g.,* 43 F.3d 1261, 1271 (C.A.9 1994) (prisoners agree that typewriters are not required); Tr. of Oral Arg. 31 (provisions regarding noise in library are unnecessary). This flexibility further suggests that the State could have sought relief from aspects of the plan through negotiation. Indeed, at oral argument in the Ninth Circuit, the parties for both sides suggested that they were willing to settle the case, and the court deferred submission of the case for 30 days to enable a settlement. "However, before the settlement process had even begun, [the State] declined to mediate." 43 F.3d, at 1265, n. 1. Notably, this is the only comment made by the appellate court regarding the process that led to the fashioning of the remedy in this case.

A fair reading of the record, therefore, reveals that the State had more than six months within which it could have initiated settlement discussions, presented more ambitious objections to the proposed decree reflecting the concerns it has raised before this Court, or offered up its own plan for the review of the plaintiffs and the Special Master. It took none of these steps. Instead, it settled for piecemeal and belated challenges to the scope of the proposed plan.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362
**(Cite as: 518 U.S. 343, 116 S.Ct. 2174)**

The Court implies that the District Court's decision to use the decree entered in *Gluth* as the starting point for fashioning**414** the relief to be ordered was unfair to petitioners and should not be repeated in comparable circumstances. The browbeaten State, the Court suggests, was "entitled to far more than an opportunity for rebuttal." *Ante,* at 2186. I strongly disagree with this characterization of the process. Whether this Court now approves or disapproves of the contents of the *Gluth* decree, the Court of Appeals had affirmed it in its entirety when this case was tried, and it was surely appropriate for the District Court to use it as a starting-point for its remedial task in this **2211** case. Petitioners were represented by competent counsel who could have advanced their own proposals for relief if they had thought it expedient to do so. By going further than necessary to correct the excesses of the order, the Court's decision rewards the State for the uncooperative posture it has assumed throughout the long period of litigating both *Gluth* and this case. See *ante,* at 2181-2182; *Gluth, 773 F.Supp., at 1312-1316.* Although the State's approach has proven sound as a matter of tactics, allowing it to prevail in a forum that is not as inhibited by precedent as are other federal courts, the Court's decision undermines the authority and equitable powers of not only this District Court, but District Courts throughout the Nation. It is quite wrong, in my judgment, for this Court to suggest that the District Court denied the State a fair opportunity to be heard, and entirely unnecessary for it to dispose of the smorgasbord of constitutional issues that it consumes in Part II.

Accordingly, while I agree that a remand is appropriate, I cannot join the Court's opinion.

U.S.Ariz.,1996.
Lewis v. Casey
518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606, 64 USLW 4587, 96 Cal. Daily Op. Serv. 4559, 96 Daily Journal D.A.R. 7362

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.